JS 44 (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
DAVID M. McCORD

**DEFENDANTS**
UNITED STATES, et. al.

(b) County of Residence of First Listed Plaintiff: Calhoun
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant: Kent
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) Attorneys *(Firm Name, Address, and Telephone Number)*
Joseph M. Xuereb (P40124) / John R. Badeen (P71014) / Thomas W. DeLano (P87592)
39209 Six Mile Rd., Suite 165, Livonia, MI 48152
(734) 455-2000

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☒ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☒ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
5 U.S.C. 702

Brief description of cause:
Unlawful agency action.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*: JUDGE ______ DOCKET NUMBER ______

DATE: 11/13/2026
SIGNATURE OF ATTORNEY OF RECORD: [signature] (P87592)

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DAVID M. McCORD,

Plaintiffs,

v

UNITED STATES, KELLY LOEFFLER, as Administrator of the United States Small Business Administration, SCOTT BESSENT, as Secretary of the Treasury of the United States, and KELLOGG COMMUNITY CREDIT UNION,

Defendants.

Case No:
Hon:
Mag:

**COMPLAINT**

---

Thomas W. DeLano (P87592)
Joseph M. Xuereb (P40124)
John R. Badeen (P71014)
**XUEREB LAW GROUP PC**
Attorneys for Plaintiffs
39209 Six Mile Rd., Ste 165
Livonia, MI 48152
734-455-2000
tdelano@xuereblawgroup.com

---

**COMPLAINT**

There are no other prior civil actions arising out of the transaction or occurrence alleged in this complaint.

Thomas W. DeLano (P87592)
Attorney for Plaintiff

Plaintiff, DAVID M. McCORD, through his attorneys, XUEREB LAW GROUP PC, by Thomas W. DeLano, for his complaint, alleges that Kellogg Community Credit Union wrongfully claimed a deficiency for an account or accounts guaranteed by the Small Business Administration, causing the Small Business Administration to wrongfully garnish plaintiff's wages:

## JURISDICTION AND VENUE

1. The events giving rise to this action took place in Calhoun and Kalamazoo Counties, Michigan.

2. This Court has jurisdiction over plaintiff's claim against the United States under 5 U.S.C. § 702 pursuant to 28 U.S.C. §§ 1331.

3. This Court has jurisdiction over plaintiff's claim against Kalamazoo Community Credit Union under Michigan law and 28 U.S.C. § 1367(a).

4. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1).

5. Therefore, jurisdiction and venue are properly exercised in this Court.

## PARTIES

6. Plaintiff DAVID M. McCORD is an individual residing in Calhoun County, Michigan.

7. Defendant UNITED STATES is a sovereign nation dedicated to the protection of life, liberty, and property as provided for in the U.S. Constitution.

8. Defendant KELLY LOEFFLER is the Administrator of the U.S. Small Business Administration ("SBA") and is sued in her official capacity as Administrator of the SBA. 15 U.S.C. § 634(b).

9. The SBA is an independent federal agency created and authorized pursuant to 15 U.S.C. § 633, *et seq*.

10. Defendant SCOTT BESSENT is the Secretary of the U.S. Treasury and is sued in his official capacity as Secretary of the Treasury, a cabinet-level department.

11. Defendant KELLOGG COMMUNITY CREDIT UNION ("KCCU") is a not-for-profit credit union organized in Michigan and insured by the National Credit Union Administration with its principal place of business located in Battle Creek, Michigan.

12. All events described in this complaint occurred in Calhoun and Kalamazoo Counties in the State of Michigan.

## FACTUAL ALLEGATIONS

### I. KCCU Security Agreements and SBA Guarantees

13. Plaintiff David McCord was the owner and manager of Sunrise Haven Assisted Living, in Kalamazoo, Michigan.

14. Sunrise Haven was an assisted living facility for seniors focused on providing personalized care in a home-like setting at a smaller scale than other large facilities and institutions.

15. Plaintiff owned and operated Sunrise Haven through his companies MM Ventures, LLC, and McCord ALF, LLC, of which he was the sole member.

16. Sunrise Haven was located at 7483 West Q Avenue, Kalamazoo, Michigan 49009 ("7483 West Q").

17. In relevant part, on November 2, 2018, MM Ventures and McCord ALF obtained financing for Sunrise Haven from Defendant KCCU through a Commercial Loan Agreement—loan number ending in 761—in the amount of $438,500.00 (Exhibit 1, Comm Loan Agmt).

18. This Commercial Loan Agreement was executed to refinance plaintiff's business loans with KCCU "under SBA 7A" (Exhibit 1, Comm Loan Agmt, 2).

19. On the same day, MM Ventures and McCord ALF also executed separate Security Agreements with KCCU that granted KCCU an interest in any and all present and future tangible and intangible personal property owned by MM Ventures and McCord ALF, respectively, to secure performance of the Commercial Loan Agreement ending in 761 in the amount of $438,500.00 (Exhibit 2, Security Agmts).

20. On the same day, MM Ventures executed a Future Advance Mortgage with KCCU that granted KCCU a mortgage in 7483 West Q "to secure the Secured Debts and Mortgagor's

performance under this Security Instrument" that was recorded on November 6, 2018 with Instrument Number 2018-035033 (Exhibit 3, MM Ventures F Adv Mort).

21. This Future Advance Mortgage defines "Secured Debts," in relevant part, as including the Commercial Loan Agreement ending in 761 in the amount of $438,500.00 (Exhibit 3, MM Ventures F Adv Mort, 2).

22. Simultaneously, and consistent with the Commercial Loan Agreement's terms, MM Ventures and McCord ALF executed a US Small Business Administration Note with Loan Number 31038170-08 (Exhibit 4, SBA Note).

23. The SBA Note identifies MM Ventures and McCord ALF as the borrowers, KCCU as the Lender, and the Loan Amount as $438,500.00 (Exhibit 4, SBA Note).

24. The Loan evidenced by the SBA Note is the KCCU Commercial Loan Agreement ending in 761 (Exhibit 1, Comm Loan Agmt).

25. Simultaneously, plaintiff executed an unconditional personal guarantee to pay in full all amounts owing under the SBA Note (Exhibit 5, SBA Guarantee).

26. The SBA Guarantee identifies MM Ventures and McCord ALF as the borrowers, KCCU as the Lender, the Loan Amount as $438,500.00, and plaintiff McCord as the Guarantor (Exhibit 5, SBA Guarantee).

27. Plaintiff defaulted on the Commercial Business Loan ending in 761 on November 30, 2019.

28. At the time of plaintiff's default, the outstanding balance for the Loan ending in 761 was $421,964.69.

29. Ultimately, on January 4, 2021, following settlement negotiations with KCCU, plaintiff agreed to execute a Quit Claim Deed in Lieu of Foreclosure, recorded with Instrument

Number 2021-001226 on January 11, 2021, that conveyed 7483 West Q to KCCU in full satisfaction of mortgages that, in relevant part, included the Secured Debts identified by the MM Ventures Future Advanced Mortgage with Instrument Number 035033 (Exhibit 6, Deed in Lieu of Foreclosure).

30. Specifically, the Deed in Lieu of Foreclosure provides in relevant part:

> This Quit claim deed is a deed in lieu of foreclosure on a mortgage dated May 17, 2017, recorded with instrument number 2017-01823 [sic] in the Kalamazoo County Register of Deeds, a mortgage dated September 15, 2017, recorded with instrument number 2017-031400 in the Kalamazoo County Register of Deeds, and a mortgage dated November 2, 2018, recorded with instrument number 2018-035033 in the Kalamazoo County Register of Deeds, between the parties on the described property. This quit claim deed extinguishes all rights of Grantor in the mortgages between the parties, including any rights of redemption, and extinguishes all other rights, title, and interests of Grantor in the premises. [(Exhibit 6, Deed in Lieu of Foreclosure).]

31. In other words, rather than allowing 7483 West Q to proceed through foreclosure and risking a deficiency judgment, plaintiff chose to convey the real property to KCCU in exchange for waiver of any potential deficiency judgment.

32. Execution of the Deed in Lieu of Foreclosure made KCCU whole with regard to all of plaintiff's loan obligations to KCCU because the Deed in Lieu of Foreclosure (Exhibit 6) was executed, in relevant part, in satisfaction of the mortgage with instrument number 2018-035033 (Exhibit 3), which was executed to secure performance of the Loan ending in 761 (Exhibit 1).

33. After executing the Deed in Lieu of Foreclosure, due to the statements and conduct of KCCU employees or agents, plaintiff understood his obligations to KCCU to be complete and his commercial loan file closed out.

34. KCCU did not close out the loan, but plaintiff was not informed at the time that KCCU did not consider the accounts satisfied.

35. On June 30, 2021, KCCU conveyed 7483 West Q to two individuals for consideration in the amount of $445,000.00, which was recorded on July 20, 2021 (Exhibit 7, 2021 Covenant Deed).

36. On July 11, 2021, an Affidavit of Error was executed for the purpose of correcting the legal description of 7483 West Q on the Deed in Lieu of Foreclosure, which was recorded on July 20, 2021 (Exhibit 8, Affidavit of Error).

37. To the extent that KCCU was not made whole by plaintiff's execution of the Deed in Lieu of Foreclosure, KCCU's conveyance of 7483 West Q for $445,000.00, made KCCU whole with regard to all of plaintiff's loan obligations to KCCU because the June 30, 2021 sale price was well in excess of the allege any amount owed by plaintiff to KCCU at the time.

38. On July 1, 2021, the day after KCCU conveyed 7483 West Q for $445,000.00, KCCU applied a credit of $383,009.85 to the Loan ending in 761, leaving a purported deficiency of $38,954.84 (Exhibit 9, Lender's Transcript of Account).

39. The credit amount of $383,009.85 is not supported by any documentation.

40. The credit amount of $383,009.85 is not derived from any particular related transaction.

41. The credit amount of $383,009.85 was an arbitrary determination regarding how much KCCU wanted to credit plaintiff's account.

42. KCCU intentionally left a deficiency on plaintiff's account even though it had been made whole by the Deed in Lieu of Foreclosure or, alternatively, by KCCU's June 30, 2021 sale of 7483 West Q, so that it could further profit by claiming a deficiency to the SBA.

## II. Administrative Wage Garnishment Proceedings

43. On September 4, 2023, the U.S. Department of Treasury sent plaintiff a Notice of Intent to Initiate Administrative Wage Garnishment ("AWG") Proceedings that reflected a

purported delinquent debt due in the amount of $64,539.79 regarding an Agency Account Number ending in 7008 (Exhibit 10, Notice of Intent re AWG).

44. The Treasury Notice concerned the SBA Note (Exhibit 4) and the corresponding Commercial Loan Agreement (Exhibit 1).

45. On September 4, 2023, plaintiff submitted a hearing request objecting to the garnishment on the bases that plaintiff did not owe the full amount of the debt and that garnishment would cause financial hardship.

46. Plaintiff issued several letters to the SBA disputing the existence and value of the loan deficiency (Exhibit 11, Letters to SBA).

47. Plaintiff also requested from KCCU a copy of his loan file and other documents evidencing that a deficiency remained on the Loan ending in 761.

48. KCCU did not provide plaintiff with those documents.

49. On April 16, 2026, plaintiff's wife, Tamara McCord, received a notification that an alleged debt in the amount of $74,566.62 associated with account number 3103817008 was referred to the Treasury Department for collections (Exhibit 12, Treasury Letter to Tamara).

50. The account number identified by this notice is the same as the Loan Number on the SBA Note (Exhibit 4, SBA Note).

51. Tamara was not a signatory to the SBA Note or the underlying guaranteed Loan ending in 761 (Exhibit 1, Comm Loan Agmt).

52. Tamara was and is not liable for the SBA Note or the Loan ending in 761.

53. On June 4, 2026, the SBA sent plaintiff an Acknowledgement of Hearing Request that also enclosed documents purporting to establish the alleged amount due (Exhibit 13, Ack of Hrg Req).

54. Crucially, among the documents that the SBA sent to plaintiff to establish the validity of the debt was an October 25, 2024 Assignment of interests to the SBA executed by Comerica Bank concerning a loan made to borrower Carlos H. Montenegro MD, Inc, and a judgment obtained on the underlying loan in the amount of $64,317.68 (Exhibit 13, Ack of Hrg Req, 4).

55. The SBA also included with those documents a ledger titled, "Payment Data," that appears to reflect that a transaction occurred on April 28, 2023, titled "Purchased guaranty" in an amount of $47,755.50 (Exhibit 13, Ack of Hrg Req, 4).

56. This document attached with Exhibit 13 was the only document provided to plaintiff regarding the existence of the alleged debt until the final decision was issued.

57. KCCU induced the SBA's payment to KCCU pursuant to the SBA Guarantee even though it was made whole by the Deed in Lieu of Foreclosure.

58. Alternatively, KCCU induced the SBA's payment to KCCU pursuant to the SBA Guarantee even though it was made whole by KCCU's conveyance of 7483 West Q for an amount well in excess of the amount allegedly remaining on the Loan ending in 761.

59. The Payment Data document does not establish how the SBA arrived at the value of $47,755.50 (Exhibit 13, Ack of Hrg Req, 4).

60. The value reflected in the Payment Data spreadsheet (Exhibit 13, Ack of Hrg Req, 4) also does not match the delinquent amount identified by KCCU in the transcript of account (Exhibit 9, Lender's Transcript of Account).

61. Plaintiff submitted letters objecting to the garnishment explaining that the property associated with the loans was sold for an amount in excess of the remaining balance and that plaintiff's debt obligations to KCCU were satisfied.

62. On August 3, 2026, the SBA issued a Garnishment Hearing Decision (Exhibit 14, AWG Hrg Decision).

63. The hearing official stated that it reviewed the documents in the file, including the unrelated October 25, 2024 Assignment and a June 10, 2026 Transcript of Account (Exhibit 14, AWG Hrg Decision, 2-3, 6 [Transcript of Account]).

64. Without specifically identifying any particular document, the hearing official determined "that, based on the totality of the evidence in the hearing record, SBA has carried its burden to prove the existence and past due status of the debt and the valid amount of debt" (Exhibit 14, AWG Hrg Decision, 3).

65. Accordingly, the hearing official concluded, "SBA has met its burden of proving the existence and amount of a debt that you owe to the SBA in the amount of $69,170.17" (Exhibit 14, AWG Hrg Decision, 4).

66. The hearing official concluded that wage garnishment was warranted and that the action for garnishment may proceed (Exhibit 14, AWG Hrg Decision, 4).

**III. Garnishment and KCCU Withholding of Account**

67. On or about September 16, 2026, plaintiff personally walked into a KCCU branch and requested copies of his loan files and evidence regarding the alleged deficiency.

68. KCCU refused to provide plaintiff with any of the requested documents.

69. On September 17, 2026, plaintiff's counsel communicated by phone and email with Tara Steele, Assistant Vice President of Business Development for KCCU.

70. On September 17, 2026, plaintiff's counsel sent an email to Tara Steele requesting "copies of Dave's entire file regarding his business loans" (Exhibit 15, KCCU Email re Proof of SBA Pmt, 3-4).

71. On September 17, 2026, Tara Steele shared with plaintiff's counsel a document showing that the SBA made a $36,537.03 payment to KCCU on April 29, 2023 (Exhibit 15, KCCU Email re Proof of SBA Pmt, 1-2, 5).

72. KCCU stated that the $36,537.03 amount "was the difference that was still owed from the sale of the property" (Exhibit 15, KCCU Email re Proof of SBA Pmt, 1).

73. After consulting with her superiors and counsel for KCCU, on October 1, 2026, Tara Steele shared with plaintiff's counsel the "loan closing documents along with a 1 page document that shows the breakdown of what the property sold for and what the balance was that was left over to you" (Exhibit 16, KCCU Email Communications, 2, 4). The one-page document referenced in this message is attached to this Complaint as Exhibit 9.

74. KCCU expressly acknowledged that the proceeds from its sale of 7483 West Q were applied to the Loan ending in 761 (Exhibit 15, KCCU Email re Proof of SBA Pmt, 1; Exhibit 16, KCCU Email Communications, 2).

75. KCCU failed to produce the requested complete the copies of plaintiff's loan files or documents evidencing the alleged deficiency because the single-page document breaking down the remaining balance merely reflects the "Amount Repaid," $383,009.85, without providing a description of how that amount was calculated from the June 30, 2021 sale price of $445,000.00.

76. KCCU's decision to apply only $383,009.85 of the June 30, 2021 sale price was arbitrary.

77. Plaintiff's counsel issued a final demand for the documents on October 7, 2026 (Exhibit 16, KCCU Email Communications, 1).

78. To date, KCCU has not responded to plaintiff's final demand.

79. To date, KCCU has not produced documents that would explain the alleged deficiency that remained on the Loan ending in 761.

80. KCCU wrongfully claimed a deficiency on the Loan ending in 761.

81. KCCU's wrongful claim of a deficiency induced the SBA to issue payment to KCCU that was not warranted.

82. The SBA's wrongful payment to KCCU for an improperly claimed deficiency caused the SBA to pursue garnishment proceedings against plaintiff.

83. KCCU harmed plaintiff by causing the SBA to garnish his wages when it wrongfully claimed a deficiency to the SBA.

84. By wrongfully claiming a deficiency on the Loan ending in 761, KCCU harmed plaintiff by making negative reports on his credit and harming his credit score.

85. The SBA harmed plaintiff by garnishing plaintiff's wages even though plaintiff satisfied his debt obligations to KCCU by executing the Deed in Lieu of Foreclosure (Exhibit 6) or, alternatively, even though the proceeds from KCCU's sale of 7483 West Q (Exhibit 7) were well in excess of plaintiff's debt obligations to KCCU.

**COUNT I: UNLAWFUL AGENCY ACTION**
**(DEFENDANTS UNITED STATES, LOEFFLER, AND BESSENT)**

86. Plaintiff restates and incorporates by reference the allegations contained in paragraphs 1 through 85, above.

87. The SBA's Garnishment Hearing Decision (Exhibit 14) is a final agency decision reviewable under the Administrative Procedure Act, 5 U.S.C. § 701, *et seq*.

88. The SBA's Garnishment Hearing Decision (Exhibit 14) was unlawful and should be set aside. 5 U.S.C. § 706(2)(A) (arbitrary, capricious), (E) (unsupported by record of agency hearing), and (F) (unwarranted by the facts reviewed de novo).

89. The SBA's Garnishment Hearing Decision contains findings and conclusions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because the documents relied on by the hearing official do not indicate how it determined that plaintiff owed $69,170.17 as of June 10, 2026 (Exhibit 14, 3-4).

90. At most, the SBA relied on a document reflecting a $47,755.50 disbursement on April 28, 2023 (Exhibit 13, Ack of Hrg Req, 4), but KCCU records reflect an April 29, 2023 payment of $36,537.03 (Exhibit 15, KCCU Email re Proof of SBA Pmt), which is more than $11,000 less than the amount claimed by the SBA.

91. The hearing record also contained a document entirely unrelated plaintiff's business or finances (Exhibit 13, Ack of Hrg Req, 4).

92. To the extent that the hearing officer relied on that document, which is not clear because the hearing officer did not articulate specific factual findings, such reliance was clearly erroneous because the document references an unrelated institution, Comerica Bank, and a doctor otherwise not referenced in any of the other related documents or instruments.

93. Notwithstanding that the $38,954.84 value was arbitrarily chosen after plaintiff executed the Deed in Lieu of Foreclosure in full satisfaction of his obligations to KCCU or, alternatively, after KCCU sold 7483 West Q for an amount well in excess of the remaining balance of the loans, neither of these values bears any relation to the amount of $38,954.84 that was allegedly due on July 1, 2021 (Exhibit 9, Lender's Transcript of Account).

94. In any event, any deficiency claimed by KCCU was in error because plaintiff satisfied his loan obligations to KCCU when he executed the Deed in Lieu of Foreclosure.

95. Alternatively, any deficiency claimed by KCCU was in error because KCCU improperly failed to apply the entire proceeds of its sale of 7483 West Q towards any remaining

balance on the Loan ending in 761, which were more than sufficient to satisfy his loan obligations to KCCU.

96. KCCU improperly claimed a deficiency on the Loan ending in 761 to the SBA.

97. The SBA should not have disbursed a payment to KCCU because KCCU had been made whole by the Deed in Lieu of Foreclosure or, alternatively, by its retention of surplus proceeds from its sale of 7483 West Q.

98. Plaintiff did not owe KCCU any amount on the Loan ending in 761 after executing the Deed in Lieu of Foreclosure or, alternatively, after KCCU sold 7483 West Q for an amount well in excess of any delinquent amount.

99. Plaintiff does not owe the SBA any amount on the Loan ending in 761 because the Loan ending in 761 has been satisfied in full, and KCCU wrongfully claimed that plaintiff remained delinquent on the account.

100. The SBA did not and cannot meet its burden of proving the existence and amount of the debt plaintiff allegedly owes.

101. The hearing official abused its discretion when it determined that the SBA met its burden of proving the existence and amount of the debt plaintiff allegedly owes.

102. The hearing official's determination that the SBA met its burden of proving the existence and amount of the debt plaintiff allegedly owes was arbitrary, capricious, and contrary to the record of the agency because the values purportedly associated with the account neither reflect that the execution of the Deed in Lieu of Foreclosure was in satisfaction of any debt nor bear any relation to the balances reported by KCCU, to the extent they were valid at all.

103. Rather, KCCU has apparently received a double recovery after plaintiff's initial default through its sale of 7483 West Q for an amount in excess of the outstanding amount on the

Loan ending in 761 and through wrongfully claiming a deficiency on the Loan ending in 761, which induced the SBA to wrongfully disburse payment to KCCU.

104. De novo review by this Court will confirm that KCCU received full compensation for the value of the Loan ending in 761 but that KCCU still claimed a deficiency on the account to the SBA.

105. Plaintiff has suffered damages in the amount that has been withheld to date from his wages pursuant to the administrative garnishment.

THEREFORE, plaintiff respectfully requests that this Court enter judgment against defendants United States, Loeffler, and Bessent, ordering the following relief:

A. Setting aside the August 3, 2026 Garnishment Hearing Decision (Exhibit 14);

B. Awarding plaintiff actual damages as established at trial;

C. Awarding plaintiff a refund of all garnished wages pursuant to 13 CFR § 140.11(n)(1)(i); and,

D. Awarding any other relief that this Court deems just and equitable.

**COUNT II: ACCOUNTING**
**(DEFENDANT KELLOGG COMMUNITY CREDIT UNION)**

106. Plaintiff restates and incorporates by reference the allegations contained in paragraphs 1 through 105, above.

107. Plaintiff has on multiple occasions between 2021 and the present requested copies from KCCU of his accounts and documents evidencing the existence of the alleged debt owed by plaintiff for the Loan ending in 761.

108. Most recently, plaintiff and his counsel specifically requested that KCCU produce copies of his loan files and evidence regarding the alleged deficiency on September 16 and 17, 2026.

109. After consulting with her superiors and counsel for KCCU, on October 1, 2026, Tara Steele shared with plaintiff's counsel the "loan closing documents along with a 1 page document that shows the breakdown of what the property sold for and what the balance was that was left over to you" (Exhibit 16, KCCU Email Communications, 2). The one-page document referenced in this message is attached to this Complaint as Exhibit 9.

110. KCCU failed to produce the requested copies of plaintiff's loan files or documents evidencing the alleged deficiency because the single-page document breaking down the remaining balance merely reflects the "Amount Repaid," $383,009.85, without providing a description of how that amount was calculated from the June 30, 2021 sale price of $445,000.00.

111. On October 7, 2026, plaintiff's counsel identified the shortcomings in KCCU's production and requested full accountings regarding all of plaintiff's accounts for the purpose of determining how KCCU calculated the alleged deficiency on plaintiff's account (Exhibit 16, KCCU Email Communications, 1).

112. To date, KCCU has not produced the requested accounting, making impossible any verification of the alleged debt that has formed the basis for the SBA garnishment action against plaintiff.

113. This Court may exercise equitable authority to compel KCCU to produce an accounting to plaintiff regarding the alleged deficiency on plaintiff's accounts with KCCU.

114. Plaintiff's wife, Tamara McCord, has received notice that AWG proceedings could begin against her with regard to the Loan ending in 761 and guaranteed by the SBA.

115. Tamara McCord was not a member of any of the entities associated with the Loan ending in 761 or the SBA Note and was not a signatory to any of the loan documents or security instruments associated with the SBA Note, let alone the SBA Note itself.

116. Tamara McCord is not personally liable for the debt, and KCCU should correct any erroneous report to the SBA that Tamara McCord is liable for the debt, to the extent it was not completely satisfied by the execution of the Deed in Lieu of Foreclosure or the subsequent sale of 7483 West Q by KCCU.

117. By wrongfully claiming a deficiency on the Loan ending in 761, KCCU harmed plaintiff by making negative reports on his credit and harming his credit score.

THEREFORE, plaintiff respectfully requests that this Court enter judgment against defendant Kellogg Community Credit Union, ordering the following relief:

A. That defendant Kellogg Community Credit Union produce a full and complete accounting of any account subject to the SBA Guaranty or that defendant Kellogg Community Credit Union claimed or claims a deficiency;

B. That defendant Kellogg Community Credit Union correct any erroneous report to the SBA that Tamara McCord is liable for the Loan ending in 761 (Exhibit 1).

C. That defendant Kellogg Community Credit Union correct any erroneous reports to credit reporting agencies that plaintiff's loan obligations to Kellogg Community Credit Union were not satisfied; and,

D. Awarding any other relief that this Court deems just and equitable.

**COUNT III: CONVERSION**
**(DEFENDANT KELLOGG COMMUNITY CREDIT UNION)**

118. Plaintiff restates and incorporates by reference the allegations contained in paragraphs 1 through 117, above.

119. Plaintiff executed the Deed in Lieu of Foreclosure in exchange for full satisfaction of the debts secured by 7483 West Q.

120. When defendant KCCU only applied a portion of the proceeds from its sale of 7483 West Q to the Loan ending in 761, defendant KCCU wrongfully exercised dominion over those proceeds in a manner inconsistent with plaintiff's rights regarding those proceeds.

121. Defendant KCCU's wrongful exercise of dominion by only applying a portion of the sale proceeds to the Loan ending in 761 caused KCCU to erroneously report a $38,954.84 balance on July 1, 2021.

122. Defendant KCCU withheld $38,954.84 of the sale proceeds from the Loan ending in 761 for KCCU's use in other transactions with its members.

123. KCCU's erroneous report of a deficiency on the Loan ending in 761 caused the SBA to initiate its garnishment action.

124. Plaintiff has suffered damages in the amount that has been withheld to date from his wages pursuant to the administrative garnishment.

125. By wrongfully claiming a deficiency on the Loan ending in 761, KCCU harmed plaintiff by making negative reports on his credit and harming his credit score.

THEREFORE, plaintiffs respectfully request that this Court enter judgment against defendant Kellogg Community Credit Union, ordering the following relief:

A. Awarding actual economic damages as established at trial;

B. Awarding compensatory damages, including but not limited to those for past and future pecuniary and non-pecuniary losses, physical and mental pain, trauma, fear, anxiety, loss of enjoyment of life, and other non-pecuniary losses;

C. Awarding punitive and exemplary damages in an amount to be determined at trial;

D. Awarding treble damages, plus costs and reasonable attorney fees, pursuant to MCL 600.2919a(1);

E. That defendant Kellogg Community Credit Union correct any erroneous reports to credit reporting agencies that plaintiff's loan obligations to Kellogg Community Credit Union were not satisfied; and,

F. Awarding any other relief that this Court deems just and equitable.

**COUNT IV: UNJUST ENRICHMENT**
**(DEFENDANT KELLOGG COMMUNITY CREDIT UNION)**

126. Plaintiff restates and incorporates by reference the allegations contained in paragraphs 1 through 125, above.

127. Defendant KCCU received a benefit from plaintiff in the form of the Deed in Lieu of Foreclosure and/or the proceeds from KCCU's subsequent sale of 7483 West Q for an amount in excess of the amount then remaining on the Loan ending in 761.

128. Defendant KCCU's retention of those benefits satisfied-in-full plaintiff's loan obligations to defendant KCCU.

129. Defendant KCCU nevertheless also wrongfully claimed a deficiency on the Loan ending in 761 to the SBA.

130. Defendant KCCU has recovered an amount in excess of the value of the Loan ending in 761 by retaining the benefits conferred by the Deed in Lieu of Foreclosure, the surplus proceeds from the sale of 7483 West Q, and the balance paid to KCCU by the SBA according to its wrongful claim of a deficiency.

131. As a result of KCCU's retention of these benefits while wrongfully claiming a deficiency on the account, an inequity has resulted to plaintiff because plaintiff is now being garnished by the SBA even though plaintiff satisfied his obligations regarding the Loan ending in 761.

132. Plaintiff has suffered damages in the amount that has been withheld to date from his wages pursuant to the administrative garnishment.

133. By wrongfully claiming a deficiency on the Loan ending in 761, KCCU harmed plaintiff by making negative reports on his credit and harming his credit score.

THEREFORE, plaintiffs respectfully request that this Court enter judgment against defendant Kellogg Community Credit Union, ordering the following relief:

A. Awarding actual economic damages as established at trial;

B. Awarding punitive and exemplary damages in an amount to be determined at trial;

C. That defendant Kellogg Community Credit Union correct any erroneous reports to credit reporting agencies that plaintiff's loan obligations to Kellogg Community Credit Union were not satisfied; and,

D. Awarding any other relief that this Court deems just and equitable.

Respectfully submitted,

**XUEREB LAW GROUP PC**

By: ______________________

Thomas W. DeLano (P87592)
Joseph M. Xuereb (P40124)
John R. Badeen (P71014)
Attorneys for Defendant
39209 Six Mile, Suite 165
Livonia, Michigan 48152
(734) 455-2000

Dated: November 13, 2026

# Exhibit 1

KELLOGG COMMUNITY credit union

| LOAN NUMBER | LOAN NAME | ACCT. NUMBER | AGREEMENT DATE | INITIALS |
|---|---|---|---|---|
| 355421-761 | MM Ventures, LLC | | 11/02/18 | |
| **NOTE AMOUNT** | **INDEX (w/Margin)** | **RATE** | **MATURITY DATE** | **LOAN PURPOSE** |
| $438,500.00 | Wall Street Journal Prime plus 2.250% | 7.500% | 11/02/33 | Commercial |
| | | **Creditor Use Only** | | |

# COMMERCIAL LOAN AGREEMENT

Single Advance Loan

**DATE AND PARTIES.** The date of this Commercial Loan Agreement (Agreement) is November 2, 2018. The parties and their addresses are as follows:

**LENDER:**
**KELLOGG COMMUNITY CREDIT UNION**
P.O. Box 140
Battle Creek, MI 49016

**BORROWER:**
**MM VENTURES, LLC**
a Michigan Limited Liability Company
90 E. Columbia Ave. Ste.F1 #122
Battle Creek, MI 49015

**MCCORD ALF LLC**
a Michigan Limited Liability Company
150 Auburn Street
Battle Creek, MI 49014

**1. DEFINITIONS.** For the purposes of this Agreement, the following terms have the following meanings.

**A. Accounting Terms.** In this Agreement, any accounting terms that are not specifically defined will have their customary meanings under generally accepted accounting principles.

**B. Insiders.** Insiders include those defined as insiders by the United States Bankruptcy Code, as amended; or to the extent left undefined, include without limitation any officer, employee, stockholder or member, director, partner, or any immediate family member of any of the foregoing, or any person or entity which, directly or indirectly, controls, is controlled by or is under common control with me.

**C. Loan.** Loan refers to this transaction generally, including obligations and duties arising from the terms of all documents prepared or submitted for this transaction.

**D. Loan Documents.** Loan Documents refer to all the documents executed as a part of or in connection with the Loan.

**E. Pronouns.** The pronouns "I", "me" and "my" refer to every Borrower signing this Agreement, individually and together with their heirs, successors and assigns, and each other person or legal entity (including guarantors, endorsers, and sureties) who agrees to pay this Agreement. "You" and "your" refers to the Loan's lender, any participants or syndicators, successors and assigns, or any person or company that acquires an interest in the Loan.

**F. Property.** Property is any property, real, personal or intangible, that secures my performance of the obligations of this Loan.

**2. SINGLE ADVANCE.** In accordance with the terms of this Agreement and other Loan Documents, you will provide me with a term note in the amount of $438,500.00 (Principal). I will receive the funds from this Loan in one advance. No additional advances are contemplated, except those made to protect and preserve your interests as provided in this Agreement or other Loan Documents.

**3. MATURITY DATE.** I agree to fully repay the Loan by November 2, 2033.

**4. WARRANTIES AND REPRESENTATIONS.** I make to you the following warranties and representations which will continue as long as this Loan is in effect, except when this Agreement provides otherwise.

**A. Power.** I am duly organized, and validly existing and in good standing in all jurisdictions in which I operate. I have the power and authority to enter into this transaction and to carry on my business or activity as it is now being conducted and, as applicable, am qualified to do so in each jurisdiction in which I operate.

**B. Authority.** The execution, delivery and performance of this Loan and the obligation evidenced by the Note are within my powers, have been duly authorized, have received all necessary governmental approval, will not violate any provision of law, or order of court or governmental agency, and will not violate any agreement to which I am a party or to which I am or any of my property is subject.

**C. Name and Place of Business.** Other than previously disclosed in writing to you I have not changed my name or principal place of business within the last 10 years and have not used any other trade or fictitious name. Without your prior written consent, I do not and will not use any other name and will preserve my existing name, trade names and franchises.

**D. Hazardous Substances.** Except as I previously disclosed in writing and you acknowledge in writing, no Hazardous Substance, underground tanks, private dumps or open wells are currently located at, on, in, under or about the Property.


Wolters Kluwer Financial Services ©1996, 2018 Bankers Systems™

**E. Use of Property.** After diligent inquiry, I do not know or have reason to know that any Hazardous Substance has been discharged, leached or disposed of, in violation of any Environmental Law, from the property onto, over or into any other property, or from any other property onto, over or into the property.

**F. Environmental Laws.** I have no knowledge or reason to believe that there is any pending or threatened investigation, claim, judgment or order, violation, lien, or other notice under any Environmental Law that concerns me or the property. The property and any activities on the property are in full compliance with all Environmental Law.

**G. Loan Purpose.** The purpose of this Loan is to refinance loans under SBA 7A.

**H. No Other Liens.** I own or lease all property that I need to conduct my business and activities. I have good and marketable title to all property that I own or lease. All of my Property is free and clear of all liens, security interests, encumbrances and other adverse claims and interests, except those to you or those you consent to in writing.

**I. Compliance With Laws.** I am not violating any laws, regulations, rules, orders, judgments or decrees applicable to me or my property, except for those which I am challenging in good faith through proper proceedings after providing adequate reserves to fully pay the claim and its challenge should I lose.

**J. Legal Dispute.** There are no pending or threatened lawsuits, arbitrations or other proceedings against me or my property that singly or together may materially and adversely affect my property, operations, financial condition, or business.

**K. Adverse Agreements.** I am not a party to, nor am I bound by, any agreement that is now or is likely to become materially adverse to my business, Property or operations.

**L. Other Claims.** There are no outstanding claims or rights that would conflict with the execution, delivery or performance by me of the terms and conditions of this Agreement or the other Loan Documents. No outstanding claims or rights exist that may result in a lien on the Property, the Property's proceeds and the proceeds of proceeds, except liens that were disclosed to and agreed to by you in writing.

**M. Solvency.** I am able to pay my debts as they mature, my assets exceed my liabilities and I have sufficient capital for my current and planned business and other activities. I will not become insolvent by the execution or performance of this Loan.

**5. FINANCIAL STATEMENTS.** I will prepare and maintain my financial records using consistently applied generally accepted accounting principles then in effect. I will provide you with financial information in a form that you accept and under the following terms.

**A. Certification.** I represent and warrant that any financial statements that I provide you fairly represents my financial condition for the stated periods, is current, complete, true and accurate in all material respects, includes all of my direct or contingent liabilities and there has been no material adverse change in my financial condition, operations or business since the date the financial information was prepared.

**B. Frequency.** I will provide to you on an annual basis my financial statements, tax returns, annual internal audit reports or those prepared by independent accountants as soon as available or at least within 120 days after the close of each of my fiscal years. Any annual financial statements that I provide you will be audited statements.

**C. SEC Reports.** I will provide you with true and correct copies of all reports, notices or statements that I provide to the Securities and Exchange Commission, any securities exchange or my stockholders, owners, or the holders of any material indebtedness as soon as available or at least within 30 days after issuance.

**D. Requested Information.** I will provide you with any other information about my operations, financial affairs and condition within 30 days after your request.

**E. Additional Financial Statements Terms.** Borrower provides lender permission to speak with borrower's professional advisors such as accountants and attorneys when reasonably necessary to maintain compliance with loan servicing terms.

Notwithstanding the default provisions and remedies contained throughout this and associated documents, borrower expressly acknowledges that failure to provide the financial and other documentation required within this loan agreement is a cause for default. In the event of noncompliance, lender may impose all remedies available including the raising of the interest rate in whole or in part.

While obligations remain unpaid by borrower, borrower will provide or cause to be provided the following:

Annual Business Tax Return of MM Ventures, LLC.
Annual Business Tax Return of McCord ALF LLC.
Annual Rent Roll of MM Ventures, LLC.
Annual Personal Financial Statement and Personal Tax Return of David and Tamara McCord.
Quarterly Company Prepared Financial Statements of McCord ALF LLC.

**6. COVENANTS.** Until the Loan and all related debts, liabilities and obligations are paid and discharged, I will comply with the following terms, unless you waive compliance in writing.

**A. Participation.** I consent to you participating or syndicating the Loan and sharing any information that you decide is necessary about me and the Loan with the other participants or syndicators.

**B. Inspection.** Following your written request, I will immediately pay for all one-time and recurring out-of-pocket costs that are related to the inspection of my records, business or Property that secures the Loan. Upon reasonable notice, I will permit you or your agents to enter any of my premises and any location where my Property is located during regular business hours to do the following.

(1) You may inspect, audit, check, review and obtain copies from my books, records, journals, orders, receipts, and any correspondence and other business related data.

(2) You may discuss my affairs, finances and business with any one who provides you with evidence that they are a creditor of mine, the sufficiency of which will be subject to your sole discretion.

(3) You may inspect my Property, audit for the use and disposition of the Property's proceeds and proceeds of proceeds; or do whatever you decide is necessary to preserve and protect the Property and your interest in the Property.

After prior notice to me, you may discuss my financial condition and business operations with my independent accountants, if any, or my chief financial officer and I may be present during these discussions. As long as the Loan is outstanding, I will direct all of my accountants and auditors to permit you to examine my records in their possession and to make copies of these records. You will use your best efforts to maintain the confidentiality of the information you or your agents obtain, except you may provide your regulator, if any, with required information about my financial condition, operation and business or that of my parent, subsidiaries or affiliates.

**C. Business Requirements.** I will preserve and maintain my present existence and good standing in the jurisdiction where I am organized and all of my rights, privileges and franchises. I will do all that is needed or required to continue my business or activities as presently conducted, by obtaining licenses, permits

and bonds everywhere I engage in business or activities or own, lease or locate my property. I will obtain your prior written consent before I cease my business or before I engage in any new line of business that is materially different from my present business.

**D. Compliance with Laws.** I will not violate any laws, regulations, rules, orders, judgments or decrees applicable to me or my Property, except for those which I challenge in good faith through proper proceedings after providing adequate reserves to fully pay the claim and its appeal should I lose. Laws include without limitation the Federal Fair Labor Standards Act requirements for producing goods, the federal Employee Retirement Income Security Act of 1974's requirements for the establishment, funding and management of qualified deferred compensation plans for employees, health and safety laws, environmental laws, tax laws, licensing and permit laws. On your request, I will provide you with written evidence that I have fully and timely paid my taxes, assessments and other governmental charges levied or imposed on me, my income or profits and my property. Taxes include without limitation sales taxes, use taxes, personal property taxes, documentary stamp taxes, recordation taxes, franchise taxes, income taxes, withholding taxes, FICA taxes and unemployment taxes. I will adequately provide for the payment of these taxes, assessments and other charges that have accrued but are not yet due and payable.

**E. New Organizations.** I will obtain your written consent before organizing, merging into, or consolidating with an entity; acquiring all or substantially all the assets of another; materially changing the legal structure, management, ownership or financial condition; or effecting or entering into a domestication, conversion or interest exchange.

**F. Dealings with Insiders.** I will not purchase, acquire or lease any property or services from, or sell, provide or lease any property or services to, or permit any outstanding loans or credit extensions to, or otherwise deal with, any Insiders except as required under contracts existing at the time I applied for the Loan and approved by you or as this Agreement otherwise permits. I will not change or breach these contracts existing at Loan application so as to cause an acceleration of or an increase in any payments due.

**G. Other Debts.** I will pay when due any and all other debts owed or guaranteed by me and will faithfully perform, or comply with all the conditions and obligations imposed on me concerning the debt or guaranty.

**H. Other Liabilities.** I will not incur, assume or permit any debt evidenced by notes, bonds or similar obligations, except: debt in existence on the date of this Agreement and fully disclosed to you; debt subordinated in payment to you on conditions and terms acceptable to you; accounts payable incurred in the ordinary course of my business and paid under customary trade terms or contested in good faith with reserves satisfactory to you.

**I. Notice to You.** I will promptly notify you of any material change in my financial condition, of the occurrence of a default under the terms of this Agreement or any other Loan Document, or a default by me under any agreement between me and any third party which materially and adversely affects my property, operations, financial condition or business.

**J. Certification of No Default.** On your request, my chief financial officer or my independent accountant will provide you with a written certification that to the best of their knowledge no event of default exists under the terms of this Agreement or the other Loan Documents, and that there exists no other action, condition or event which with the giving of notice or lapse of time or both would constitute a default. As requested, my chief financial officer or my independent accountant will also provide you with computations demonstrating compliance with any financial covenants and ratios contained in this Agreement. If an action, condition or event of default does exist, the certificate must accurately and fully disclose the extent and nature of this action, condition or event and state what must be done to correct it.

**K. Use of Loan Proceeds.** I will not permit the loan proceeds to be used to purchase, carry, reduce, or retire any loan originally incurred to purchase or carry any margin stock or otherwise cause the Loan to violate Federal Reserve Board Regulations U or X, or Section 8 of the Securities and Exchange Act of 1934 and its regulations, as amended.

**L. Dispose of No Assets.** Without your prior written consent or as the Loan Documents permit, I will not sell, lease, assign, transfer, dispose of or otherwise distribute all or substantially all of my assets to any person other than in the ordinary course of business for the assets' depreciated book value or more.

**M. No Other Liens.** I will not create, permit or suffer any lien or encumbrance upon any of my properties for or by anyone, other than you, except for: nonconsensual liens imposed by law arising out of the ordinary course of business on obligations that are not overdue or which I am contesting in good faith after making appropriate reserves; valid purchase money security interests on personal property; or any other liens specifically agreed to by you in writing.

**N. Guaranties.** I will not guaranty or become liable in any way as surety, endorser (other than as endorser of negotiable instruments in the ordinary course of business) or accommodation endorser or otherwise for the debt or obligations of any other person or entity, except to you or as you otherwise specifically agree in writing.

**O. No Default under Other Agreements.** I will not allow to occur, or to continue unremedied, any act, event or condition which constitutes a default , or which, with the passage of time or giving of notice, or both, would constitute a default under any agreement, document, instrument or undertaking to which I am a party or by which I may be bound.

**P. Legal Disputes.** I will promptly notify you in writing of any threatened or pending lawsuit, arbitration or other proceeding against me or any of my property, not identified in my financial statements, whose claim exceeds $5,000 or that singly or together with other proceedings may materially and adversely affect my property, operations, financial condition or business. I will use my best efforts to bring about a favorable and speedy result of any of these lawsuits, arbitrations or other proceedings.

**Q. Other Notices.** I will immediately provide you with any information that may materially and adversely affect my ability to perform this Agreement and of its anticipated effect.

**R. No Change in Capital.** I will not release, redeem, retire, purchase or otherwise acquire, directly or indirectly, any of my capital stock or other equity security or partnership interest, or make any change in my capital structure, except to the extent required by any agreements signed prior to this Agreement and disclosed to you or with your prior written consent.

**S. Loan Obligations.** I will make full and timely payment of all principal and interest obligations, and comply with the other terms and agreements contained in this Agreement and in the other Loan Documents.

**T. Insurance.** I will obtain and maintain insurance with insurers, in amounts and coverages that are acceptable to you and customary with industry practice. This may include without limitation insurance policies for public liability, fire, hazard and extended risk, workers compensation, and, at your request, business interruption and/or rent loss insurance. At your request, I will deliver to you certified copies of all of these insurance policies, binders or certificates. I will obtain and maintain a mortgagee clause (or lender loss payable clause) endorsement - naming you as the loss payee. If you require, I will also obtain an "additional insured" endorsement - naming you as an additional insured. I will immediately notify you of cancellation or termination of insurance. I will require all insurance policies to provide you with at least 10 days prior written notice to you of cancellation or modification. I consent to you using or disclosing information relative to any contract of insurance required by the Loan for the purpose of replacing this insurance. I also authorize my insurer and you to exchange all relevant information related to any contract of insurance required by any document executed as part of this Loan.

**U. Property Maintenance.** I will keep all tangible and intangible property that I consider necessary or useful in my business in good working condition by making all needed repairs, replacements and improvements and by making all rental, lease or other payments due on this property.


Wolters Kluwer Financial Services ©1996, 2018 Bankers Systems™

**V. Property Loss.** I will immediately notify you, and the insurance company when appropriate, of any material casualty, loss or depreciation to the Property or to my other property that affects my business.

**W. Accounts Receivable Collection.** I will collect and otherwise enforce all of my unpaid Accounts Receivable at my cost and expense, until you end my authority to do so, which you may do at any time to protect your best interests. I will not sell, assign or otherwise dispose of any Accounts Receivable without your written consent. I will not commingle the Accounts Receivable proceeds with any of my other property.

**X. Reserves.** You may set aside and reserve Loan proceeds for Loan interest, fees and expenses, taxes, and insurance. I grant you a security interest in the reserves.

No interest will accrue on any reserve Loan proceeds. Disbursement of reserves is disbursement of the Loan's proceeds. At my request, you will disburse the reserves for the purpose they were set aside for, as long as I am not in default under this Agreement. You may directly pay these reserved items, reimburse me for payments I made, or reduce the reserves and increase the Loan proceeds available for disbursement.

**Y. Additional Taxes.** I will pay all filing and recording costs and fees, including any recordation, documentary or transfer taxes or stamps, that are required to be paid with respect to this Loan and any Loan Documents.

**Z. Additional Covenants.** Borrower acknowledges that it will maintain membership in a credit union affiliated with the loan servicer for the life of the loan. Borrower also acknowledges that all rights of depository setoff legally owned by the credit union are available to the loan servicer in order to perform its duties on behalf of the credit unions it serves.

So long as balances remain under these commitments, borrower shall maintain compliance with all loan terms and conditions including:

Annual Debt Service Coverage of 1.20x beginning with yearend 12/31/2019. Calculated as: Net Income + Rent (Less Cash Expenses) + Depreciation + Amortization + Interest - (Less) Cash
Distributions / Annual Debt Service Requirements of existing business and property debts.

**7. DEFAULT.** I will be in default if any of the following events (known separately and collectively as an Event of Default) occur:

**A. Payments.** I fail to make a payment in full when due.

**B. Insolvency or Bankruptcy.** The death, dissolution or insolvency of, appointment of a receiver by or on behalf of, application of any debtor relief law, the assignment for the benefit of creditors by or on behalf of, the voluntary or involuntary termination of existence by, or the commencement of any proceeding under any present or future federal or state insolvency, bankruptcy, reorganization, composition or debtor relief law by or against me or any co-signer, endorser, surety or guarantor of this Agreement or any other obligations I have with you.

**C. Business Termination.** I merge, dissolve, reorganize, end my business or existence, or a partner or majority owner dies or is declared legally incompetent.

**D. Failure to Perform.** I fail to perform any condition or to keep any promise or covenant of this Agreement.

**E. Other Documents.** A default occurs under the terms of any other Loan Document.

**F. Other Agreements.** I am in default on any other debt or agreement I have with you.

**G. Misrepresentation.** I make any verbal or written statement or provide any financial information that is untrue, inaccurate, or conceals a material fact at the time it is made or provided.

**H. Judgment.** I fail to satisfy or appeal any judgment against me.

**I. Forfeiture.** The Property is used in a manner or for a purpose that threatens confiscation by a legal authority.

**J. Name Change.** I change my name or assume an additional name without notifying you before making such a change.

**K. Property Transfer.** I transfer all or a substantial part of my money or property.

**L. Property Value.** You determine in good faith that the value of the Property has declined or is impaired.

**M. Material Change.** Without first notifying you, there is a material change in my business, including ownership, management, and financial conditions.

**N. Insecurity.** You determine in good faith that a material adverse change has occurred in Borrower's financial condition from the conditions set forth in Borrower's most recent financial statement before the date of this Agreement or that the prospect for payment or performance of the Loan is impaired for any reason.

**8. REMEDIES.** After I default, you may at your option do any one or more of the following.

**A. Acceleration.** You may make all or any part of the amount owing by the terms of the Loan immediately due. If I am a debtor in a bankruptcy petition or in an application filed under section 5(a)(3) of the Securities Investor Protection Act, the Loan is automatically accelerated and immediately due and payable without notice or demand upon filing of the petition or application.

**B. Sources.** You may use any and all remedies you have under state or federal law or in any Loan Document.

**C. Insurance Benefits.** You may make a claim for any and all insurance benefits or refunds that may be available on my default.

**D. Payments Made On My Behalf.** Amounts advanced on my behalf will be immediately due and may be added to the balance owing under the terms of the Loan, and accrue interest at the highest post-maturity interest rate.

**E. Set-Off.** You may use the right of set-off. This means you may set-off any amount due and payable under the terms of the Loan against any right I have to receive money from you.

My right to receive money from you includes any deposit or share account balance I have with you; any money owed to me on an item presented to you or in your possession for collection or exchange; and any repurchase agreement or other non-deposit obligation. "Any amount due and payable under the terms of the Loan" means the total amount to which you are entitled to demand payment under the terms of the Loan at the time you set-off.

Subject to any other written contract, if my right to receive money from you is also owned by someone who has not agreed to pay the Loan, your right of set-off will apply to my interest in the obligation and to any other amounts I could withdraw on my sole request or endorsement.

In addition, you may also have rights under a "statutory lien". A "statutory lien" means your right under state or federal law to establish a right in, or claim to, my shares and dividends to the extent of any outstanding financial obligations that I have with you. If you have a statutory lien, you may without further notice, impress and enforce the statutory lien on my shares and dividends to the extent of any sums due and payable under the terms of the Loan that I fail to satisfy.

Your set-off and statutory lien rights do not apply to an account or other obligation where my rights arise only in a representative capacity. They also do not apply to any Individual Retirement Account or other tax-deferred retirement account.

You will not be liable for the dishonor of any check or share draft when the dishonor occurs because you set-off against any of my accounts, or exercised your statutory lien rights. I agree to hold you harmless from any such claims arising as a result of your exercise of your right of set-off or statutory lien rights.

**F. Waiver.** Except as otherwise required by law, by choosing any one or more of these remedies you do not give up your right to use any other remedy. You do not waive a default if you choose not to use a remedy. By electing not to use any remedy, you do not waive your right to later consider the event a default and to use any remedies if the default continues or occurs again.

**9. COLLECTION EXPENSES AND ATTORNEYS' FEES.** On or after the occurrence of an Event of Default, to the extent permitted by law, I agree to pay all expenses of collection, enforcement or protection of your rights and remedies under this Agreement or any other Loan Document. Expenses include, but are not limited to, attorneys' fees, court costs and other legal expenses. These expenses are due and payable immediately. If not paid immediately, these expenses will bear interest from the date of payment until paid in full at the highest interest rate in effect as provided for in the terms of this Loan. All fees and expenses will be secured by the Property I have granted to you, if any. In addition, to the extent permitted by the United States Bankruptcy Code, I agree to pay the reasonable attorneys' fees incurred by you to protect your rights and interests in connection with any bankruptcy proceedings initiated by or against me.

**10. APPLICABLE LAW.** This Agreement is governed by the laws of Michigan, the United States of America, and to the extent required, by the laws of the jurisdiction where the Property is located, except to the extent such state laws are preempted by federal law.

**11. JOINT AND INDIVIDUAL LIABILITY AND SUCCESSORS.** My obligation to pay the Loan is independent of the obligation of any other person who has also agreed to pay it. You may sue me alone, or anyone else who is obligated on the Loan, or any number of us together, to collect the Loan. Extending the Loan or new obligations under the Loan, will not affect my duty under the Loan and I will still be obligated to pay the Loan. You may assign all or part of your rights or duties under this Agreement or the Loan Documents without my consent. If you assign this Agreement, all of my covenants, agreements, representations and warranties contained in this Agreement or the Loan Documents will benefit your successors and assigns. I may not assign this Agreement or any of my rights under it without your prior written consent. The duties of the Loan will bind my successors and assigns.

**12. AMENDMENT, INTEGRATION AND SEVERABILITY.** This Agreement may not be amended or modified by oral agreement. No amendment or modification of this Agreement is effective unless made in writing. This Agreement and the other Loan Documents are the complete and final expression of the understanding between you and me. If any provision of this Agreement is unenforceable, then the unenforceable provision will be severed and the remaining provisions will still be enforceable.

**13. INTERPRETATION.** Whenever used, the singular includes the plural and the plural includes the singular. The section headings are for convenience only and are not to be used to interpret or define the terms of this Agreement.

**14. NOTICE, FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS.** Unless otherwise required by law, any notice will be given by delivering it or mailing it by first class mail to the appropriate party's address listed in the DATE AND PARTIES section, or to any other address designated in writing. Notice to one Borrower will be deemed to be notice to all Borrowers. I will inform you in writing of any change in my name, address or other application information. I will provide you any correct and complete financial statements or other information you request. I agree to sign, deliver, and file any additional documents or certifications that you may consider necessary to perfect, continue, and preserve my obligations under this Loan and to confirm your lien status on any Property. Time is of the essence.

**15. AGREEMENT TO ARBITRATE.** You or I may submit to binding arbitration any dispute, claim or other matter in question between or among you and me that arises out of or relates to this Transaction (Dispute), except as otherwise indicated in this section or as you and I agree to in writing. For purposes of this section, this Transaction includes this Agreement and the other Loan Documents, and proposed loans or extensions of credit that relate to this Agreement. You or I will not arbitrate any Dispute within any "core proceedings" under the United States bankruptcy laws.

You and I must consent to arbitrate any Dispute concerning a debt secured by real estate at the time of the proposed arbitration. You may foreclose or exercise any powers of sale against real property securing a debt underlying any Dispute before, during or after any arbitration. You may also enforce a debt secured by this real property and underlying the Dispute before, during or after any arbitration.

You or I may, whether or not any arbitration has begun, pursue any self-help or similar remedies, including taking property or exercising other rights under the law; seek attachment, garnishment, receivership or other provisional remedies from a court having jurisdiction to preserve the rights of or to prevent irreparable injury to you or me; or foreclose against any property by any method or take legal action to recover any property. Foreclosing or exercising a power of sale, beginning and continuing a judicial action or pursuing self-help remedies will not constitute a waiver of the right to compel arbitration.

The arbitrator will determine whether a Dispute is arbitrable. A single arbitrator will resolve any Dispute, whether individual or joint in nature, or whether based on contract, tort, or any other matter at law or in equity. The arbitrator may consolidate any Dispute with any related disputes, claims or other matters in question not arising out of this Transaction. Any court having jurisdiction may enter a judgment or decree on the arbitrator's award. The judgment or decree will be enforced as any other judgment or decree.

You and I acknowledge that the agreements, transactions or the relationships which result from the agreements or transactions between and among you and me involve interstate commerce. The United States Arbitration Act will govern the interpretation and enforcement of this section.

The American Arbitration Association's Commercial Arbitration Rules, in effect on the date of this Agreement, will govern the selection of the arbitrator and the arbitration process, unless otherwise agreed to in this Agreement or another writing.

**16. WAIVER OF TRIAL FOR ARBITRATION. You and I understand that the parties have the right or opportunity to litigate any Dispute through a trial by judge or jury, but that the parties prefer to resolve Disputes through arbitration instead of litigation. If any Dispute is arbitrated, you and I voluntarily and knowingly waive the right to have a trial by jury or judge during the arbitration.**

**17. WAIVER OF JURY TRIAL. If the parties do not opt for arbitration, then all of the parties to this Agreement knowingly and intentionally, irrevocably and unconditionally, waive any and all right to a trial by jury in any litigation arising out of or concerning this Agreement or any other Loan Document or related obligation. All of these parties acknowledge that this section has either been brought to the attention of each party's legal counsel or that each party had the opportunity to do so.**

**18. SIGNATURES.** By signing, I agree to the terms contained in this Agreement. I also acknowledge receipt of a copy of this Agreement.

**BORROWER:**

MM Ventures, LLC

By [signature] MM Ventures LLC Date 11/2/18
David McCord, Sole Member Member

McCord ALF LLC

By [signature] McCord ALF LLC ~~MM Ventures~~ Date 11/2/18
David McCord, Sole Member Member

# Exhibit 2

KELLOGG COMMUNITY credit union

# SECURITY AGREEMENT

**DATE AND PARTIES.** The date of this Security Agreement (Agreement) is November 02, 2018. The parties and their addresses are:

**SECURED PARTY:**
**KELLOGG COMMUNITY CREDIT UNION**
P.O. Box 140
Battle Creek, MI 49016

**DEBTOR:**
**MM VENTURES, LLC**
a Michigan Limited Liability Company
7483 West Q Ave
Battle Creek, MI 49009

**Definitions.** For the purposes of this document, the following terms have the following meanings.

"Loan" refers to this transaction generally, including obligations and duties arising from the terms of all documents prepared or submitted for this transaction.

The pronouns "you" and "your" refer to the Secured Party. The pronouns "I," "me" and "my" refer to each person or entity signing this Agreement as Debtor and agreeing to give the Property described in this Agreement as security for the Secured Debts.

Where the owner of the Property is different from the obligor or guarantor whose obligation this Agreement secures, "Debtor" refers to each person or entity who is an owner of the Property and "Obligor" or "Guarantor," as applicable, refer to such parties as designated in the SECURED DEBTS section.

**1. SECURED DEBTS.** The term "Secured Debts" includes and this Agreement will secure each of the following:

**A. Specific Debts.** The following debts and all extensions, renewals, refinancings, modifications and replacements. A promissory note or other agreement, No. 355421-761, dated November 2, 2018, from MM Ventures, LLC and McCord ALF LLC (Obligor) to you, in the amount of $438,500.00.

**B. All Debts.** All present and future debts from Obligor to you, even if this Agreement is not specifically referenced, the future debts are also secured by other collateral, or if the future debt is unrelated to or of a different type than this debt. If more than one person signs this Agreement, each agrees that it will secure debts incurred either individually or with others who may not sign this Agreement. Nothing in this Agreement constitutes a commitment to make additional or future loans or advances. Any such commitment must be in writing.

This Agreement will not secure any debt which is also secured by real property or for which a non-possessory, non-purchase money security interest is created in "household goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices. In addition, this Agreement will not secure any other debt if, with respect to such other debt, you fail to fulfill any necessary requirements or fail to conform to any limitations of the Truth in Lending Act (Regulation Z) or the Real Estate Settlement Procedures Act (Regulation X) that are required for loans secured by the Property or if, as a result, the other debt would become subject to Section 670 of the John Warner National Defense Authorization Act for Fiscal Year 2007.

**C. Sums Advanced.** All sums advanced and expenses incurred by you under the terms of this Agreement.

Loan Documents refer to all the documents executed in connection with the Secured Debts.

**2. SECURITY INTEREST.** To secure the payment and performance of the Secured Debts, I grant you a security interest in all of the Property described in this Agreement that I own or have sufficient rights in which to transfer an interest, now or in the future, wherever the Property is or will be located, and all proceeds and products from the Property (including, but not limited to, all parts, accessories, repairs, replacements, improvements, and accessions to the Property). Property is all the collateral given as security for the Secured Debts and described in this Agreement, and includes all obligations that support the payment or performance of the Property. "Proceeds" includes cash proceeds, non-cash proceeds and anything acquired upon the sale, lease, license, exchange, or other disposition of the Property; any rights and claims arising from the Property; and any collections and distributions on account of the Property.

This Agreement remains in effect until terminated in writing, even if the Secured Debts are paid and you are no longer obligated to advance funds to me under any loan or credit agreement.

**3. PROPERTY DESCRIPTION.** The Property is described as follows:

**A. All Assets.** All present and future right, title and interest in and to any and all personal property of the Debtor, whether such property is now existing or hereafter created, acquired or arising and wherever located from time to time, including without limitation, the following categories of property: goods (including inventory, equipment, fixtures, farm products and any accessions thereto), instruments (including promissory notes), documents, accounts (including health-care-insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter-of-credit is evidenced by a writing), commercial tort claims, securities and all other investment property, general intangibles (including payment intangibles and software), all supporting obligations and all proceeds, products, additions, accessions, substitutions and replacements of the foregoing property.

Any term used herein is as defined by the Uniform Commercial Code and further as modified or amended by the laws of the jurisdiction which governs this transaction.

**4. WARRANTIES AND REPRESENTATIONS.** I make to you the following warranties and representations which will continue as long as this Agreement is in effect:

**A. Power.** I am duly organized, and validly existing and in good standing in all jurisdictions in which I operate. I have the power and authority to enter into this transaction and to carry on my business or activity as it is now being conducted and, as applicable, am qualified to do so in each jurisdiction in which I operate.

**B. Authority.** The execution, delivery and performance of this Agreement and the obligation evidenced by this Agreement are within my powers, have been duly authorized, have received all necessary governmental approval, will not violate any provision of law, or order of court or governmental agency, and will not violate any agreement to which I am a party or to which I am or any of my property is subject.

**C. Name and Location.** My name indicated in the DATE AND PARTIES section is my exact legal name. I am located at the address indicated in the DATE AND PARTIES section. I will provide verification of registration and location upon your request. I will provide you with at least 30 days notice prior to any change in my name, address, or state of organization or registration.

**D. Business Name.** Other than previously disclosed in writing to you I have not changed my name or principal place of business within the last 10 years and have not used any other trade or fictitious name. Without your prior written consent, I do not and will not use any other name and will preserve my existing name, trade names and franchises.

**E. Ownership of Property.** I represent that I own all of the Property. Your claim to the Property is ahead of the claims of any other creditor, except as disclosed in writing to you prior to any advance on the Secured Debts. I represent that I am the original owner of the Property and, if I am not, that I have provided you with a list of prior owners of the Property.

**5. DUTIES TOWARD PROPERTY.**

**A. Protection of Secured Party's Interest.** I will defend the Property against any other claim. I agree to do whatever you require to protect your security interest and to keep your claim in the Property ahead of the claims of other creditors. I will not do anything to harm your position.

I will keep books, records and accounts about the Property and my business in general. I will let you examine these and make copies at any reasonable time. I will prepare any report or accounting you request which deals with the Property.

**B. Use, Location, and Protection of the Property.** I will keep the Property in my possession and in good repair. I will use it only for commercial purposes. I will not change this specified use without your prior written consent. You have the right of reasonable access to inspect the Property and I will immediately inform you of any loss or damage to the Property. I will not cause or permit waste to the Property.

I will keep the Property at my address listed in the DATE AND PARTIES section unless we agree I may keep it at another location. If the Property is to be used in other states, I will give you a list of those states. The location of the Property is given to aid in the identification of the Property. It does not in any way limit the scope of the security interest granted to you. I will notify you in writing and obtain your prior written consent to any change in location of any of the Property. I will not use the Property in violation of any law. I will notify you in writing prior to any change in my address, name or, if an organization, any change in my identity or structure.

Until the Secured Debts are fully paid and this Agreement is terminated, I will not grant a security interest in any of the Property without your prior written consent. I will pay all taxes and assessments levied or assessed against me or the Property and provide timely proof of payment of these taxes and assessments upon request.

**C. Selling, Leasing or Encumbering the Property.** I will not sell, offer to sell, lease, or otherwise transfer or encumber the Property without your prior written permission. Any disposition of the Property contrary to this Agreement will violate your rights. Your permission to sell the Property may be reasonably withheld without regard to the creditworthiness of any buyer or transferee. I will not permit the Property to be the subject of any court order affecting my rights to the Property in any action by anyone other than you. If the Property includes chattel paper or instruments, either as original collateral or as proceeds of the Property, I will note your security interest on the face of the chattel paper or instruments.

**6. INSURANCE.** I agree to keep the Property insured against the risks reasonably associated with the Property. I will maintain this insurance in the amounts you require. This insurance will last until the Property is released from this Agreement. I may choose the insurance company, subject to your approval, which will not be unreasonably withheld.

I will have the insurance company name you as loss payee on any insurance policy. I will give you and the insurance company immediate notice of any loss. You may apply the insurance proceeds toward what is owed on the Secured Debts. You may require added security as a condition of permitting any insurance proceeds to be used to repair or replace the Property.

If you acquire the Property in damaged condition, my right to any insurance policies and proceeds will pass to you to the extent of the Secured Debts.

I will immediately notify you of cancellation or termination of insurance. If I fail to keep the Property insured, you may obtain insurance to protect your interest in the Property and I will pay for the insurance on your demand. You may demand that I pay for the insurance all at once, or you may add the insurance premiums to the balance of the Secured Debts and charge interest on it at the rate that applies to the Secured Debts. This insurance may include lesser or greater coverages than originally required of me, may be written by a company other than one I would choose, and may be written at a higher rate than I could obtain if I purchased the insurance. I acknowledge and agree that you or one of your affiliates may receive commissions on the purchase of this insurance.

**7. COLLECTION RIGHTS OF THE SECURED PARTY.** Account Debtor means the person who is obligated on an account, chattel paper, or general intangible. I authorize you to notify my Account Debtors of your security interest and to deal with the Account Debtors' obligations at your discretion. You may enforce the obligations of an Account Debtor, exercising any of my rights with respect to the Account Debtors' obligations to make payment or otherwise render performance to me, including the enforcement of any security interest that secures such obligations. You may apply proceeds received from the Account Debtors to the Secured Debts or you may release such proceeds to me.

I specifically and irrevocably authorize you to exercise any of the following powers at my expense, without limitation, until the Secured Debts are paid in full:

**A.** demand payment and enforce collection from any Account Debtor or Obligor by suit or otherwise.

**B.** enforce any security interest, lien or encumbrance given to secure the payment or performance of any Account Debtor or any obligation constituting Property.

**C.** file proofs of claim or similar documents in the event of bankruptcy, insolvency or death of any person obligated as an Account Debtor.

**D.** compromise, release, extend, or exchange any indebtedness of an Account Debtor.

**E.** take control of any proceeds of the Account Debtors' obligations and any returned or repossessed goods.

**F.** endorse all payments by any Account Debtor which may come into your possession as payable to me.

**G.** deal in all respects as the holder and owner of the Account Debtors' obligations.

**8. AUTHORITY TO PERFORM.** I authorize you to do anything you deem reasonably necessary to protect the Property, and perfect and continue your security interest in the Property. If I fail to perform any of my duties under this Agreement or any other Loan Document, you are authorized, without notice to me, to perform the duties or cause them to be performed.

These authorizations include, but are not limited to, permission to:

**A.** pay and discharge taxes, liens, security interests or other encumbrances at any time levied or placed on the Property.

**B.** pay any rents or other charges under any lease affecting the Property.

**C.** order and pay for the repair, maintenance and preservation of the Property.

**D.** file any financing statements on my behalf and pay for filing and recording fees pertaining to the Property.

**E.** place a note on any chattel paper indicating your interest in the Property.

F. take any action you feel necessary to realize on the Property, including performing any part of a contract or endorsing it in my name.

G. handle any suits or other proceedings involving the Property in my name.

H. prepare, file, and sign my name to any necessary reports or accountings.

I. make an entry on my books and records showing the existence of this Agreement.

J. notify any Account Debtor or Obligor of your interest in the Property and tell the Account Debtor or Obligor to make payments to you or someone else you name.

If you perform for me, you will use reasonable care. If you exercise the care and follow the procedures that you generally apply to the collection of obligations owed to you, you will be deemed to be using reasonable care. Reasonable care will not include: any steps necessary to preserve rights against prior parties; the duty to send notices, perform services or take any other action in connection with the management of the Property; or the duty to protect, preserve or maintain any security interest given to others by me or other parties. Your authorization to perform for me will not create an obligation to perform and your failure to perform will not preclude you from exercising any other rights under the law or this Loan Agreement. All cash and non-cash proceeds of the Property may be applied by you only upon your actual receipt of cash proceeds against such of the Secured Debts, matured or unmatured, as you determine in your sole discretion.

If you come into actual or constructive possession of the Property, you will preserve and protect the Property. For purposes of this paragraph, you will be in actual possession of the Property only when you have physical, immediate and exclusive control over the Property and you have affirmatively accepted that control. You will be in constructive possession of the Property only when you have both the power and the intent to exercise control over the Property.

**9. DEFAULT.** I will be in default if any of the following events (known separately and collectively as an Event of Default) occur:

**A. Payments.** I or Obligor fail to make a payment in full when due.

**B. Insolvency or Bankruptcy.** The death, dissolution or insolvency of, appointment of a receiver by or on behalf of, application of any debtor relief law, the assignment for the benefit of creditors by or on behalf of, the voluntary or involuntary termination of existence by, or the commencement of any proceeding under any present or future federal or state insolvency, bankruptcy, reorganization, composition or debtor relief law by or against me, Obligor, or any co-signer, endorser, surety or guarantor of this Agreement or any other obligations Obligor has with you.

**C. Business Termination.** I merge, dissolve, reorganize, end my business or existence, or a partner or majority owner dies or is declared legally incompetent.

**D. Failure to Perform.** I fail to perform any condition or to keep any promise or covenant of this Agreement.

**E. Other Documents.** A default occurs under the terms of any other Loan Document.

**F. Other Agreements.** I am in default on any other debt or agreement I have with you.

**G. Misrepresentation.** I make any verbal or written statement or provide any financial information that is untrue, inaccurate, or conceals a material fact at the time it is made or provided.

**H. Judgment.** I fail to satisfy or appeal any judgment against me.

**I. Forfeiture.** The Property is used in a manner or for a purpose that threatens confiscation by a legal authority.

**J. Name Change.** I change my name or assume an additional name without notifying you before making such a change.

**K. Property Transfer.** I transfer all or a substantial part of my money or property.

**L. Property Value.** You determine in good faith that the value of the Property has declined or is impaired.

**M. Material Change.** Without first notifying you, there is a material change in my business, including ownership, management, and financial conditions.

**N. Insecurity.** You determine in good faith that a material adverse change has occurred in Borrower's financial condition from the conditions set forth in Borrower's most recent financial statement before the date of this Agreement or that the prospect for payment or performance of the Secured Debts is impaired for any reason.

**10. DUE ON SALE OR ENCUMBRANCE.** You may, at your option, declare the entire balance of this Agreement to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of all or any part of the Property. This right is subject to the restrictions imposed by federal law, as applicable.

**11. REMEDIES.** After I default, you may at your option do any one or more of the following.

**A. Acceleration.** You may make all or any part of the amount owing by the terms of the Secured Debts immediately due.

**B. Sources.** You may use any and all remedies you have under state or federal law or in any Loan Document.

**C. Insurance Benefits.** You may make a claim for any and all insurance benefits or refunds that may be available on my default.

**D. Payments Made On My Behalf.** Amounts advanced on my behalf will be immediately due and may be added to the Secured Debts.

**E. Assembly of Property.** You may require me to gather the Property and make it available to you in a reasonable fashion.

**F. Repossession.** You may repossess the Property so long as the repossession does not involve a breach of the peace. You may sell, lease or otherwise dispose of the Property as provided by law. You may apply what you receive from the disposition of the Property to your expenses, your attorneys' fees and legal expenses (where not prohibited by law), and any debt I owe you. If what you receive from the disposition of the Property does not satisfy the debt, I will be liable for the deficiency (where permitted by law). In some cases, you may keep the Property to satisfy the debt.

Where a notice is required, I agree that ten days prior written notice sent by first class mail to my address listed in this Agreement will be reasonable notice to me under the Michigan Uniform Commercial Code. If the Property is perishable or threatens to decline speedily in value, you may, without notice to me, dispose of any or all of the Property in a commercially reasonable manner at my expense following any commercially reasonable preparation or processing (where permitted by law).

If any items not otherwise subject to this Agreement are contained in the Property when you take possession, you may hold these items for me at my risk and you will not be liable for taking possession of them (where permitted by law).

**G. Use and Operation.** You may enter upon my premises and take possession of all or any part of my property for the purpose of preserving the Property or its value, so long as you do not breach the peace. You may use and operate my property for the length of time you feel is necessary to protect your interest, all without payment or compensation to me.

**H. Waiver.** By choosing any one or more of these remedies you do not give up your right to use any other remedy. You do not waive a default if you choose not to use a remedy. By electing not to use any remedy, you do not waive your right to later consider the event a default and to use any remedies if the default continues or occurs again.

**12. WAIVER OF CLAIMS.** I waive all claims for loss or damage caused by your acts or omissions where you acted reasonably and in good faith.

**13. PERFECTION OF SECURITY INTEREST AND COSTS.** I authorize you to file a financing statement and/or security agreement, as appropriate, covering all of my personal Property. I will comply with, facilitate, and otherwise assist you in connection with obtaining perfection or control over the Property for purposes of perfecting your security interest under the Uniform Commercial Code. I agree to pay all taxes, fees and costs you pay or incur in connection with preparing, filing or recording any financing statements or other security interest filings on the Property. I agree to pay all actual costs of terminating your security interest.

**14. APPLICABLE LAW.** This Agreement is governed by the laws of Michigan, the United States of America, and to the extent required, by the laws of the jurisdiction where the Property is located, except to the extent such state laws are preempted by federal law. In the event of a dispute, the exclusive forum, venue and place of jurisdiction will be in Michigan, unless otherwise required by law.

**15. JOINT AND INDIVIDUAL LIABILITY AND SUCCESSORS.** Each Debtor's obligations under this Agreement are independent of the obligations of any other Debtor. You may sue each Debtor individually or together with any other Debtor. You may release any part of the Property and I will still be obligated under this Agreement for the remaining Property. Debtor agrees that you and any party to this Agreement may extend, modify or make any change in the terms of this Agreement or any evidence of debt without Debtor's consent. Such a change will not release Debtor from the terms of this Agreement. If you assign any of the Secured Debts, you may assign all or any part of this Agreement without notice to me or my consent, and this Agreement will inure to the benefit of your assignee to the extent of such assignment. You will continue to have the unimpaired right to enforce this Agreement as to any of the Secured Debts that are not assigned. This Agreement shall inure to the benefit of and be enforceable by you and your successors and assigns and any other person to whom you may grant an interest in the Secured Debts and shall be binding upon and enforceable against me and my personal representatives, successors, heirs and assigns.

**16. AMENDMENT, INTEGRATION AND SEVERABILITY.** This Agreement may not be amended or modified by oral agreement. No amendment or modification of this Agreement is effective unless made in writing. This Agreement and the other Loan Documents are the complete and final expression of the understanding between you and me. If any provision of this Agreement is unenforceable, then the unenforceable provision will be severed and the remaining provisions will still be enforceable.

**17. INTERPRETATION.** Whenever used, the singular includes the plural and the plural includes the singular. The section headings are for convenience only and are not to be used to interpret or define the terms of this Agreement.

**18. NOTICE AND ADDITIONAL DOCUMENTS.** Unless otherwise required by law, any notice will be given by delivering it or mailing it by first class mail to the appropriate party's address listed in the DATE AND PARTIES section, or to any other address designated in writing. Notice to one Debtor will be deemed to be notice to all Debtors. I will inform you in writing of any change in my name, address or other application information. I will provide you any other, correct and complete information you request to effectively grant a security interest on the Property. I agree to sign, deliver, and file any additional documents or certifications that you may consider necessary to perfect, continue, and preserve my obligations under this Agreement and to confirm your lien status on any Property. Time is of the essence.

**19. AGREEMENT TO ARBITRATE.** You or I may submit to binding arbitration any dispute, claim or other matter in question between or among you and me that arises out of or relates to this Transaction (Dispute), except as otherwise indicated in this section or as you and I agree to in writing. For purposes of this section, this Transaction includes this Agreement and the other Loan Documents, and proposed loans or extensions of credit that relate to this Agreement. You or I will not arbitrate any Dispute within any "core proceedings" under the United States bankruptcy laws.

You or I may, whether or not any arbitration has begun, pursue any self-help or similar remedies, including taking property or exercising other rights under the law; seek attachment, garnishment, receivership or other provisional remedies from a court having jurisdiction to preserve the rights of or to prevent irreparable injury to you or me; or foreclose against any property by any method or take legal action to recover any property. Foreclosing or exercising a power of sale, beginning and continuing a judicial action or pursuing self-help remedies will not constitute a waiver of the right to compel arbitration.

The arbitrator will determine whether a Dispute is arbitrable. A single arbitrator will resolve any Dispute, whether individual or joint in nature, or whether based on contract, tort, or any other matter at law or in equity. The arbitrator may consolidate any Dispute with any related disputes, claims or other matters in question not arising out of this Transaction. Any court having jurisdiction may enter a judgment or decree on the arbitrator's award. The judgment or decree will be enforced as any other judgment or decree.

You and I acknowledge that the agreements, transactions or the relationships which result from the agreements or transactions between and among you and me involve interstate commerce. The United States Arbitration Act will govern the interpretation and enforcement of this section.

The American Arbitration Association's Commercial Arbitration Rules, in effect on the date of this Agreement, will govern the selection of the arbitrator and the arbitration process, unless otherwise agreed to in this Agreement or another writing.

**20. WAIVER OF TRIAL FOR ARBITRATION. You and I understand that the parties have the right or opportunity to litigate any Dispute through a trial by judge or jury, but that the parties prefer to resolve Disputes through arbitration instead of litigation. If any Dispute is arbitrated, you and I voluntarily and knowingly waive the right to have a trial by jury or judge during the arbitration.**

**21. WAIVER OF JURY TRIAL. If the parties do not opt for arbitration, then all of the parties to this Agreement knowingly and intentionally, irrevocably and unconditionally, waive any and all right to a trial by jury in any litigation arising out of or concerning this Agreement or any other Loan Document or related obligation. All of these parties acknowledge that this section has either been brought to the attention of each party's legal counsel or that each party had the opportunity to do so.**

**SIGNATURES.** By signing, I agree to the terms contained in this Agreement. I also acknowledge receipt of a copy of this Agreement.

**DEBTOR:**

MM Ventures, LLC

By D.J. McCord MM Ventures LLC Member Date 11/2/18
David McCord, Sole Member



Wolters Kluwer Financial Services ©1996, 2018 Bankers Systems™

KELLOGG COMMUNITY credit union

# SECURITY AGREEMENT

**DATE AND PARTIES.** The date of this Security Agreement (Agreement) is November 02, 2018. The parties and their addresses are:

**SECURED PARTY:**
**KELLOGG COMMUNITY CREDIT UNION**
P.O. Box 140
Battle Creek, MI 49016

**DEBTOR:**
**MCCORD ALF LLC**
a Michigan Limited Liability Company
150 Auburn Street
Battle Creek, MI 49014

**Definitions.** For the purposes of this document, the following terms have the following meanings.

"Loan" refers to this transaction generally, including obligations and duties arising from the terms of all documents prepared or submitted for this transaction.

The pronouns "you" and "your" refer to the Secured Party. The pronouns "I," "me" and "my" refer to each person or entity signing this Agreement as Debtor and agreeing to give the Property described in this Agreement as security for the Secured Debts.

Where the owner of the Property is different from the obligor or guarantor whose obligation this Agreement secures, "Debtor" refers to each person or entity who is an owner of the Property and "Obligor" or "Guarantor," as applicable, refer to such parties as designated in the SECURED DEBTS section.

**1. SECURED DEBTS.** The term "Secured Debts" includes and this Agreement will secure each of the following:

**A. Specific Debts.** The following debts and all extensions, renewals, refinancings, modifications and replacements. A promissory note or other agreement, No. 355421-761, dated November 2, 2018, from MM Ventures, LLC and McCord ALF LLC (Obligor) to you, in the amount of $438,500.00.

**B. All Debts.** All present and future debts from Obligor to you, even if this Agreement is not specifically referenced, the future debts are also secured by other collateral, or if the future debt is unrelated to or of a different type than this debt. If more than one person signs this Agreement, each agrees that it will secure debts incurred either individually or with others who may not sign this Agreement. Nothing in this Agreement constitutes a commitment to make additional or future loans or advances. Any such commitment must be in writing.

This Agreement will not secure any debt which is also secured by real property or for which a non-possessory, non-purchase money security interest is created in "household goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices. In addition, this Agreement will not secure any other debt if, with respect to such other debt, you fail to fulfill any necessary requirements or fail to conform to any limitations of the Truth in Lending Act (Regulation Z) or the Real Estate Settlement Procedures Act (Regulation X) that are required for loans secured by the Property or if, as a result, the other debt would become subject to Section 670 of the John Warner National Defense Authorization Act for Fiscal Year 2007.

**C. Sums Advanced.** All sums advanced and expenses incurred by you under the terms of this Agreement.

Loan Documents refer to all the documents executed in connection with the Secured Debts.

**2. SECURITY INTEREST.** To secure the payment and performance of the Secured Debts, I grant you a security interest in all of the Property described in this Agreement that I own or have sufficient rights in which to transfer an interest, now or in the future, wherever the Property is or will be located, and all proceeds and products from the Property (including, but not limited to, all parts, accessories, repairs, replacements, improvements, and accessions to the Property). Property is all the collateral given as security for the Secured Debts and described in this Agreement, and includes all obligations that support the payment or performance of the Property. "Proceeds" includes cash proceeds, non-cash proceeds and anything acquired upon the sale, lease, license, exchange, or other disposition of the Property; any rights and claims arising from the Property; and any collections and distributions on account of the Property.

This Agreement remains in effect until terminated in writing, even if the Secured Debts are paid and you are no longer obligated to advance funds to me under any loan or credit agreement.

**3. PROPERTY DESCRIPTION.** The Property is described as follows:

**A. All Assets.** All present and future right, title and interest in and to any and all personal property of the Debtor, whether such property is now existing or hereafter created, acquired or arising and wherever located from time to time, including without limitation, the following categories of property: goods (including inventory, equipment, fixtures, farm products and any accessions thereto), instruments (including promissory notes), documents, accounts (including health-care-insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter-of-credit is evidenced by a writing), commercial tort claims, securities and all other investment property, general intangibles (including payment intangibles and software), all supporting obligations and all proceeds, products, additions, accessions, substitutions and replacements of the foregoing property.

Any term used herein is as defined by the Uniform Commercial Code and further as modified or amended by the laws of the jurisdiction which governs this transaction.

**4. WARRANTIES AND REPRESENTATIONS.** I make to you the following warranties and representations which will continue as long as this Agreement is in effect:

**A. Power.** I am duly organized, and validly existing and in good standing in all jurisdictions in which I operate. I have the power and authority to enter into this transaction and to carry on my business or activity as it is now being conducted and, as applicable, am qualified to do so in each jurisdiction in which I operate.

**B. Authority.** The execution, delivery and performance of this Agreement and the obligation evidenced by this Agreement are within my powers, have been duly authorized, have received all necessary governmental approval, will not violate any provision of law, or order of court or governmental agency, and will not violate any agreement to which I am a party or to which I am or any of my property is subject.

**C. Name and Location.** My name indicated in the DATE AND PARTIES section is my exact legal name. I am located at the address indicated in the DATE AND PARTIES section. I will provide verification of registration and location upon your request. I will provide you with at least 30 days notice prior to any change in my name, address, or state of organization or registration.


Wolters Kluwer Financial Services ©1996, 2018 Bankers Systems™

**D. Business Name.** Other than previously disclosed in writing to you I have not changed my name or principal place of business within the last 10 years and have not used any other trade or fictitious name. Without your prior written consent, I do not and will not use any other name and will preserve my existing name, trade names and franchises.

**E. Ownership of Property.** I represent that I own all of the Property. Your claim to the Property is ahead of the claims of any other creditor, except as disclosed in writing to you prior to any advance on the Secured Debts. I represent that I am the original owner of the Property and, if I am not, that I have provided you with a list of prior owners of the Property.

**5. DUTIES TOWARD PROPERTY.**

**A. Protection of Secured Party's Interest.** I will defend the Property against any other claim. I agree to do whatever you require to protect your security interest and to keep your claim in the Property ahead of the claims of other creditors. I will not do anything to harm your position.

I will keep books, records and accounts about the Property and my business in general. I will let you examine these and make copies at any reasonable time. I will prepare any report or accounting you request which deals with the Property.

**B. Use, Location, and Protection of the Property.** I will keep the Property in my possession and in good repair. I will use it only for commercial purposes. I will not change this specified use without your prior written consent. You have the right of reasonable access to inspect the Property and I will immediately inform you of any loss or damage to the Property. I will not cause or permit waste to the Property.

I will keep the Property at my address listed in the DATE AND PARTIES section unless we agree I may keep it at another location. If the Property is to be used in other states, I will give you a list of those states. The location of the Property is given to aid in the identification of the Property. It does not in any way limit the scope of the security interest granted to you. I will notify you in writing and obtain your prior written consent to any change in location of any of the Property. I will not use the Property in violation of any law. I will notify you in writing prior to any change in my address, name or, if an organization, any change in my identity or structure.

Until the Secured Debts are fully paid and this Agreement is terminated, I will not grant a security interest in any of the Property without your prior written consent. I will pay all taxes and assessments levied or assessed against me or the Property and provide timely proof of payment of these taxes and assessments upon request.

**C. Selling, Leasing or Encumbering the Property.** I will not sell, offer to sell, lease, or otherwise transfer or encumber the Property without your prior written permission. Any disposition of the Property contrary to this Agreement will violate your rights. Your permission to sell the Property may be reasonably withheld without regard to the creditworthiness of any buyer or transferee. I will not permit the Property to be the subject of any court order affecting my rights to the Property in any action by anyone other than you. If the Property includes chattel paper or instruments, either as original collateral or as proceeds of the Property, I will note your security interest on the face of the chattel paper or instruments.

**6. INSURANCE.** I agree to keep the Property insured against the risks reasonably associated with the Property. I will maintain this insurance in the amounts you require. This insurance will last until the Property is released from this Agreement. I may choose the insurance company, subject to your approval, which will not be unreasonably withheld.

I will have the insurance company name you as loss payee on any insurance policy. I will give you and the insurance company immediate notice of any loss. You may apply the insurance proceeds toward what is owed on the Secured Debts. You may require added security as a condition of permitting any insurance proceeds to be used to repair or replace the Property.

If you acquire the Property in damaged condition, my right to any insurance policies and proceeds will pass to you to the extent of the Secured Debts.

I will immediately notify you of cancellation or termination of insurance. If I fail to keep the Property insured, you may obtain insurance to protect your interest in the Property and I will pay for the insurance on your demand. You may demand that I pay for the insurance all at once, or you may add the insurance premiums to the balance of the Secured Debts and charge interest on it at the rate that applies to the Secured Debts. This insurance may include lesser or greater coverages than originally required of me, may be written by a company other than one I would choose, and may be written at a higher rate than I could obtain if I purchased the insurance. I acknowledge and agree that you or one of your affiliates may receive commissions on the purchase of this insurance.

**7. COLLECTION RIGHTS OF THE SECURED PARTY.** Account Debtor means the person who is obligated on an account, chattel paper, or general intangible. I authorize you to notify my Account Debtors of your security interest and to deal with the Account Debtors' obligations at your discretion. You may enforce the obligations of an Account Debtor, exercising any of my rights with respect to the Account Debtors' obligations to make payment or otherwise render performance to me, including the enforcement of any security interest that secures such obligations. You may apply proceeds received from the Account Debtors to the Secured Debts or you may release such proceeds to me.

I specifically and irrevocably authorize you to exercise any of the following powers at my expense, without limitation, until the Secured Debts are paid in full:

A. demand payment and enforce collection from any Account Debtor or Obligor by suit or otherwise.

B. enforce any security interest, lien or encumbrance given to secure the payment or performance of any Account Debtor or any obligation constituting Property.

C. file proofs of claim or similar documents in the event of bankruptcy, insolvency or death of any person obligated as an Account Debtor.

D. compromise, release, extend, or exchange any indebtedness of an Account Debtor.

E. take control of any proceeds of the Account Debtors' obligations and any returned or repossessed goods.

F. endorse all payments by any Account Debtor which may come into your possession as payable to me.

G. deal in all respects as the holder and owner of the Account Debtors' obligations.

**8. AUTHORITY TO PERFORM.** I authorize you to do anything you deem reasonably necessary to protect the Property, and perfect and continue your security interest in the Property. If I fail to perform any of my duties under this Agreement or any other Loan Document, you are authorized, without notice to me, to perform the duties or cause them to be performed.

These authorizations include, but are not limited to, permission to:

A. pay and discharge taxes, liens, security interests or other encumbrances at any time levied or placed on the Property.

B. pay any rents or other charges under any lease affecting the Property.

C. order and pay for the repair, maintenance and preservation of the Property.

D. file any financing statements on my behalf and pay for filing and recording fees pertaining to the Property.

E. place a note on any chattel paper indicating your interest in the Property.

F. take any action you feel necessary to realize on the Property, including performing any part of a contract or endorsing it in my name.

G. handle any suits or other proceedings involving the Property in my name.

H. prepare, file, and sign my name to any necessary reports or accountings.

I. make an entry on my books and records showing the existence of this Agreement.

J. notify any Account Debtor or Obligor of your interest in the Property and tell the Account Debtor or Obligor to make payments to you or someone else you name.

If you perform for me, you will use reasonable care. If you exercise the care and follow the procedures that you generally apply to the collection of obligations owed to you, you will be deemed to be using reasonable care. Reasonable care will not include: any steps necessary to preserve rights against prior parties; the duty to send notices, perform services or take any other action in connection with the management of the Property; or the duty to protect, preserve or maintain any security interest given to others by me or other parties. Your authorization to perform for me will not create an obligation to perform and your failure to perform will not preclude you from exercising any other rights under the law or this Loan Agreement. All cash and non-cash proceeds of the Property may be applied by you only upon your actual receipt of cash proceeds against such of the Secured Debts, matured or unmatured, as you determine in your sole discretion.

If you come into actual or constructive possession of the Property, you will preserve and protect the Property. For purposes of this paragraph, you will be in actual possession of the Property only when you have physical, immediate and exclusive control over the Property and you have affirmatively accepted that control. You will be in constructive possession of the Property only when you have both the power and the intent to exercise control over the Property.

**9. DEFAULT.** I will be in default if any of the following events (known separately and collectively as an Event of Default) occur:

**A. Payments.** I or Obligor fail to make a payment in full when due.

**B. Insolvency or Bankruptcy.** The death, dissolution or insolvency of, appointment of a receiver by or on behalf of, application of any debtor relief law, the assignment for the benefit of creditors by or on behalf of, the voluntary or involuntary termination of existence by, or the commencement of any proceeding under any present or future federal or state insolvency, bankruptcy, reorganization, composition or debtor relief law by or against me, Obligor, or any co-signer, endorser, surety or guarantor of this Agreement or any other obligations Obligor has with you.

**C. Business Termination.** I merge, dissolve, reorganize, end my business or existence, or a partner or majority owner dies or is declared legally incompetent.

**D. Failure to Perform.** I fail to perform any condition or to keep any promise or covenant of this Agreement.

**E. Other Documents.** A default occurs under the terms of any other Loan Document.

**F. Other Agreements.** I am in default on any other debt or agreement I have with you.

**G. Misrepresentation.** I make any verbal or written statement or provide any financial information that is untrue, inaccurate, or conceals a material fact at the time it is made or provided.

**H. Judgment.** I fail to satisfy or appeal any judgment against me.

**I. Forfeiture.** The Property is used in a manner or for a purpose that threatens confiscation by a legal authority.

**J. Name Change.** I change my name or assume an additional name without notifying you before making such a change.

**K. Property Transfer.** I transfer all or a substantial part of my money or property.

**L. Property Value.** You determine in good faith that the value of the Property has declined or is impaired.

**M. Material Change.** Without first notifying you, there is a material change in my business, including ownership, management, and financial conditions.

**N. Insecurity.** You determine in good faith that a material adverse change has occurred in Borrower's financial condition from the conditions set forth in Borrower's most recent financial statement before the date of this Agreement or that the prospect for payment or performance of the Secured Debts is impaired for any reason.

**10. DUE ON SALE OR ENCUMBRANCE.** You may, at your option, declare the entire balance of this Agreement to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of all or any part of the Property. This right is subject to the restrictions imposed by federal law, as applicable.

**11. REMEDIES.** After I default, you may at your option do any one or more of the following.

**A. Acceleration.** You may make all or any part of the amount owing by the terms of the Secured Debts immediately due.

**B. Sources.** You may use any and all remedies you have under state or federal law or in any Loan Document.

**C. Insurance Benefits.** You may make a claim for any and all insurance benefits or refunds that may be available on my default.

**D. Payments Made On My Behalf.** Amounts advanced on my behalf will be immediately due and may be added to the Secured Debts.

**E. Assembly of Property.** You may require me to gather the Property and make it available to you in a reasonable fashion.

**F. Repossession.** You may repossess the Property so long as the repossession does not involve a breach of the peace. You may sell, lease or otherwise dispose of the Property as provided by law. You may apply what you receive from the disposition of the Property to your expenses, your attorneys' fees and legal expenses (where not prohibited by law), and any debt I owe you. If what you receive from the disposition of the Property does not satisfy the debt, I will be liable for the deficiency (where permitted by law). In some cases, you may keep the Property to satisfy the debt.

Where a notice is required, I agree that ten days prior written notice sent by first class mail to my address listed in this Agreement will be reasonable notice to me under the Michigan Uniform Commercial Code. If the Property is perishable or threatens to decline speedily in value, you may, without notice to me, dispose of any or all of the Property in a commercially reasonable manner at my expense following any commercially reasonable preparation or processing (where permitted by law).

If any items not otherwise subject to this Agreement are contained in the Property when you take possession, you may hold these items for me at my risk and you will not be liable for taking possession of them (where permitted by law).

**G. Use and Operation.** You may enter upon my premises and take possession of all or any part of my property for the purpose of preserving the Property or its value, so long as you do not breach the peace. You may use and operate my property for the length of time you feel is necessary to protect your interest, all without payment or compensation to me.

**H. Waiver.** By choosing any one or more of these remedies you do not give up your right to use any other remedy. You do not waive a default if you choose not to use a remedy. By electing not to use any remedy, you do not waive your right to later consider the event a default and to use any remedies if the default continues or occurs again.

**12. WAIVER OF CLAIMS.** I waive all claims for loss or damage caused by your acts or omissions where you acted reasonably and in good faith.

**13. PERFECTION OF SECURITY INTEREST AND COSTS.** I authorize you to file a financing statement and/or security agreement, as appropriate, covering all of my personal Property. I will comply with, facilitate, and otherwise assist you in connection with obtaining perfection or control over the Property for purposes of perfecting your security interest under the Uniform Commercial Code. I agree to pay all taxes, fees and costs you pay or incur in connection with preparing, filing or recording any financing statements or other security interest filings on the Property. I agree to pay all actual costs of terminating your security interest.

**14. APPLICABLE LAW.** This Agreement is governed by the laws of Michigan, the United States of America, and to the extent required, by the laws of the jurisdiction where the Property is located, except to the extent such state laws are preempted by federal law. In the event of a dispute, the exclusive forum, venue and place of jurisdiction will be in Michigan, unless otherwise required by law.

**15. JOINT AND INDIVIDUAL LIABILITY AND SUCCESSORS.** Each Debtor's obligations under this Agreement are independent of the obligations of any other Debtor. You may sue each Debtor individually or together with any other Debtor. You may release any part of the Property and I will still be obligated under this Agreement for the remaining Property. Debtor agrees that you and any party to this Agreement may extend, modify or make any change in the terms of this Agreement or any evidence of debt without Debtor's consent. Such a change will not release Debtor from the terms of this Agreement. If you assign any of the Secured Debts, you may assign all or any part of this Agreement without notice to me or my consent, and this Agreement will inure to the benefit of your assignee to the extent of such assignment. You will continue to have the unimpaired right to enforce this Agreement as to any of the Secured Debts that are not assigned. This Agreement shall inure to the benefit of and be enforceable by you and your successors and assigns and any other person to whom you may grant an interest in the Secured Debts and shall be binding upon and enforceable against me and my personal representatives, successors, heirs and assigns.

**16. AMENDMENT, INTEGRATION AND SEVERABILITY.** This Agreement may not be amended or modified by oral agreement. No amendment or modification of this Agreement is effective unless made in writing. This Agreement and the other Loan Documents are the complete and final expression of the understanding between you and me. If any provision of this Agreement is unenforceable, then the unenforceable provision will be severed and the remaining provisions will still be enforceable.

**17. INTERPRETATION.** Whenever used, the singular includes the plural and the plural includes the singular. The section headings are for convenience only and are not to be used to interpret or define the terms of this Agreement.

**18. NOTICE AND ADDITIONAL DOCUMENTS.** Unless otherwise required by law, any notice will be given by delivering it or mailing it by first class mail to the appropriate party's address listed in the DATE AND PARTIES section, or to any other address designated in writing. Notice to one Debtor will be deemed to be notice to all Debtors. I will inform you in writing of any change in my name, address or other application information. I will provide you any other, correct and complete information you request to effectively grant a security interest on the Property. I agree to sign, deliver, and file any additional documents or certifications that you may consider necessary to perfect, continue, and preserve my obligations under this Agreement and to confirm your lien status on any Property. Time is of the essence.

**19. AGREEMENT TO ARBITRATE.** You or I may submit to binding arbitration any dispute, claim or other matter in question between or among you and me that arises out of or relates to this Transaction (Dispute), except as otherwise indicated in this section or as you and I agree to in writing. For purposes of this section, this Transaction includes this Agreement and the other Loan Documents, and proposed loans or extensions of credit that relate to this Agreement. You or I will not arbitrate any Dispute within any "core proceedings" under the United States bankruptcy laws.

You or I may, whether or not any arbitration has begun, pursue any self-help or similar remedies, including taking property or exercising other rights under the law; seek attachment, garnishment, receivership or other provisional remedies from a court having jurisdiction to preserve the rights of or to prevent irreparable injury to you or me; or foreclose against any property by any method or take legal action to recover any property. Foreclosing or exercising a power of sale, beginning and continuing a judicial action or pursuing self-help remedies will not constitute a waiver of the right to compel arbitration.

The arbitrator will determine whether a Dispute is arbitrable. A single arbitrator will resolve any Dispute, whether individual or joint in nature, or whether based on contract, tort, or any other matter at law or in equity. The arbitrator may consolidate any Dispute with any related disputes, claims or other matters in question not arising out of this Transaction. Any court having jurisdiction may enter a judgment or decree on the arbitrator's award. The judgment or decree will be enforced as any other judgment or decree.

You and I acknowledge that the agreements, transactions or the relationships which result from the agreements or transactions between and among you and me involve interstate commerce. The United States Arbitration Act will govern the interpretation and enforcement of this section.

The American Arbitration Association's Commercial Arbitration Rules, in effect on the date of this Agreement, will govern the selection of the arbitrator and the arbitration process, unless otherwise agreed to in this Agreement or another writing.

**20. WAIVER OF TRIAL FOR ARBITRATION. You and I understand that the parties have the right or opportunity to litigate any Dispute through a trial by judge or jury, but that the parties prefer to resolve Disputes through arbitration instead of litigation. If any Dispute is arbitrated, you and I voluntarily and knowingly waive the right to have a trial by jury or judge during the arbitration.**

**21. WAIVER OF JURY TRIAL. If the parties do not opt for arbitration, then all of the parties to this Agreement knowingly and intentionally, irrevocably and unconditionally, waive any and all right to a trial by jury in any litigation arising out of or concerning this Agreement or any other Loan Document or related obligation. All of these parties acknowledge that this section has either been brought to the attention of each party's legal counsel or that each party had the opportunity to do so.**

**SIGNATURES.** By signing, I agree to the terms contained in this Agreement. I also acknowledge receipt of a copy of this Agreement.

**DEBTOR:**

McCord ALF LLC

By: David McCord McCord ALF LLC Member Date 11/2/18

David McCord, Sole Member

# Exhibit 3

CERTIFIED COPY OF ORIGINAL DOCUMENT

# THIS IS A FUTURE ADVANCE MORTGAGE

This instrument was prepared by Kirk Schwarz, Kellogg Community Credit Union, PO Box 140, Battle Creek, MI 49016
MAXIMUM PRINCIPAL AMOUNT: Unlimited.

Return To: Kirk Schwarz, Kellogg Community Credit Union, PO Box 140, Battle Creek, MI 49016

**DATE AND PARTIES.** The date of this Mortgage (Security Instrument) is November 2, 2018. The parties and their addresses are:

**MORTGAGOR:**
**MM VENTURES, LLC**
A Michigan Limited Liability Company
7483 West Q Ave
Battle Creek, MI 49009

**LENDER:**
**KELLOGG COMMUNITY CREDIT UNION**
Organized and existing under the laws of Michigan
P.O. Box 140
Battle Creek, MI 49016

1. **DEFINITIONS.** For the purposes of this document, the following term has the following meaning.

**A. Loan.** "Loan" refers to this transaction generally, including obligations and duties arising from the terms of all documents prepared or submitted for this transaction.

2. **MAXIMUM OBLIGATION LIMIT. The maximum principal amount, excluding protective advances, secured by this Security Instrument is unlimited.** Any limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Protective advances are defined by law and include an expenditure or expenditures such as advances made under the terms of this Security Instrument to protect Lender's priority and advances made to fulfill or perform an obligation of the Mortgagor under this Security Instrument, with respect to the mortgaged property, that the Mortgagor has failed to fulfill or perform.

3. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debts and Mortgagor's performance under this Security Instrument, Mortgagor does hereby grant, bargain, convey, sell, mortgage and warrant to Lender, with the power of sale, the following described property:

Land situated in the Township of Texas, County Kalamazoo, State of Michigan and described as follows:

That part of the Northeast 1/4 of Section 22, T3S, R12W, Texas Township, Kalamazoo County, Michigan described as: Beginning at the North 1/4 corner of said Section 22; thence North 89°50'24" East along the North line of said Section 160.00 feet; thence South 00°14'07" West parallel with the North and South 1/4 line of said Section 200.00 feet; thence South 89°50'24" West 160.00 feet to said 1/4 line; thence North 00°14'07" East along said 1/4 line 200.00 feet to the point of beginning.

Tax ID: 09-22-201-001

The property is located in Kalamazoo County at 7483 West Q Ave, Kalamazoo, Michigan 49009.

Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian rights, wells, ditches and water stock, crops, timber including timber to be cut now or at any time in the future, all diversion payments or third party payments made to crop producers and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described (all referred to as Property). This Security Instrument will remain in effect until the Secured Debts and all underlying agreements have been terminated in writing by Lender.

**4. SECURED DEBTS AND FUTURE ADVANCES.** The term "Secured Debts" includes and this Security Instrument will secure each of the following:

**A. Specific Debts.** The following debts and all extensions, renewals, refinancings, modifications and replacements. A promissory note or other agreement, No. 355421-761, dated November 2, 2018, from MM Ventures, LLC and McCord ALF LLC (Borrower) to Lender, with a loan amount of $438,500.00.

**B. Future Advances.** All future advances from Lender to MM Ventures, LLC and McCord ALF LLC under the Specific Debts executed by MM Ventures, LLC and McCord ALF LLC in favor of Lender after this Security Instrument. If more than one person signs this Security Instrument, each agrees that this Security Instrument will secure all future advances that are given to MM Ventures, LLC and McCord ALF LLC either individually or with others who may not sign this Security Instrument. All future advances are secured by this Security Instrument even though all or part may not yet be advanced. All future advances are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future advances in any amount. Any such commitment must be agreed to in a separate writing.

**C. All Debts.** All present and future debts from MM Ventures, LLC and McCord ALF LLC to Lender, even if this Security Instrument is not specifically referenced, or if the future debt is unrelated to or of a different type than this debt. If more than one person signs this Security Instrument, each agrees that it will secure debts incurred either individually or with others who may not sign this Security Instrument. Nothing in this Security Instrument constitutes a commitment to make additional or future loans or advances. Any such commitment must be in writing. This Security Instrument will not secure any debt for which a non-possessory, non-purchase money security interest is created in "household goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices. This Security Instrument will not secure any debt for which a security interest is created in

"margin stock" and Lender does not obtain a "statement of purpose," as defined and required by federal law governing securities. This Security Instrument will not secure any other debt if Lender, with respect to that other debt, fails to fulfill any necessary requirements or fails to conform to any limitations of the Truth in Lending Act (Regulation Z) or the Real Estate Settlement Procedures Act (Regulation X) that are required for loans secured by the Property.

**D. Sums Advanced.** All sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

**5. PAYMENTS.** Mortgagor agrees that all payments under the Secured Debts will be paid when due and in accordance with the terms of the Secured Debts and this Security Instrument.

**6. WARRANTY OF TITLE.** Mortgagor warrants that Mortgagor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to grant, bargain, convey, sell, mortgage, and warrant, with the power of sale, the Property. Mortgagor also warrants that the Property is unencumbered, except for encumbrances of record.

**7. PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Mortgagor agrees:

**A.** To make all payments when due and to perform or comply with all covenants.

**B.** To promptly deliver to Lender any notices that Mortgagor receives from the holder.

**C.** Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

**8. CLAIMS AGAINST TITLE.** Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Mortgagor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Mortgagor may have against parties who supply labor or materials to maintain or improve the Property.

**9. DUE ON SALE OR ENCUMBRANCE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of all or any part of the Property. This right is subject to the restrictions imposed by federal law, as applicable.

**10. TRANSFER OF AN INTEREST IN THE MORTGAGOR.** If Mortgagor is an entity other than a natural person (such as a corporation, partnership, limited liability company or other organization), Lender may demand immediate payment if:

**A.** A beneficial interest in Mortgagor is sold or transferred.

**B.** There is a change in either the identity or number of members of a partnership or similar entity.

**C.** There is a change in ownership of more than 25 percent of the voting stock of a corporation, partnership, limited liability company or similar entity.

However, Lender may not demand payment in the above situations if it is prohibited by law as of the date of this Security Instrument.

**11. WARRANTIES AND REPRESENTATIONS.** Mortgagor makes to Lender the following warranties and representations which will continue as long as this Security Instrument is in effect:

**A. Power.** Mortgagor is duly organized, and validly existing and in good standing in all jurisdictions in which Mortgagor operates. Mortgagor has the power and authority to enter into this transaction and to carry on Mortgagor's business or activity as it is now being conducted and, as applicable, is qualified to do so in each jurisdiction in which Mortgagor operates.

**B. Authority.** The execution, delivery and performance of this Security Instrument and the obligation evidenced by this Security Instrument are within Mortgagor's powers, have been duly authorized, have received all necessary governmental approval, will not violate any provision of law, or order of court or governmental agency, and will not violate any agreement to which Mortgagor is a party or to which Mortgagor is or any of Mortgagor's property is subject.

**C. Name and Place of Business.** Other than previously disclosed in writing to Lender, Mortgagor has not changed Mortgagor's name or principal place of business within the last 10 years and has not used any other trade or fictitious name. Without Lender's prior written consent, Mortgagor does not and will not use any other name and will preserve Mortgagor's existing name, trade names and franchises.

**12. PROPERTY CONDITION, ALTERATIONS, INSPECTION, VALUATION AND APPRAISAL.** Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary. Mortgagor will not commit or allow any waste, impairment, or deterioration of the Property. Mortgagor will keep the Property free of noxious weeds and grasses. Mortgagor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Mortgagor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Mortgagor will notify Lender of all demands, proceedings, claims, and actions against Mortgagor, and of any loss or damage to the Property.

No portion of the Property will be removed, demolished or materially altered without Lender's prior written consent except that Mortgagor has the right to remove items of personal property comprising a part of the Property that become worn or obsolete, provided that such personal property is replaced with other personal property at least equal in value to the replaced personal property, free from any title retention device, security agreement or other encumbrance. Such replacement of personal property will be deemed subject to the security interest created by this Security Instrument. Mortgagor will not partition or subdivide the Property without Lender's prior written consent.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time and frequency for the purpose of inspecting, valuating, or appraising the Property. Lender will give Mortgagor notice at the time of or before an on-site inspection, valuation, or appraisal for on-going due diligence or otherwise specifying a reasonable purpose. Any inspection, valuation or appraisal of the Property will be entirely for Lender's benefit and Mortgagor will in no way rely on Lender's inspection, valuation or appraisal for its own purpose, except as otherwise provided by law.

**13. AUTHORITY TO PERFORM.** If Mortgagor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any amount necessary for performance. Lender's right to perform for Mortgagor will not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may take all steps necessary to protect Lender's security interest in the Property, including completion of the construction.

**14. DEFAULT.** Mortgagor will be in default if any of the following events (known separately and collectively as an Event of Default) occur:

**A. Payments.** Mortgagor or Borrower fail to make a payment in full when due.

**B. Insolvency or Bankruptcy.** The death, dissolution or insolvency of, appointment of a receiver by or on behalf of, application of any debtor relief law, the assignment for the benefit of creditors by or on behalf of, the voluntary or involuntary termination of existence by, or the commencement of any proceeding under any present or future federal or state insolvency, bankruptcy, reorganization, composition or debtor relief law by or against Mortgagor, Borrower, or any co-signer, endorser, surety or guarantor of this Security Instrument or any other obligations Borrower has with Lender.

**C. Business Termination.** Mortgagor merges, dissolves, reorganizes, ends its business or existence, or a partner or majority owner dies or is declared legally incompetent.

**D. Failure to Perform.** Mortgagor fails to perform any condition or to keep any promise or covenant of this Security Instrument.

**E. Other Documents.** A default occurs under the terms of any other document relating to the Secured Debts.

**F. Other Agreements.** Mortgagor is in default on any other debt or agreement Mortgagor has with Lender.

**G. Misrepresentation.** Mortgagor makes any verbal or written statement or provides any financial information that is untrue, inaccurate, or conceals a material fact at the time it is made or provided.

**H. Judgment.** Mortgagor fails to satisfy or appeal any judgment against Mortgagor.

**I. Forfeiture.** The Property is used in a manner or for a purpose that threatens confiscation by a legal authority.

**J. Name Change.** Mortgagor changes Mortgagor's name or assumes an additional name without notifying Lender before making such a change.

**K. Property Transfer.** Mortgagor transfers all or a substantial part of Mortgagor's money or property. This condition of default, as it relates to the transfer of the Property, is subject to the restrictions contained in the DUE ON SALE section.

**L. Property Value.** Lender determines in good faith that the value of the Property has declined or is impaired.

**M. Material Change.** Without first notifying Lender, there is a material change in Mortgagor's business, including ownership, management, and financial conditions.

**N. Insecurity.** Lender determines in good faith that a material adverse change has occurred in Borrower's financial condition from the conditions set forth in Borrower's most recent financial statement before the date of this Security Instrument or that the prospect for payment or performance of the Secured Debts is impaired for any reason.

**15. REMEDIES.** On or after the occurrence of an Event of Default, Lender may use any and all remedies Lender has under state or federal law or in any document relating to the Secured Debts, including, without limitation, the power to sell the Property. Any amounts advanced on Mortgagor's behalf will be immediately due and may be added to the balance owing under the Secured Debts. Lender may make a claim for any and all insurance benefits or refunds that may be available on Mortgagor's default.

Subject to any right to cure, required time schedules or any other notice rights Mortgagor may have under federal and state law, Lender may make all or any part of the amount owing by the terms of the Secured Debts immediately due and foreclose this Security Instrument in a manner provided by law upon the occurrence of an Event of Default or anytime thereafter.

If there is an occurrence of an Event of Default, Lender may, in addition to any other permitted remedy, invoke the power of sale and sell the Property as a whole or in such parcels (and in such order) as Lender may direct at public sale to the highest bidder. If Lender invokes the power of sale, Lender will give notice of the sale as prescribed by applicable law in effect at the time of the proposed sale. Lender or its designee may purchase the Property at any sale. The proceeds of the sale will be applied in the manner prescribed by applicable law.

Upon any sale of the Property, Lender will make and deliver a deed without warranty or appropriate deed required by applicable law that conveys all right, title and interest to the Property that was sold to the purchaser(s). The recitals in any deed of conveyance will be prima facie evidence of the facts set forth therein.

All remedies are distinct, cumulative and not exclusive, and Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth. The acceptance by Lender of any sum in payment or partial payment on the Secured Debts after the balance is due or is accelerated or after foreclosure proceedings are filed will not constitute a waiver of Lender's right to require full and complete cure of any existing default. By not exercising any remedy, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

**16. COLLECTION EXPENSES AND ATTORNEYS' FEES.** On or after the occurrence of an Event of Default, to the extent permitted by law, Mortgagor agrees to pay all expenses of collection, enforcement, valuation, appraisal or protection of Lender's rights and remedies under this Security Instrument or any other document relating to the Secured Debts. Mortgagor agrees to pay expenses for Lender to inspect, valuate, appraise and preserve the Property. Expenses include, but are not limited to, attorneys' fees, court costs and other legal expenses. These expenses are due and payable immediately. If not paid immediately, these expenses will bear interest from the date of payment until paid in full at the highest interest rate in effect as provided for in the terms of the Secured Debts. In addition, to the extent permitted by the United States Bankruptcy Code, Mortgagor agrees to pay the reasonable attorneys' fees incurred by Lender to protect Lender's rights and interests in connection with any bankruptcy proceedings initiated by or against Mortgagor.

**17. ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substance," "hazardous waste," "hazardous substance," or "regulated substance" under any Environmental Law.

Mortgagor represents, warrants and agrees that:

**A.** Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance has been, is, or will be located, transported, manufactured, treated, refined, or handled by any person on, under or about the Property, except in the ordinary course of business and in strict compliance with all applicable Environmental Law.

**B.** Except as previously disclosed and acknowledged in writing to Lender, Mortgagor has not and will not cause, contribute to, or permit the release of any Hazardous Substance on the Property.

**C.** Mortgagor will immediately notify Lender if (1) a release or threatened release of Hazardous Substance occurs on, under or about the Property or migrates or threatens to migrate from nearby


Wolters Kluwer Financial Services ©1996, 2018 Bankers Systems™

property; or (2) there is a violation of any Environmental Law concerning the Property. In such an event, Mortgagor will take all necessary remedial action in accordance with Environmental Law.

**D.** Except as previously disclosed and acknowledged in writing to Lender, Mortgagor has no knowledge of or reason to believe there is any pending or threatened investigation, claim, or proceeding of any kind relating to (1) any Hazardous Substance located on, under or about the Property; or (2) any violation by Mortgagor or any tenant of any Environmental Law. Mortgagor will immediately notify Lender in writing as soon as Mortgagor has reason to believe there is any such pending or threatened investigation, claim, or proceeding. In such an event, Lender has the right, but not the obligation, to participate in any such proceeding including the right to receive copies of any documents relating to such proceedings.

**E.** Except as previously disclosed and acknowledged in writing to Lender, Mortgagor and every tenant have been, are and will remain in full compliance with any applicable Environmental Law.

**F.** Except as previously disclosed and acknowledged in writing to Lender, there are no underground storage tanks, private dumps or open wells located on or under the Property and no such tank, dump or well will be added unless Lender first consents in writing.

**G.** Mortgagor will regularly inspect the Property, monitor the activities and operations on the Property, and confirm that all permits, licenses or approvals required by any applicable Environmental Law are obtained and complied with.

**H.** Mortgagor will permit, or cause any tenant to permit, Lender or Lender's agent to enter and inspect the Property and review all records at any reasonable time to determine (1) the existence, location and nature of any Hazardous Substance on, under or about the Property; (2) the existence, location, nature, and magnitude of any Hazardous Substance that has been released on, under or about the Property; or (3) whether or not Mortgagor and any tenant are in compliance with applicable Environmental Law.

**I.** Upon Lender's request and at any time, Mortgagor agrees, at Mortgagor's expense, to engage a qualified environmental engineer to prepare an environmental audit of the Property and to submit the results of such audit to Lender. The choice of the environmental engineer who will perform such audit is subject to Lender's approval.

**J.** Lender has the right, but not the obligation, to perform any of Mortgagor's obligations under this section at Mortgagor's expense.

**K.** As a consequence of any breach of any representation, warranty or promise made in this section, (1) Mortgagor will indemnify and hold Lender and Lender's successors or assigns harmless from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses, including without limitation all costs of litigation and attorneys' fees, which Lender and Lender's successors or assigns may sustain; and (2) at Lender's discretion, Lender may release this Security Instrument and in return Mortgagor will provide Lender with collateral of at least equal value to the Property without prejudice to any of Lender's rights under this Security Instrument.

**L.** Notwithstanding any of the language contained in this Security Instrument to the contrary, the terms of this section will survive any foreclosure or satisfaction of this Security Instrument regardless of any passage of title to Lender or any disposition by Lender of any or all of the Property. Any claims and defenses to the contrary are hereby waived.

**18. CONDEMNATION.** Mortgagor will give Lender prompt notice of any pending or threatened action by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Mortgagor authorizes Lender to intervene in Mortgagor's name in any of the above described actions or claims. Mortgagor assigns to Lender the proceeds of any

award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds will be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

**19. INSURANCE.** Mortgagor agrees to keep the Property insured against the risks reasonably associated with the Property. Mortgagor will maintain this insurance in the amounts Lender requires. This insurance will last until the Property is released from this Security Instrument. What Lender requires pursuant to the preceding two sentences can change during the term of the Secured Debts. Mortgagor may choose the insurance company, subject to Lender's approval, which will not be unreasonably withheld.

All insurance policies and renewals shall include a standard "mortgage clause" (or "lender loss payable clause") endorsement that names Lender as "mortgagee" and "loss payee". If required by Lender, all insurance policies and renewals will also include an "additional insured" endorsement that names Lender as an "additional insured". If required by Lender, Mortgagor agrees to maintain comprehensive general liability insurance and rental loss or business interruption insurance in amounts and under policies acceptable to Lender. The comprehensive general liability insurance must name Lender as an additional insured. The rental loss or business interruption insurance must be in an amount equal to at least coverage of one year's debt service, and required escrow account deposits (if agreed to separately in writing).

Mortgagor will give Lender and the insurance company immediate notice of any loss. All insurance proceeds will be applied to restoration or repair of the Property or to the Secured Debts, at Lender's option. If Lender acquires the Property in damaged condition, Mortgagor's rights to any insurance policies and proceeds will pass to Lender to the extent of the Secured Debts.

Mortgagor will immediately notify Lender of cancellation or termination of insurance. If Mortgagor fails to keep the Property insured, Lender may obtain insurance to protect Lender's interest in the Property and Mortgagor will pay for the insurance on Lender's demand. Lender may demand that Mortgagor pay for the insurance all at once, or Lender may add the insurance premiums to the balance of the Secured Debts and charge interest on it at the rate that applies to the Secured Debts. This insurance may include lesser or greater coverages than originally required of Mortgagor, may be written by a company other than one Mortgagor would choose, and may be written at a higher rate than Mortgagor could obtain if Mortgagor purchased the insurance. Mortgagor acknowledges and agrees that Lender or one of Lender's affiliates may receive commissions on the purchase of this insurance.

**20. ESCROW FOR TAXES AND INSURANCE.** Mortgagor will not be required to pay to Lender funds for taxes and insurance in escrow unless provided in a separate agreement.

**21. WAIVERS.** Except to the extent prohibited by law, Mortgagor waives all appraisement and homestead exemption rights relating to the Property.

**22. USE OF PROPERTY.** Mortgagor shall not use or occupy the Property in any manner that would constitute a violation of any state and/or federal laws involving controlled substances, even in a jurisdiction that allows such use by state or local law or ordinance. In the event that Mortgagor becomes aware of such a violation, Mortgagor shall take all actions allowed by law to terminate the violating activity.

In addition to all other indemnifications, obligations, rights and remedies contained herein, if the Lender and/or its respective directors, officers, employees, agents and attorneys (each an "Indemnitee") is made a party defendant to any litigation or any claim is threatened or brought against such Indemnitee concerning this Security Instrument or the related property or any part

thereof or therein or concerning the construction, maintenance, operation or the occupancy or use of such property, then the Mortgagor shall (to the extent permitted by applicable law) indemnify, defend and hold each Indemnitee harmless from and against all liability by reason of said litigation or claims, including attorneys' fees and expenses incurred by such Indemnitee in connection with any such litigation or claim, whether or not any such litigation or claim is prosecuted to judgment. To the extent permitted by applicable law, the within indemnification shall survive payment of the Secured Debt, and/or any termination, release or discharge executed by the Lender in favor of the Mortgagor.

Violation of this provision is a material breach of this Security Instrument and thereby constitutes a default under the terms and provisions of this Security Instrument.

**23. APPLICABLE LAW.** This Security Instrument is governed by the laws of Michigan, the United States of America, and to the extent required, by the laws of the jurisdiction where the Property is located, except to the extent such state laws are preempted by federal law.

**24. JOINT AND INDIVIDUAL LIABILITY AND SUCCESSORS.** Each Mortgagor's obligations under this Security Instrument are independent of the obligations of any other Mortgagor. Lender may sue each Mortgagor individually or together with any other Mortgagor. Lender may release any part of the Property and Mortgagor will still be obligated under this Security Instrument for the remaining Property. Mortgagor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without Mortgagor's consent. Such a change will not release Mortgagor from the terms of this Security Instrument. The duties and benefits of this Security Instrument will bind and benefit the successors and assigns of Lender and Mortgagor.

**25. AMENDMENT, INTEGRATION AND SEVERABILITY.** This Security Instrument may not be amended or modified by oral agreement. No amendment or modification of this Security Instrument is effective unless made in writing. This Security Instrument and any other documents relating to the Secured Debts are the complete and final expression of the agreement. If any provision of this Security Instrument is unenforceable, then the unenforceable provision will be severed and the remaining provisions will still be enforceable.

**26. INTERPRETATION.** Whenever used, the singular includes the plural and the plural includes the singular. The section headings are for convenience only and are not to be used to interpret or define the terms of this Security Instrument.

**27. NOTICE, ADDITIONAL DOCUMENTS AND RECORDING FEES.** Unless otherwise required by law, any notice will be given by delivering it or mailing it by first class mail to the appropriate party's address listed in the DATE AND PARTIES section, or to any other address designated in writing. Notice to one Mortgagor will be deemed to be notice to all Mortgagors. Mortgagor will inform Lender in writing of any change in Mortgagor's name, address or other application information. Mortgagor will provide Lender any other, correct and complete information Lender requests to effectively mortgage or convey the Property. Mortgagor agrees to pay all expenses, charges and taxes in connection with the preparation and recording of this Security Instrument. Mortgagor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Mortgagor's obligations under this Security Instrument and to confirm Lender's lien status on any Property, and Mortgagor agrees to pay all expenses, charges and taxes in connection with the preparation and recording thereof. Time is of the essence.

**28. AGREEMENT TO ARBITRATE.** Lender or Mortgagor may submit to binding arbitration any dispute, claim or other matter in question between or among Lender and Mortgagor that arises out of or relates to this Transaction (Dispute), except as otherwise indicated in this section or as Lender and Mortgagor agree to in writing. For purposes of this section, this Transaction includes this Security

Instrument and any other document relating to the Secured Debts, and proposed loans or extensions of credit that relate to this Security Instrument. Lender or Mortgagor will not arbitrate any Dispute within any "core proceedings" under the United States bankruptcy laws.

Lender and Mortgagor must consent to arbitrate any Dispute concerning the Secured Debt secured by real estate at the time of the proposed arbitration. Lender may foreclose or exercise any powers of sale against real property securing the Secured Debt underlying any Dispute before, during or after any arbitration. Lender may also enforce the Secured Debt secured by this real property and underlying the Dispute before, during or after any arbitration.

Lender or Mortgagor may, whether or not any arbitration has begun, pursue any self-help or similar remedies, including taking property or exercising other rights under the law; seek attachment, garnishment, receivership or other provisional remedies from a court having jurisdiction to preserve the rights of or to prevent irreparable injury to Lender or Mortgagor; or foreclose against any property by any method or take legal action to recover any property. Foreclosing or exercising a power of sale, beginning and continuing a judicial action or pursuing self-help remedies will not constitute a waiver of the right to compel arbitration.

The arbitrator will determine whether a Dispute is arbitrable. A single arbitrator will resolve any Dispute, whether individual or joint in nature, or whether based on contract, tort, or any other matter at law or in equity. The arbitrator may consolidate any Dispute with any related disputes, claims or other matters in question not arising out of this Transaction. Any court having jurisdiction may enter a judgment or decree on the arbitrator's award. The judgment or decree will be enforced as any other judgment or decree.

Lender and Mortgagor acknowledge that the agreements, transactions or the relationships which result from the agreements or transactions between and among Lender and Mortgagor involve interstate commerce. The United States Arbitration Act will govern the interpretation and enforcement of this section.

The American Arbitration Association's Commercial Arbitration Rules, in effect on the date of this Security Instrument, will govern the selection of the arbitrator and the arbitration process, unless otherwise agreed to in this Security Instrument or another writing.

**29. WAIVER OF TRIAL FOR ARBITRATION. Lender and Mortgagor understand that the parties have the right or opportunity to litigate any Dispute through a trial by judge or jury, but that the parties prefer to resolve Disputes through arbitration instead of litigation. If any Dispute is arbitrated, Lender and Mortgagor voluntarily and knowingly waive the right to have a trial by jury or judge during the arbitration.**

**30. WAIVER OF JURY TRIAL. If the parties do not opt for arbitration, then all of the parties to this Security Instrument knowingly and intentionally, irrevocably and unconditionally, waive any and all right to a trial by jury in any litigation arising out of or concerning this Security Instrument or any other documents relating to the Secured Debts or related obligation. All of these parties acknowledge that this section has either been brought to the attention of each party's legal counsel or that each party had the opportunity to do so.**

**SIGNATURES.** By signing, Mortgagor agrees to the terms and covenants contained in this Security Instrument. Mortgagor also acknowledges receipt of a copy of this Security Instrument.

**MORTGAGOR:**

MM Ventures, LLC

By [signature] MM Ventures, LLC Date 11/2/18
David McCord, Sole Member Member

**ACKNOWLEDGMENT.**

STATE OF MICHIGAN, COUNTY OF Calhoun ss.

This instrument was acknowledged before me this 2 day of November, 2018 by David McCord - Sole Member of MM Ventures, LLC, a Limited Liability Company on behalf of the Limited Liability Company.

KIMBERLY KAY LAKE
NOTARY PUBLIC, CALHOUN COUNTY, MI
MY COMMISSION EXPIRES FEB. 13, 2021
ACTING IN THE COUNTY OF Calhoun

[signature]

Notary Public, State of Michigan,
County of ______
My commission expires ______
Acting in the County of ______

# Exhibit 4

U.S. Small Business Administration

# NOTE

| | |
|---|---|
| SBA Loan # | 31038170-08 |
| SBA Loan Name | Sunrise Haven |
| Date | |
| Loan Amount | $438,500.00 |
| Interest Rate | "Prime Rate" + 2.25% |
| Borrower | MM Ventures, LLC, a Michigan limited liability company and McCord ALF, LLC, a Michigan limited liability company |
| Operating Company | McCord ALF, LLC, a Michigan limited liability company |
| Lender | Kellogg Community Credit Union |

1. PROMISE TO PAY:

In return for the Loan, Borrower promises to pay to the order of Lender the amount of

Four Hundred Thirty-Eight Thousand Five Hundred and No/100 Dollars,

interest on the unpaid principal balance, and all other amounts required by this Note.

2. DEFINITIONS:

"Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.

"Guarantor" means each person or entity that signs a guarantee of payment of this Note.

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.

3. PAYMENT TERMS:

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

The interest rate on this Note will fluctuate. The initial interest rate is 7.50% per year. This initial rate is the Prime Rate in effect on the first business day of the month in which SBA received the loan application, plus 2.25%. The initial interest rate must remain in effect until the first change period begins unless reduced in accordance with SOP 50 10.

Borrower must pay principal and interest payments of $4,091.86 every month, beginning one month from the month this Note is dated; payments must be made on the 5th calendar day in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

The interest rate will be adjusted every 5 years (the "change period"), beginning November 5, 2023 (date of first rate adjustment).

The "Prime Rate" is the prime rate in effect on the first business day of the month (as published in the Wall Street Journal newspaper) in which SBA received the application, or the first day of the month in which any interest rate change occurs. Base Rates will be rounded to two decimal places with .004 being rounded down and .005 being rounded up.

The adjusted interest rate will be 2.25% above the Prime Rate. Lender will adjust the interest rate on the first calendar day of each change period. The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change.

The interest rate identified in the Note may not be changed during the life of the Loan unless changed in accordance with SOP 50 10.

The interest rate adjustment period may only be changed in accordance with SOP 50 10.

Lender must adjust the payment amount at least annually as needed to amortize principal over the remaining term of the note.

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default. If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.

Loan Prepayment:

Notwithstanding any provision in this Note to the contrary:

Borrower may prepay this Note. Borrower may prepay 20% or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20% and the Loan has been sold on the secondary market, Borrower must:

a. Give Lender written notice;

b. Pay all accrued interest; and

c. If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

Subsidy Recoupment Fee. When in any one of the first three years from the date of initial disbursement Borrower voluntarily prepays more than 25% of the outstanding principal balance of the loan, Borrower must pay to Lender on behalf of SBA a prepayment fee for that year as follows:

a. During the first year after the date on which the loan is first disbursed, 5% of the total prepayment amount;

b. During the second year after the date on which the loan is first disbursed, 3% of the total prepayment amount; and

c. During the third year after the date on which the loan is first disbursed, 1% of the total prepayment amount.

All remaining principal and accrued interest is due and payable 15 years from date of Note.

Late Charge: If a payment on this Note is more than 10 days late, Lender may charge Borrower a late fee of up to 5.00% of the unpaid portion of the regularly scheduled payment.

4. DEFAULT:

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

A. Fails to do anything required by this Note and other Loan Documents;
B. Defaults on any other loan with Lender;
C. Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;
D. Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;
E. Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;
F. Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;
G. Fails to pay any taxes when due;
H. Becomes the subject of a proceeding under any bankruptcy or insolvency law;
I. Has a receiver or liquidator appointed for any part of their business or property;
J. Makes an assignment for the benefit of creditors;
K. Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;
L. Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent; or
M. Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note.

5. LENDER'S RIGHTS IF THERE IS A DEFAULT:

Without notice or demand and without giving up any of its rights, Lender may:

A. Require immediate payment of all amounts owing under this Note;
B. Collect all amounts owing from any Borrower or Guarantor;
C. File suit and obtain judgment;
D. Take possession of any Collateral; or
E. Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

6. LENDER'S GENERAL POWERS:

Without notice and without Borrower's consent, Lender may:

A. Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;
B. Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;
C. Release anyone obligated to pay this Note;
D. Compromise, release, renew, extend or substitute any of the Collateral; and
E. Take any action necessary to protect the Collateral or collect amounts owing on this Note.

7. WHEN FEDERAL LAW APPLIES:

When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

8. SUCCESSORS AND ASSIGNS:

Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

9. GENERAL PROVISIONS:

A. All individuals and entities signing this Note are jointly and severally liable.
B. Borrower waives all suretyship defenses.
C. Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.
D. Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.
E. Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.
F. If any part of this Note is unenforceable, all other parts remain in effect.
G. To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

10. STATE-SPECIFIC PROVISIONS:

NONE

11. BORROWER'S NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated under this Note as Borrower.

MM Ventures, LLC, a Michigan limited liability company

BY: DMM MM Ventures LLC Member
David M. McCord, Member

McCord ALF, LLC, a Michigan limited liability company

BY: DMM McCord ALF LLC Member
David M. McCord, Member

# Exhibit 5

U.S. Small Business Administration SBA

U.S. Small Business Administration

# UNCONDITIONAL GUARANTEE

| | |
|---|---|
| SBA Loan # | 31038170-08 |
| SBA Loan Name | Sunrise Haven |
| Guarantor | David M. McCord |
| Borrower | MM Ventures, LLC, a Michigan limited liability company and McCord ALF, LLC, a Michigan limited liability company |
| Lender | Kellogg Community Credit Union |
| Date | |
| Note Amount | $438,500.00 |

1. GUARANTEE:

Guarantor unconditionally guarantees payment to Lender of all amounts owing under the Note. This Guarantee remains in effect until the Note is paid in full. Guarantor must pay all amounts due under the Note when Lender makes written demand upon Guarantor. Lender is not required to seek payment from any other source before demanding payment from Guarantor.

2. NOTE:

The "Note" is the promissory note dated ______________________ in the principal amount of Four Hundred Thirty-Eight Thousand Five Hundred and No/100 Dollars, from Borrower to Lender. It includes any assumption, renewal, substitution, or replacement of the Note, and multiple notes under a line of credit.

3. DEFINITIONS:

"Collateral" means any property taken as security for payment of the Note or any guarantee of the Note.

"Loan" means the loan evidenced by the Note.

"Loan Documents" means the documents related to the Loan signed by Borrower, Guarantor or any other guarantor, or anyone who pledges Collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.

4. LENDER'S GENERAL POWERS:

Lender may take any of the following actions at any time, without notice, without Guarantor's consent, and without making demand upon Guarantor:

A. Modify the terms of the Note or any other Loan Document except to increase the amounts due under the Note;

B. Refrain from taking any action on the Note, the Collateral, or any guarantee;

C. Release any Borrower or any guarantor of the Note;

D. Compromise or settle with the Borrower or any guarantor of the Note;

E. Substitute or release any of the Collateral, whether or not Lender receives anything in return;

F. Foreclose upon or otherwise obtain, and dispose of, any Collateral at public or private sale, with or without advertisement;

G. Bid or buy at any sale of Collateral by Lender or any other lienholder, at any price Lender chooses; and

H. Exercise any rights it has, including those in the Note and other Loan Documents.

These actions will not release or reduce the obligations of Guarantor or create any rights or claims against Lender.

5. FEDERAL LAW:

When SBA is the holder, the Note and this Guarantee will be construed and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Guarantee, Guarantor may not claim or assert any local or state law against SBA to deny any obligation, defeat any claim of SBA, or preempt federal law.

6. RIGHTS, NOTICES, AND DEFENSES THAT GUARANTOR WAIVES:

To the extent permitted by law,

A. Guarantor waives all rights to:
   1) Require presentment, protest, or demand upon Borrower;
   2) Redeem any Collateral before or after Lender disposes of it;
   3) Have any disposition of Collateral advertised; and
   4) Require a valuation of Collateral before or after Lender disposes of it.

B. Guarantor waives any notice of:
   1) Any default under the Note;
   2) Presentment, dishonor, protest, or demand;
   3) Execution of the Note;
   4) Any action or inaction on the Note or Collateral, such as disbursements, payment, nonpayment, acceleration, intent to accelerate, assignment, collection activity, and incurring enforcement expenses;
   5) Any change in the financial condition or business operations of Borrower or any guarantor;
   6) Any changes in the terms of the Note or other Loan Documents, except increases in the amounts due under the Note; and
   7) The time or place of any sale or other disposition of Collateral.

C. Guarantor waives defenses based upon any claim that:
   1) Lender failed to obtain any guarantee;
   2) Lender failed to obtain, perfect, or maintain a security interest in any property offered or taken as Collateral;
   3) Lender or others improperly valued or inspected the Collateral;
   4) The Collateral changed in value, or was neglected, lost, destroyed, or underinsured;

5) Lender impaired the Collateral;
6) Lender did not dispose of any of the Collateral;
7) Lender did not conduct a commercially reasonable sale;
8) Lender did not obtain the fair market value of the Collateral;
9) Lender did not make or perfect a claim upon the death or disability of Borrower or any guarantor of the Note;
10) The financial condition of Borrower or any guarantor was overstated or has adversely changed;
11) Lender made errors or omissions in Loan Documents or administration of the Loan;
12) Lender did not seek payment from the Borrower, any other guarantors, or any Collateral before demanding payment from Guarantor:
13) Lender impaired Guarantor's suretyship rights;
14) Lender modified the Note terms, other than to increase amounts due under the Note. If Lender modifies the Note to increase the amounts due under the Note without Guarantor's consent, Guarantor will not be liable for the increased amounts and related interest and expenses, but remains liable for all other amounts;
15) Borrower has avoided liability on the Note; or
16) Lender has taken an action allowed under the Note, this Guarantee, or other Loan Documents.

7. DUTIES AS TO COLLATERAL:

Guarantor will preserve the Collateral pledged by Guarantor to secure this Guarantee. Lender has no duty to preserve or dispose of any Collateral.

8. SUCCESSORS AND ASSIGNS:

Under this Guarantee, Guarantor includes heirs and successors, and Lender includes its successors and assigns.

9. GENERAL PROVISIONS:

A. ENFORCEMENT EXPENSES. Guarantor promises to pay all expenses Lender incurs to enforce this Guarantee, including, but not limited to, attorney's fees and costs.

B. SBA NOT A CO-GUARANTOR. Guarantor's liability will continue even if SBA pays Lender. SBA is not a co-guarantor with Guarantor. Guarantor has no right of contribution from SBA.

C. SUBROGATION RIGHTS. Guarantor has no subrogation rights as to the Note or the Collateral until the Note is paid in full.

D. JOINT AND SEVERAL LIABILITY. All individuals and entities signing as Guarantor are jointly and severally liable.

E. DOCUMENT SIGNING. Guarantor must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

F. FINANCIAL STATEMENTS. Guarantor must give Lender financial statements as Lender requires.

G. LENDER'S RIGHTS CUMULATIVE, NOT WAIVED. Lender may exercise any of its rights separately or together, as many times as it chooses. Lender may delay or forgo enforcing any of its rights without losing or impairing any of them.

H. ORAL STATEMENTS NOT BINDING. Guarantor may not use an oral statement to contradict or alter the written terms of the Note or this Guarantee, or to raise a defense to this Guarantee.

I. SEVERABILITY. If any part of this Guarantee is found to be unenforceable, all other parts will remain in effect.

J. CONSIDERATION. The consideration for this Guarantee is the Loan or any accommodation by Lender as to the Loan.

10. STATE-SPECIFIC PROVISIONS:

NONE

11. GUARANTOR ACKNOWLEDGMENT OF TERMS.

Guarantor acknowledges that Guarantor has read and understands the significance of all terms of the Note and this Guarantee, including all waivers.

12. GUARANTOR NAME(S) AND SIGNATURE(S):

By signing below, each individual or entity becomes obligated as Guarantor under this Guarantee.

David M. McCord, Individually

# Exhibit 6

2021-001226 01/11/2021 11:30:10 AM
Pages: 1 of 2 QC
DAVE MCCORD
Meredith Place County Clerk/Register Kalamazoo County, MI

(2)

RECEIVED
2021 JAN 11 AM 11: 15
COUNTY OF KALAMAZOO

# QUIT CLAIM DEED IN LIEU OF FORECLOSURE

Grantor, MM Ventures, LLC, a Michigan Limited Liability Company, whose address is 7483 West Q Avenue, Kalamazoo, MI 49009, quit claims to Grantee, Kellogg Community Credit Union, whose address is PO Box 140, Battle Creek, MI 49016, the premises in the Township of Texas, County of Kalamazoo, Michigan, described as

> That part of the Northeast 1/4 of Section 22, T3S, R12W, Texas Township, Kalamazoo County, Michigan, described as: Beginning at the North 1/4 corner of said Section 22; thence North 89°50'24" East along the North line of said Section 160.00 feet; thence South 00°14'07" West parallel with the North and South 1/4 line of said Section 200.00 feet; thence South 89°50'24" West 160.00 feet to said 1/4 line; thence North 00°14'07" East along said 1/4 line 200.00 feet to the point of beginning.
>
> PPN: 09-22-201-001
>
> Commonly known as: 7483 West Q Avenue, Kalamazoo, MI 49009

This Quit claim deed is a deed in lieu of foreclosure on a mortgage dated May 17, 2017, recorded with instrument number 2017-01823 in the Kalamazoo County Register of Deeds, a mortgage dated September 15, 2017, recorded with instrument number 2017-031400 in the Kalamazoo County Register of Deeds, and a mortgage dated November 2, 2018, recorded with instrument number 2018-035033 in the Kalamazoo County Register of Deeds, between the parties on the described property. This quit claim deed extinguishes all rights of Grantor in the mortgages between the parties, including any rights of redemption, and extinguishes all other rights, title, and interests of Grantor in the premises.

Grantor grants to the Grantee the right to make 0 divisions under section 108 of the Land Division Act, Act No 288 of the Public Acts of 1967, as amended.

This conveyance is exempt from the real estate transfer tax under the provisions of MCL 207.505(a) and MCL 207.526(a).

This property may be located within the vicinity of farmland or a farm operation. Generally accepted agricultural and management practices that may generate noise, dust, odors, and other associated conditions may be used and are protected by the Michigan Right to Farm Act.

Dated: 1/4/2021

MM Ventures, LLC

[signature]

David McCord
Its: Sole Member

STATE OF MICHIGAN )
KALAMAZOO COUNTY )

Acknowledged before me in Kalamazoo County, Michigan on 01/04, ~~2020~~ 2021, by David McCord, sole member of MM Ventures, LLC.

[signature: Mary K Johnson]
Notary public's printed name: Mary K Johnson
Notary public, State of Michigan, County of Kalamazoo.
My commission expires 3/8/2026.
Acting in the County of:

Drafted by and when recorded return to:

Mark D. Hofstee
Bolhouse Hofstee & McLean, PC
3996 Chicago Drive SW
Grandville, MI 49418

Send subsequent tax bills to:

Kellogg Community Credit Union
PO Box 140
Battle Creek, MI 49009

2021-001226 01/11/2021 11:30:10 AM
Pages: 2 of 2 QC
DAVE MCCORD
Meredith Place County Clerk/Register Kalamazoo County, MI

# Exhibit 7

2021-029109 07/20/2021 11:00:17 AM
Pages: 1 of 2 DEED
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

2) $38.00

$3827.00

RECEIVED
2021 JUL 13 AM 10: 19
COUNTY OF KALAMAZOO

RECEIVED
2021 JUL 20 AM 10: 21
COUNTY OF KALAMAZOO

CERT #304635

## COVENANT DEED

KNOW ALL MEN BY THESE PRESENTS Kellogg Community Credit Union, ("Grantor") whose address is: 41 2nd St., Battle Creek, MI 49016-0140

Convey(s) to: Dinah Owiti and Jasper Mukwada, joint tenants ("Grantee") whose address is: 203 Pepperidge Lane, Battle Creek, MI 49037

The following described premises situated in the Township of Texas, County of Kalamazoo; and State of Michigan, to-wit:

That part of the Northeast 1/4 of Section 22, T3S, R12W, Texas Township, Kalamazoo County, Michigan described as: Beginning at the North 1/4 corner of said Section 22; thence North 89°50'24" East along the North line of said Section 160.00 feet; thence South 00°14'07" West parallel with the North and South 1/4 line of said Section 280.00 feet; thence South 89°50'24" West 160.00 feet to said 1/4 line; thence North 00°14'07" East along said 1/4 line 280.00 feet to the point of beginning

Commonly Known as: 7483 W Q Ave, Kalamazoo, MI 49009
Parcel ID No.: 39-09-22-201-001

together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining, for the sum of Four Hundred Forty Five Thousand and 00/100 Dollars (***$445,000.00***).

Subject to zoning ordinances and to restrictions and easements of record, if any, existing reservations, or leases of oil, gas, or mineral rights, zoning limitations, and apparent and beneficial easements. The Grantor covenants and agrees that the Grantor has not previously done or committed or willingly suffered to be done or committed any act, matter, or thing that would cause the premises or any part of them to be charged or encumbered in title, estate, or otherwise.

This property may be located within the vicinity of farmland or a farm operation. Generally accepted agricultural and management practices that may generate noise, dust, odors, and other associated conditions may be used and are protected by the Michigan Right to Farm Act.

The Grantor grants to the Grantee the right to make all available divisions under section 108 of the Land Division Act, Act No 288 of the Public Acts of 1967, as amended.

Instrument Drafted by:
Michael J Ogrin for Kellogg Community Credit Union
Assisted by ATA National Title Group, LLC, c/o Peggy Wood
7127 S. Westnedge Ave, Suite 1 Portage, MI, 49002

Send subsequent tax bills and recorded deed to:
Dinah Owiti

7483 W Q Ave
Kalamazoo, MI 49009

File No.: 39-21784826-KAZ

2021-029109 Receipt# 21-20934
07/20/2021 11:00 AM Kalamazoo County, Michigan
Real Estate Transfer Tax
Tax Stamp # 315105
County Tax: $489.50 State Tax: $3337.50

Page 2 of 2 of Covenant Deed between Kellogg Community Credit Union, ("Grantor") and Dinah Owiti, ("Grantee") dated this June 30, 2021.

Dated: June 30, 2021

By: Michael J. Ogrin, Chief Financial Officer

State of Michigan )
)SS.
County of Kalamazoo )

The foregoing instrument was acknowledged before me on this 30th day of June, 2021 by Kellogg Community Credit Union by Michael J Ogrin, Chief Financial Officer

Notary Public: __________
Notary County: __________,State: __________
Commission Expires: __________
Acting In: __________

P Wood
NOTARY PUBLIC - STATE OF MICHIGAN
County of Kalamazoo
My Commission Expires October 25, 2023
Acting in the County of Kalamazoo

2021-029109 07/20/2021 11:00:17 AM
Pages: 2 of 2 DEED
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

# Exhibit 8

2021-029108 07/20/2021 11:00:17 AM
Pages: 1 of 26 AFF
ATA NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

RECEIVED
2021 JUL 13 AM 10: 19
COUNTY OF KALAMAZOO

RECEIVED
2021 JUL 20 AM 10: 21
COUNTY OF KALAMAZOO

# AFFIDAVIT OF ERROR - LEGAL DESCRIPTION

STATE OF MICHIGAN )
)§
COUNTY OF KALAMAZOO )

Terry Pingel, being duly sworn deposes and states:

1. That he is a person of suitable age and discretion and has personal knowledge of the matters asserted herein.

2. That he is the SW Michigan Area Manager of ATA National Title Group, is familiar with this transaction related to the property located at 7483 West Q Avenue, Kalamazoo, MI 49009; ATA National Title Group File No.: 39-17524859-ACM.

3. This Affidavit is filed pursuant to MCL 565.451(d) which provides for the giving and recording of notice relating to certain matters which may affect title to real property in the State of Michigan and to claims of interest in land.

4. That a certain Mortgage (a copy which is hereby attached as EXHIBIT B) between MM Ventures, LLC to Kellogg Community Credit Union recorded May 26, 2017 and being Instrument No. 2017-018213, Kalamazoo County Records. That a certain Quit Claim Deed in Lieu of Foreclosure (a copy which is hereby attached as EXHIBIT C) between MM Ventures, LLC and Kellogg Community Credit Union recorded January 11, 2021 and being Instrument No. 2021-001226, Kalamazoo County Records.

5. Said Mortgage and Quit Claim Deed in Lieu of Foreclosure contained an error in the legal description. The correct legal description should read as follows:

See attached- EXHIBIT A

Further Deponent says not.

IN WITNESS WHEREOF, the undersigned has executed this Affidavit on the 11th day of June, 2021.

ATA National Title Group

By: ______________________
Terry Pingel

Its: SW Michigan Area Manager

The foregoing was acknowledged, sworn to and subscribed before me this 11th day of June 2021, by Terry Pingel, SW Michigan Area Manager ATA National Title Group.

______________________
, Notary Public
County, Michigan

P Wood
NOTARY PUBLIC - STATE OF MICHIGAN
County of Kalamazoo
My Commission Expires October 25, 2023
Acting in the County of Kalamazoo

My commission expires: ____________

**Drafted by and when recorded return to:**
Paul C. Anast
ATA National Title Group
7127 S. Westnedge Ave, Suite 1
Portgage, MI 49002

2021-029108 07/20/2021 11:00:17 AM
Pages: 2 of 26 AFF
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

# EXHIBIT A

That part of the Northeast 1/4 of Section 22, T3S, R12W, Texas Township, Kalamazoo County, Michigan described as: Beginning at the North 1/4 corner of said Section 22; thence North 89°50'24" East along the North line of said Section 160.00 feet; thence South 00°14'07" West parallel with the North and South 1/4 line of said Section 280.00 feet; thence South 89°50'24" West 160.00 feet to said 1/4 line; thence North 00°14'07" East along said 1/4 line 280.00 feet to the point of beginning

2021-029108 07/20/2021 11:00:17 AM
Pages: 3 of 26 AFF
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

EXHIBIT B

10 RECEIVED
2017 MAY 24 PM 4:03
COUNTY OF KALAMAZOO

RECEIVED
2017 MAY 26 AM 11:49
COUNTY OF KALAMAZOO

2017-018213 05/26/2017 01:37:01 PM
Pages: 1 of 10 MTG
ATTORNEYS TITLE
Timothy A. Snow County Clerk/Register Kalamazoo County, MI

## THIS IS A FUTURE ADVANCE MORTGAGE

This instrument was prepared by Jaime Cogan, Stephanie Alstott And Heather Converse, Michigan Business Connection, LC, 3600 Green Court, Ann Arbor, MI 48105
MAXIMUM PRINCIPAL AMOUNT: Unlimited.

Return To: Kirk Schwarz, Kellogg Community Federal Credit Union, P.O. Box 140, Battle Creek, MI 49016

**DATE AND PARTIES.** The date of this Mortgage (Security Instrument) is May 17, 2017. The parties and their addresses are:

**MORTGAGOR:**
**MM VENTURES, LLC**
A Michigan Limited Liability Company
90 E. Columbia Ave. Ste.F1 #122
Battle Creek, MI 49015

**LENDER:**
**KELLOGG COMMUNITY CREDIT UNION**
Organized and existing under the laws of Michigan
P.O. Box 140
Battle Creek, MI 49016

1. **DEFINITIONS.** For the purposes of this document, the following term has the following meaning.

A. Loan. "Loan" refers to this transaction generally, including obligations and duties arising from the terms of all documents prepared or submitted for this transaction.

2. **MAXIMUM OBLIGATION LIMIT. The maximum principal amount, excluding protective advances, secured by this Security Instrument is unlimited.** Any limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Protective advances are defined by law and include an expenditure or expenditures such as advances made under the terms of this Security Instrument to protect Lender's priority and advances made to fulfill or perform an obligation of the Mortgagor under this Security Instrument, with respect to the mortgaged property, that the Mortgagor has failed to fulfill or perform.

3. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debts and Mortgagor's performance under this Security



2021-029108 07/20/2021 11:00:17 AM
Pages: 4 of 26 AFF
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

Instrument, Mortgagor does hereby grant, bargain, convey, sell, mortgage and warrant to Lender, with the power of sale; the following described property:

Land situated in the Township of Texas, County of Kalamazoo, State of Michigan, and described as follows:

That part of the Northeast 1/4 of Section 22, T3S, R12W, Texas Township, Kalamazoo County, Michigan described as: Beginning at the North 1/4 corner of said Section 22; thence North 89°50'24" East along the North line of said Section 160.00 feet; thence South 00°14'07" West parallel with the North and South 1/4 line of said Section 200.00 feet; thence South 89°50'24" West 160.00 feet to said 1/4 line; thence North 00°14'07" East along said 1/4 line 200.00 feet to the point of beginning.

Tax Parcel No.: 09-22-201-001

The property is located in Kalamazoo County at 7483 W Q Ave., Kalamazoo, Michigan 49009.

Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian rights, wells, ditches and water stock, crops, timber including timber to be cut now or at any time in the future, all diversion payments or third party payments made to crop producers and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described (all referred to as Property). This Security Instrument will remain in effect until the Secured Debts and all underlying agreements have been terminated in writing by Lender.

**4. SECURED DEBTS AND FUTURE ADVANCES.** The term "Secured Debts" includes and this Security Instrument will secure each of the following:

**A. Specific Debts.** The following debts and all extensions, renewals, refinancings, modifications and replacements. A promissory note or other agreement, No. 355421-760, dated May 17, 2017, from Mortgagor to Lender, with a loan amount of $119,625.00.

**B. Future Advances.** All future advances from Lender to Mortgagor under the Specific Debts executed by Mortgagor in favor of Lender after this Security Instrument. If more than one person signs this Security Instrument, each agrees that this Security Instrument will secure all future advances that are given to Mortgagor either individually or with others who may not sign this Security Instrument. All future advances are secured by this Security Instrument even though all or part may not yet be advanced. All future advances are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future advances in any amount. Any such commitment must be agreed to in a separate writing.

**C. All Debts.** All present and future debts from Mortgagor to Lender, even if this Security Instrument is not specifically referenced, or if the future debt is unrelated to or of a different type than this debt. If more than one person signs this Security Instrument, each agrees that it will secure debts incurred either individually or with others who may not sign this Security Instrument. Nothing in this Security Instrument constitutes a commitment to make additional or future loans or advances. Any such commitment must be in writing. This Security Instrument will not secure any debt for which a non-possessory, non-purchase money security interest is created in "household goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices. This Security Instrument will not secure any



2017-018213 05/26/2017 01:37:01 PM
Pages: 2 of 10 MTG
ATTORNEYS TITLE
Timothy A. Snow County Clerk/Register Kalamazoo County, MI

2021-029108 07/20/2021 11:00:17 AM
Pages: 5 of 26 AFF
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

debt for which a security interest is created in "margin stock" and Lender does not obtain a "statement of purpose," as defined and required by federal law governing securities. This Security Instrument will not secure any other debt if Lender, with respect to that other debt, fails to fulfill any necessary requirements or fails to conform to any limitations of the Truth in Lending Act (Regulation Z) or the Real Estate Settlement Procedures Act (Regulation X) that are required for loans secured by the Property.

**D. Sums Advanced.** All sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

**5. PAYMENTS.** Mortgagor agrees that all payments under the Secured Debts will be paid when due and in accordance with the terms of the Secured Debts and this Security Instrument.

**6. WARRANTY OF TITLE.** Mortgagor warrants that Mortgagor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to grant, bargain, convey, sell, mortgage, and warrant, with the power of sale, the Property. Mortgagor also warrants that the Property is unencumbered, except for encumbrances of record.

**7. PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Mortgagor agrees:

**A.** To make all payments when due and to perform or comply with all covenants.

**B.** To promptly deliver to Lender any notices that Mortgagor receives from the holder.

**C.** Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

**8. CLAIMS AGAINST TITLE.** Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Mortgagor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Mortgagor may have against parties who supply labor or materials to maintain or improve the Property.

**9. DUE ON SALE OR ENCUMBRANCE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of all or any part of the Property. This right is subject to the restrictions imposed by federal law, as applicable.

**10. TRANSFER OF AN INTEREST IN THE MORTGAGOR.** If Mortgagor is an entity other than a natural person (such as a corporation, partnership, limited liability company or other organization), Lender may demand immediate payment if:

**A.** A beneficial interest in Mortgagor is sold or transferred.

**B.** There is a change in either the identity or number of members of a partnership or similar entity.

**C.** There is a change in ownership of more than 25 percent of the voting stock of a corporation, partnership, limited liability company or similar entity.

However, Lender may not demand payment in the above situations if it is prohibited by law as of the date of this Security Instrument.

**11. WARRANTIES AND REPRESENTATIONS.** Mortgagor makes to Lender the following warranties and representations which will continue as long as this Security Instrument is in effect:



2017-018213 05/26/2017 01:37:01 PM
Pages: 3 of 10 MTG
ATTORNEYS TITLE
Timothy A. Snow County Clerk/Register Kalamazoo County, MI

2021-029108 07/20/2021 11:00:17 AM
Pages: 6 of 26 AFF
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

**A. Power.** Mortgagor is duly organized, and validly existing and in good standing in all jurisdictions in which Mortgagor operates. Mortgagor has the power and authority to enter into this transaction and to carry on Mortgagor's business or activity as it is now being conducted and, as applicable, is qualified to do so in each jurisdiction in which Mortgagor operates.

**B. Authority.** The execution, delivery and performance of this Security Instrument and the obligation evidenced by this Security Instrument are within Mortgagor's powers, have been duly authorized, have received all necessary governmental approval, will not violate any provision of law, or order of court or governmental agency, and will not violate any agreement to which Mortgagor is a party or to which Mortgagor is or any of Mortgagor's property is subject.

**C. Name and Place of Business.** Other than previously disclosed in writing to Lender, Mortgagor has not changed Mortgagor's name or principal place of business within the last 10 years and has not used any other trade or fictitious name. Without Lender's prior written consent, Mortgagor does not and will not use any other name and will preserve Mortgagor's existing name, trade names and franchises.

**12. PROPERTY CONDITION, ALTERATIONS, INSPECTION, VALUATION AND APPRAISAL.** Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary.. Mortgagor will not commit or allow any waste, impairment, or deterioration of the Property. Mortgagor will keep the Property free of noxious weeds and grasses. Mortgagor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Mortgagor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Mortgagor will notify Lender of all demands, proceedings, claims, and actions against Mortgagor, and of any loss or damage to the Property.

No portion of the Property will be removed, demolished or materially altered without Lender's prior written consent except that Mortgagor has the right to remove items of personal property comprising a part of the Property that become worn or obsolete, provided that such personal property is replaced with other personal property at least equal in value to the replaced personal property, free from any title retention device, security agreement or other encumbrance. Such replacement of personal property will be deemed subject to the security interest created by this Security Instrument. Mortgagor will not partition or subdivide the Property without Lender's prior written consent.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time and frequency for the purpose of inspecting, valuating, or appraising the Property. Lender will give Mortgagor notice at the time of or before an on-site inspection, valuation, or appraisal for on-going due diligence or otherwise specifying a reasonable purpose. Any inspection, valuation or appraisal of the Property will be entirely for Lender's benefit and Mortgagor will in no way rely on Lender's inspection, valuation or appraisal for its own purpose, except as otherwise provided by law.

**13. AUTHORITY TO PERFORM.** If Mortgagor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any amount necessary for performance. Lender's right to perform for Mortgagor will not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may take all steps necessary to protect Lender's security interest in the Property, including completion of the construction.

**14. DEFAULT.** Mortgagor will be in default if any of the following events (known separately and collectively as an Event of Default) occur:

**A. Payments.** Mortgagor fails to make a payment in full when due.



2017-018213 05/26/2017 01:37:01 PM
Pages: 4 of 10 MTG
ATTORNEYS TITLE
Timothy A. Snow County Clerk/Register Kalamazoo County, MI

2021-029108 07/20/2021 11:00:17 AM
Pages: 7 of 26 AFF
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

**B. Insolvency or Bankruptcy.** The death, dissolution or insolvency of, appointment of a receiver by or on behalf of, application of any debtor relief law, the assignment for the benefit of creditors by or on behalf of, the voluntary or involuntary termination of existence by, or the commencement of any proceeding under any present or future federal or state insolvency, bankruptcy, reorganization, composition or debtor relief law by or against Mortgagor, Borrower, or any co-signer, endorser, surety or guarantor of this Security Instrument or any other obligations Borrower has with Lender.

**C. Business Termination.** Mortgagor merges, dissolves, reorganizes, ends its business or existence, or a partner or majority owner dies or is declared legally incompetent.

**D. Failure to Perform.** Mortgagor fails to perform any condition or to keep any promise or covenant of this Security Instrument.

**E. Other Documents.** A default occurs under the terms of any other document relating to the Secured Debts.

**F. Other Agreements.** Mortgagor is in default on any other debt or agreement Mortgagor has with Lender.

**G. Misrepresentation.** Mortgagor makes any verbal or written statement or provides any financial information that is untrue, inaccurate, or conceals a material fact at the time it is made or provided.

**H. Judgment.** Mortgagor fails to satisfy or appeal any judgment against Mortgagor.

**I. Forfeiture.** The Property is used in a manner or for a purpose that threatens confiscation by a legal authority.

**J. Name Change.** Mortgagor changes Mortgagor's name or assumes an additional name without notifying Lender before making such a change.

**K. Property Transfer.** Mortgagor transfers all or a substantial part of Mortgagor's money or property. This condition of default, as it relates to the transfer of the Property, is subject to the restrictions contained in the DUE ON SALE section.

**L. Property Value.** Lender determines in good faith that the value of the Property has declined or is impaired.

**M. Material Change.** Without first notifying Lender, there is a material change in Mortgagor's business, including ownership, management, and financial conditions.

**N. Insecurity.** Lender determines in good faith that a material adverse change has occurred in Mortgagor's financial condition from the conditions set forth in Mortgagor's most recent financial statement before the date of this Security Instrument or that the prospect for payment or performance of the Secured Debts is impaired for any reason.

**15. REMEDIES.** On or after the occurrence of an Event of Default, Lender may use any and all remedies Lender has under state or federal law or in any document relating to the Secured Debts, including, without limitation, the power to sell the Property. Any amounts advanced on Mortgagor's behalf will be immediately due and may be added to the balance owing under the Secured Debts. Lender may make a claim for any and all insurance benefits or refunds that may be available on Mortgagor's default.

Subject to any right to cure, required time schedules or any other notice rights Mortgagor may have under federal and state law, Lender may make all or any part of the amount owing by the terms of the Secured Debts immediately due and foreclose this Security Instrument in a manner provided by law upon the occurrence of an Event of Default or anytime thereafter.



2017-018213 05/26/2017 01:37:01 PM
Pages: 5 of 10 MTG
ATTORNEYS TITLE
Timothy A. Snow County Clerk/Register Kalamazoo County, MI

2021-029108 07/20/2021 11:00:17 AM
Pages: 8 of 26 AFF
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

If there is an occurrence of an Event of Default, Lender may, in addition to any other permitted remedy, invoke the power of sale and sell the Property as a whole or in such parcels (and in such order) as Lender may direct at public sale to the highest bidder. If Lender invokes the power of sale, Lender will give notice of the sale as prescribed by applicable law in effect at the time of the proposed sale. Lender or its designee may purchase the Property at any sale. The proceeds of the sale will be applied in the manner prescribed by applicable law.

Upon any sale of the Property, Lender will make and deliver a deed without warranty or appropriate deed required by applicable law that conveys all right, title and interest to the Property that was sold to the purchaser(s). The recitals in any deed of conveyance will be prima facie evidence of the facts set forth therein.

All remedies are distinct, cumulative and not exclusive, and Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth. The acceptance by Lender of any sum in payment or partial payment on the Secured Debts after the balance is due or is accelerated or after foreclosure proceedings are filed will not constitute a waiver of Lender's right to require full and complete cure of any existing default. By not exercising any remedy, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

**16. COLLECTION EXPENSES AND ATTORNEYS' FEES.** On or after the occurrence of an Event of Default, to the extent permitted by law, Mortgagor agrees to pay all expenses of collection, enforcement, valuation, appraisal or protection of Lender's rights and remedies under this Security Instrument or any other document relating to the Secured Debts. Mortgagor agrees to pay expenses for Lender to inspect, valuate, appraise and preserve the Property. Expenses include, but are not limited to, attorneys' fees, court costs and other legal expenses. These expenses are due and payable immediately. If not paid immediately, these expenses will bear interest from the date of payment until paid in full at the highest interest rate in effect as provided for in the terms of the Secured Debts. In addition, to the extent permitted by the United States Bankruptcy Code, Mortgagor agrees to pay the reasonable attorneys' fees incurred by Lender to protect Lender's rights and interests in connection with any bankruptcy proceedings initiated by or against Mortgagor.

**17. ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substance," "hazardous waste," "hazardous substance," or "regulated substance" under any Environmental Law.

Mortgagor represents, warrants and agrees that:

A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance has been, is, or will be located, transported, manufactured, treated, refined, or handled by any person on, under or about the Property, except in the ordinary course of business and in strict compliance with all applicable Environmental Law.

B. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor has not and will not cause, contribute to, or permit the release of any Hazardous Substance on the Property.

C. Mortgagor will immediately notify Lender if (1) a release or threatened release of Hazardous Substance occurs on, under or about the Property or migrates or threatens to migrate from nearby



2017-018213 05/26/2017 01:37:01 PM
Pages: 6 of 10 MTG
ATTORNEYS TITLE
Timothy A. Snow County Clerk/Register Kalamazoo County, MI

2021-029108 07/20/2021 11:00:17 AM
Pages: 9 of 26 AFF
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

property; or (2) there is a violation of any Environmental Law concerning the Property. In such an event, Mortgagor will take all necessary remedial action in accordance with Environmental Law.

D. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor has no knowledge of or reason to believe there is any pending or threatened investigation, claim, or proceeding of any kind relating to (1) any Hazardous Substance located on, under or about the Property; or (2) any violation by Mortgagor or any tenant of any Environmental Law. Mortgagor will immediately notify Lender in writing as soon as Mortgagor has reason to believe there is any such pending or threatened investigation, claim; or proceeding. In such an event, Lender has the right, but not the obligation, to participate in any such proceeding including the right to receive copies of any documents relating to such proceedings.

E. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor and every tenant have been, are and will remain in full compliance with any applicable Environmental Law.

F. Except as previously disclosed and acknowledged in writing to Lender, there are no underground storage tanks, private dumps or open wells located on or under the Property and no such tank, dump or well will be added unless Lender first consents in writing.

G. Mortgagor will regularly inspect the Property, monitor the activities and operations on the Property, and confirm that all permits, licenses or approvals required by any applicable Environmental Law are obtained and complied with.

H. Mortgagor will permit, or cause any tenant to permit, Lender or Lender's agent to enter and inspect the Property and review all records at any reasonable time to determine (1) the existence, location and nature of any Hazardous Substance on, under or about the Property; (2) the existence, location, nature, and magnitude of any Hazardous Substance that has been released on, under or about the Property; or (3) whether or not Mortgagor and any tenant are in compliance with applicable Environmental Law.

I. Upon Lender's request and at any time, Mortgagor agrees, at Mortgagor's expense, to engage a qualified environmental engineer to prepare an environmental audit of the Property and to submit the results of such audit to Lender. The choice of the environmental engineer who will perform such audit is subject to Lender's approval.

J. Lender has the right, but not the obligation, to perform any of Mortgagor's obligations under this section at Mortgagor's expense.

K. As a consequence of any breach of any representation, warranty or promise made in this section, (1) Mortgagor will indemnify and hold Lender and Lender's successors or assigns harmless from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses, including without limitation all costs of litigation and attorneys' fees, which Lender and Lender's successors or assigns may sustain; and (2) at Lender's discretion, Lender may release this Security Instrument and in return Mortgagor will provide Lender with collateral of at least equal value to the Property without prejudice to any of Lender's rights under this Security Instrument.

L. Notwithstanding any of the language contained in this Security Instrument to the contrary, the terms of this section will survive any foreclosure or satisfaction of this Security Instrument regardless of any passage of title to Lender or any disposition by Lender of any or all of the Property. Any claims and defenses to the contrary are hereby waived.

**18. CONDEMNATION.** Mortgagor will give Lender prompt notice of any pending or threatened action by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Mortgagor authorizes Lender to intervene in Mortgagor's name in any of the above described actions or claims. Mortgagor assigns to Lender the proceeds of any



2017-018213 05/26/2017 01:37:01 PM
Pages: 7 of 10 MTG
ATTORNEYS TITLE
Timothy A. Snow County Clerk/Register Kalamazoo County, MI

2021-029108 07/20/2021 11:00:17 AM
Pages: 10 of 26 AFF
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds will be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

**19. INSURANCE.** Mortgagor agrees to keep the Property insured against the risks reasonably associated with the Property. Mortgagor will maintain this insurance in the amounts Lender requires. This insurance will last until the Property is released from this Security Instrument. What Lender requires pursuant to the preceding two sentences can change during the term of the Secured Debts. Mortgagor may choose the insurance company, subject to Lender's approval, which will not be unreasonably withheld.

All insurance policies and renewals shall include a standard "mortgage clause" (or "lender loss payable clause") endorsement that names Lender as "mortgagee" and "loss payee". If required by Lender, all insurance policies and renewals will also include an "additional insured" endorsement that names Lender as an "additional insured". If required by Lender, Mortgagor agrees to maintain comprehensive general liability insurance and rental loss or business interruption insurance in amounts and under policies acceptable to Lender. The comprehensive general liability insurance must name Lender as an additional insured. The rental loss or business interruption insurance must be in an amount equal to at least coverage of one year's debt service, and required escrow account deposits (if agreed to separately in writing).

Mortgagor will give Lender and the insurance company immediate notice of any loss. All insurance proceeds will be applied to restoration or repair of the Property or to the Secured Debts, at Lender's option. If Lender acquires the Property in damaged condition, Mortgagor's rights to any insurance policies and proceeds will pass to Lender to the extent of the Secured Debts.

Mortgagor will immediately notify Lender of cancellation or termination of insurance. If Mortgagor fails to keep the Property insured, Lender may obtain insurance to protect Lender's interest in the Property and Mortgagor will pay for the insurance on Lender's demand. Lender may demand that Mortgagor pay for the insurance all at once, or Lender may add the insurance premiums to the balance of the Secured Debts and charge interest on it at the rate that applies to the Secured Debts. This insurance may include lesser or greater coverages than originally required of Mortgagor, may be written by a company other than one Mortgagor would choose, and may be written at a higher rate than Mortgagor could obtain if Mortgagor purchased the insurance. Mortgagor acknowledges and agrees that Lender or one of Lender's affiliates may receive commissions on the purchase of this insurance.

**20. ESCROW FOR TAXES AND INSURANCE.** Mortgagor will not be required to pay to Lender funds for taxes and insurance in escrow unless provided in a separate agreement.

**21. WAIVERS.** Except to the extent prohibited by law, Mortgagor waives all appraisement and homestead exemption rights relating to the Property.

**22. APPLICABLE LAW.** This Security Instrument is governed by the laws of Michigan, the United States of America, and to the extent required, by the laws of the jurisdiction where the Property is located, except to the extent such state laws are preempted by federal law.

**23. JOINT AND INDIVIDUAL LIABILITY AND SUCCESSORS.** Each Mortgagor's obligations under this Security Instrument are independent of the obligations of any other Mortgagor. Lender may sue each Mortgagor individually or together with any other Mortgagor. Lender may release any part of the Property and Mortgagor will still be obligated under this Security Instrument for the remaining Property. Mortgagor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without



2017-018213 05/26/2017 01:37:01 PM
Pages: 8 of 10 MTG
ATTORNEYS TITLE
Timothy A. Snow County Clerk/Register Kalamazoo County, MI

2021-029108 07/20/2021 11:00:17 AM
Pages: 11 of 26 AFF
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

Mortgagor's consent. Such a change will not release Mortgagor from the terms of this Security Instrument. The duties and benefits of this Security Instrument will bind and benefit the successors and assigns of Lender and Mortgagor.

**24. AMENDMENT, INTEGRATION AND SEVERABILITY.** This Security Instrument may not be amended or modified by oral agreement. No amendment or modification of this Security Instrument is effective unless made in writing and executed by Mortgagor and Lender. This Security Instrument and any other documents relating to the Secured Debts are the complete and final expression of the agreement. If any provision of this Security Instrument is unenforceable, then the unenforceable provision will be severed and the remaining provisions will still be enforceable.

**25. INTERPRETATION.** Whenever used, the singular includes the plural and the plural includes the singular. The section headings are for convenience only and are not to be used to interpret or define the terms of this Security Instrument.

**26. NOTICE, ADDITIONAL DOCUMENTS AND RECORDING FEES.** Unless otherwise required by law, any notice will be given by delivering it or mailing it by first class mail to the appropriate party's address listed in the DATE AND PARTIES section, or to any other address designated in writing. Notice to one Mortgagor will be deemed to be notice to all Mortgagors. Mortgagor will inform Lender in writing of any change in Mortgagor's name, address or other application information. Mortgagor will provide Lender any other, correct and complete information Lender requests to effectively mortgage or convey the Property. Mortgagor agrees to pay all expenses, charges and taxes in connection with the preparation and recording of this Security Instrument. Mortgagor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Mortgagor's obligations under this Security Instrument and to confirm Lender's lien status on any Property, and Mortgagor agrees to pay all expenses, charges and taxes in connection with the preparation and recording thereof. Time is of the essence.

**27. AGREEMENT TO ARBITRATE.** Lender or Mortgagor may submit to binding arbitration any dispute, claim or other matter in question between or among Lender and Mortgagor that arises out of or relates to this Transaction (Dispute), except as otherwise indicated in this section or as Lender and Mortgagor agree to in writing. For purposes of this section, this Transaction includes this Security Instrument and any other document relating to the Secured Debts, and proposed loans or extensions of credit that relate to this Security Instrument. Lender or Mortgagor will not arbitrate any Dispute within any "core proceedings" under the United States bankruptcy laws.

Lender and Mortgagor must consent to arbitrate any Dispute concerning the Secured Debt secured by real estate at the time of the proposed arbitration. Lender may foreclose or exercise any powers of sale against real property securing the Secured Debt underlying any Dispute before, during or after any arbitration. Lender may also enforce the Secured Debt secured by this real property and underlying the Dispute before, during or after any arbitration.

Lender or Mortgagor may, whether or not any arbitration has begun, pursue any self-help or similar remedies, including taking property or exercising other rights under the law; seek attachment, garnishment, receivership or other provisional remedies from a court having jurisdiction to preserve the rights of or to prevent irreparable injury to Lender or Mortgagor; or foreclose against any property by any method or take legal action to recover any property. Foreclosing or exercising a power of sale, beginning and continuing a judicial action or pursuing self-help remedies will not constitute a waiver of the right to compel arbitration.

The arbitrator will determine whether a Dispute is arbitrable. A single arbitrator will resolve any Dispute, whether individual or joint in nature, or whether based on contract, tort, or any other matter at law or in equity. The arbitrator may consolidate any Dispute with any related disputes, claims or



2017-018213 05/26/2017 01:37:01 PM
Pages: 9 of 10 MTG
ATTORNEYS TITLE
Timothy A. Snow County Clerk/Register Kalamazoo County, MI

2021-029108 07/20/2021 11:00:17 AM
Pages: 12 of 26 AFF
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

other matters in question not arising out of this Transaction. Any court having jurisdiction may enter a judgment or decree on the arbitrator's award. The judgment or decree will be enforced as any other judgment or decree.

Lender and Mortgagor acknowledge that the agreements, transactions or the relationships which result from the agreements or transactions between and among Lender and Mortgagor involve interstate commerce. The United States Arbitration Act will govern the interpretation and enforcement of this section.

The American Arbitration Association's Commercial Arbitration Rules, in effect on the date of this Security Instrument, will govern the selection of the arbitrator and the arbitration process, unless otherwise agreed to in this Security Instrument or another writing.

**28. WAIVER OF TRIAL FOR ARBITRATION. Lender and Mortgagor understand that the parties have the right or opportunity to litigate any Dispute through a trial by judge or jury, but that the parties prefer to resolve Disputes through arbitration instead of litigation. If any Dispute is arbitrated, Lender and Mortgagor voluntarily and knowingly waive the right to have a trial by jury or judge during the arbitration.**

**29. WAIVER OF JURY TRIAL. If the parties do not opt for arbitration, then all of the parties to this Security Instrument knowingly and intentionally, irrevocably and unconditionally, waive any and all right to a trial by jury in any litigation arising out of or concerning this Security Instrument or any other documents relating to the Secured Debts or related obligation. All of these parties acknowledge that this section has either been brought to the attention of each party's legal counsel or that each party had the opportunity to do so.**

**SIGNATURES.** By signing, Mortgagor agrees to the terms and covenants contained in this Security Instrument. Mortgagor also acknowledges receipt of a copy of this Security Instrument.

**MORTGAGOR:**

MM Ventures, LLC

By [signature] MM Ventures LLC Date 5/17/17
David McCord, Sole Member

**ACKNOWLEDGMENT.**

STATE OF MICHIGAN, COUNTY OF ~~Kalamazoo~~ Calhoun ss.

This instrument was acknowledged before me this 17 day of May, 2017 by David McCord - Sole Member of MM Ventures, LLC, a Limited Liability Company on behalf of the Limited Liability Company.

KIM L. REIMINK
NOTARY PUBLIC, KALAMAZOO COUNTY, MI
MY COMMISSION EXPIRES JUNE 10, 2020
ACTING IN THE COUNTY OF ~~Kalamazoo~~ Calhoun

[signature] Kim L Reimink

Notary Public, State of Michigan,
County of ______
My commission expires ______
Acting in the County of ______



2017-018213 05/26/2017 01:37:01 PM
Pages: 10 of 10 MTG
ATTORNEYS TITLE
Timothy A. Snow County Clerk/Register Kalamazoo County, MI

2021-029108 07/20/2021 11:00:17 AM
Pages: 13 of 26 AFF
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

11th RECEIVED
2017 MAY 24 PM 4:03
COUNTY OF KALAMAZOO

RECEIVED
2017 MAY 26 AM 11:49
COUNTY OF KALAMAZOO

2017-018214 05/26/2017 01:37:01 PM
Pages: 1 of 11 ALR
ATTORNEYS TITLE
Timothy A. Snow County Clerk/Register Kalamazoo County, MI

# ASSIGNMENT OF LEASES AND RENTS

This instrument was prepared by Jaime Cogan, Michigan Business Connection, LC, 3600 Green Court, Ann Arbor, MI 48105
MAXIMUM PRINCIPAL AMOUNT: $119,625.00.

Return To: Kirk Schwarz, Kellogg Community Federal Credit Union, P.O. Box 140, Battle Creek, MI 49016

**DATE AND PARTIES.** The date of this Assignment of Leases and Rents (Assignment) is May 17, 2017. The parties and their addresses are:

**ASSIGNOR:**
**MM VENTURES, LLC**
A Michigan Limited Liability Company
90 E. Columbia Ave. Ste.F1 #122
Battle Creek, MI 49015

**LENDER:**
**KELLOGG COMMUNITY CREDIT UNION**
Organized and existing under the laws of Michigan
P.O. Box 140
Battle Creek, MI 49016

1. **DEFINITIONS.** For the purposes of this document, the following term has the following meaning.

**A. Loan.** "Loan" refers to this transaction generally, including obligations and duties arising from the terms of all documents prepared or submitted for this transaction.

2. **MAXIMUM OBLIGATION LIMIT.** **The maximum principal amount, excluding protective advances, secured by this Assignment at any one time and from time to time will not exceed $119,625.00.** Any limitation of amount does not include interest and other fees and charges validly made pursuant to this Assignment. Protective advances are defined by law and include an expenditure or expenditures such as advances made under the terms of this Assignment to protect Lender's priority and advances made to fulfill or perform an obligation of the Assignor under this Assignment, with respect to the assigned property, that the Assignor has failed to fulfill or perform.

3. **SECURED DEBTS AND FUTURE ADVANCES.** The term "Secured Debts" includes and this Assignment will secure each of the following:



2021-029108 07/20/2021 11:00:17 AM
Pages: 14 of 26 AFF
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

**A. Specific Debts.** The following debts and all extensions, renewals, refinancings, modifications and replacements. A promissory note or other agreement, No. 355421-760, dated May 17, 2017, from Assignor to Lender, with a loan amount of $119,625.00.

**B. Future Advances.** All future advances from Lender to Assignor under the Specific Debts executed by Assignor in favor of Lender after this Assignment. If more than one person signs this Assignment, each agrees that this Assignment will secure all future advances that are given to Assignor either individually or with others who may not sign this Assignment. All future advances are secured by this Assignment even though all or part may not yet be advanced. All future advances are secured as if made on the date of this Assignment. Nothing in this Assignment shall constitute a commitment to make additional or future advances in any amount. Any such commitment must be agreed to in a separate writing.

**C. All Debts.** All present and future debts from Assignor to Lender, even if this Assignment is not specifically referenced, or if the future debt is unrelated to or of a different type than this debt. If more than one person signs this Assignment, each agrees that it will secure debts incurred either individually or with others who may not sign this Assignment. Nothing in this Assignment constitutes a commitment to make additional or future loans or advances. Any such commitment must be in writing. This Assignment will not secure any debt for which a non-possessory, non-purchase money security interest is created in "household goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices. This Assignment will not secure any debt for which a security interest is created in "margin stock" and Lender does not obtain a "statement of purpose," as defined and required by federal law governing securities. This Assignment will not secure any other debt if Lender, with respect to that other debt, fails to fulfill any necessary requirements or fails to conform to any limitations of the Truth in Lending Act (Regulation Z) or the Real Estate Settlement Procedures Act (Regulation X) that are required for loans secured by the Property.

**D. Sums Advanced.** All sums advanced and expenses incurred by Lender under the terms of this Assignment.

**4. ASSIGNMENT OF LEASES AND RENTS.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debts and Assignor's performance under this Assignment, Assignor does hereby assign, grant, bargain and mortgage to Lender as additional security all the right, title and interest in the following (Property).

A. Existing or future leases, subleases, licenses, guaranties and any other written or verbal agreements for the use and occupancy of the Property, including but not limited to any extensions, renewals, modifications or replacements (Leases).

B. Rents, issues and profits, including but not limited to security deposits, minimum rents, percentage rents, additional rents, common area maintenance charges, parking charges, real estate taxes, other applicable taxes, insurance premium contributions, liquidated damages following default, cancellation premiums, "loss of rents" insurance, guest receipts, revenues, royalties, proceeds, bonuses, accounts, contract rights, general intangibles, and all rights and claims which Assignor may have regarding the Property (Rents). Excluded from Rents are rents, issues and profits from the use and occupancy of the portion of the Property which is a family residence or an apartment building with less than six apartments.

C. The term Property as used in this Assignment shall include the following described real property:



2017-018214 05/26/2017 01:37:01 PM
Pages: 2 of 11 ALR
ATTORNEYS TITLE
Timothy A. Snow County Clerk/Register Kalamazoo County, MI

2021-029108 07/20/2021 11:00:17 AM
Pages: 15 of 26 AFF
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

Land situated in the Township of Texas, County of Kalamazoo, State of Michigan, and described as follows:

That part of the Northeast 1/4 of Section 22, T3S, R12W, Texas Township, Kalamazoo County, Michigan described as: Beginning at the North 1/4 corner of said Section 22; thence North 89°50'24" East along the North line of said Section 160.00 feet; thence South 00°14'07" West parallel with the North and South 1/4 line of said Section 200.00 feet; thence South 89°50'24" West 160.00 feet to said 1/4 line; thence North 00°14'07" East along said 1/4 line 200.00 feet to the point of beginning.

Tax Parcel No.: 09-22-201-001

The property is located in Kalamazoo County at 7483 W Q Ave., Kalamazoo, Michigan 49009.

In the event any item listed as Leases or Rents is determined to be personal property, this Assignment will also be regarded as a security agreement.

**5. PAYMENTS.** Assignor agrees that all payments under the Secured Debts will be paid when due and in accordance with the terms of the Secured Debts and this Assignment.

**6. COLLECTION OF RENTS.** Assignor may collect, receive, enjoy and use the Rents so long as Assignor is not in default. Assignor will not collect in advance any Rents due in future lease periods, unless Assignor first obtains Lender's written consent.

Upon default, Assignor will receive any Rents in trust for Lender and Assignor will not commingle the Rents with any other funds. When Lender so directs, Assignor will endorse and deliver any payments of Rents from the Property to Lender. Amounts collected will be applied at Lender's discretion to the Secured Debts, the costs of managing, protecting, valuating, appraising and preserving the Property, and other necessary expenses.

Assignor agrees that this Assignment is immediately effective between Assignor and Lender and effective as to third parties on the recording of this Assignment.

This Assignment applies when it secures commercial or industrial property other than an apartment building with less than six apartments or any family residence.

**7. COLLECTION EXPENSES AND ATTORNEYS' FEES.** On or after the occurrence of an Event of Default, to the extent permitted by law, Assignor agrees to pay all expenses of collection, enforcement, valuation, appraisal or protection of Lender's rights and remedies under this Assignment or any other document relating to the Secured Debts. Assignor agrees to pay expenses for Lender to inspect, valuate, appraise and preserve the Property. Expenses include, but are not limited to, attorneys' fees, court costs and other legal expenses. These expenses are due and payable immediately. If not paid immediately, these expenses will bear interest from the date of payment until paid in full at the highest interest rate in effect as provided for in the terms of the Secured Debts. In addition, to the extent permitted by the United States Bankruptcy Code, Assignor agrees to pay the reasonable attorneys' fees incurred by Lender to protect Lender's rights and interests in connection with any bankruptcy proceedings initiated by or against Assignor.

**8. ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2)



2017-018214 05/26/2017 01:37:01 PM
Pages: 3 of 11 ALR
ATTORNEYS TITLE
Timothy A. Snow County Clerk/Register Kalamazoo County, MI

2021-029108 07/20/2021 11:00:17 AM
Pages: 16 of 26 AFF
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substance," "hazardous waste," "hazardous substance," or "regulated substance" under any Environmental Law.

Assignor represents, warrants and agrees that:

**A.** Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance has been, is, or will be located, transported, manufactured, treated, refined, or handled by any person on, under or about the Property, except in the ordinary course of business and in strict compliance with all applicable Environmental Law.

**B.** Except as previously disclosed and acknowledged in writing to Lender, Assignor has not and will not cause, contribute to, or permit the release of any Hazardous Substance on the Property.

**C.** Assignor will immediately notify Lender if (1) a release or threatened release of Hazardous Substance occurs on, under or about the Property or migrates or threatens to migrate from nearby property; or (2) there is a violation of any Environmental Law concerning the Property. In such an event, Assignor will take all necessary remedial action in accordance with Environmental Law.

**D.** Except as previously disclosed and acknowledged in writing to Lender, Assignor has no knowledge of or reason to believe there is any pending or threatened investigation, claim, or proceeding of any kind relating to (1) any Hazardous Substance located on, under or about the Property; or (2) any violation by Assignor or any tenant of any Environmental Law. Assignor will immediately notify Lender in writing as soon as Assignor has reason to believe there is any such pending or threatened investigation, claim, or proceeding. In such an event, Lender has the right, but not the obligation, to participate in any such proceeding including the right to receive copies of any documents relating to such proceedings.

**E.** Except as previously disclosed and acknowledged in writing to Lender, Assignor and every tenant have been, are and will remain in full compliance with any applicable Environmental Law.

**F.** Except as previously disclosed and acknowledged in writing to Lender, there are no underground storage tanks, private dumps or open wells located on or under the Property and no such tank, dump or well will be added unless Lender first consents in writing.

**G.** Assignor will regularly inspect the Property, monitor the activities and operations on the Property, and confirm that all permits, licenses or approvals required by any applicable Environmental Law are obtained and complied with.

**H.** Assignor will permit, or cause any tenant to permit, Lender or Lender's agent to enter and inspect the Property and review all records at any reasonable time to determine (1) the existence, location and nature of any Hazardous Substance on, under or about the Property; (2) the existence, location, nature, and magnitude of any Hazardous Substance that has been released on, under or about the Property; or (3) whether or not Assignor and any tenant are in compliance with applicable Environmental Law.

**I.** Upon Lender's request and at any time, Assignor agrees, at Assignor's expense, to engage a qualified environmental engineer to prepare an environmental audit of the Property and to submit the results of such audit to Lender. The choice of the environmental engineer who will perform such audit is subject to Lender's approval.

**J.** Lender has the right, but not the obligation, to perform any of Assignor's obligations under this section at Assignor's expense.

**K.** As a consequence of any breach of any representation, warranty or promise made in this section, (1) Assignor will indemnify and hold Lender and Lender's successors or assigns harmless



2017-018214 05/26/2017 01:37:01 PM
Pages: 4 of 11 ALR
ATTORNEYS TITLE
Timothy A. Snow County Clerk/Register Kalamazoo County, MI

2021-029108 07/20/2021 11:00:17 AM
Pages: 17 of 26 AFF
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses, including without limitation all costs of litigation and attorneys' fees, which Lender and Lender's successors or assigns may sustain; and (2) at Lender's discretion, Lender may release this Assignment and in return Assignor will provide Lender with collateral of at least equal value to the Property without prejudice to any of Lender's rights under this Assignment.

**L.** Notwithstanding any of the language contained in this Assignment to the contrary, the terms of this section will survive any foreclosure or satisfaction of this Assignment regardless of any passage of title to Lender or any disposition by Lender of any or all of the Property. Any claims and defenses to the contrary are hereby waived.

**9. CONDEMNATION.** Assignor will give Lender prompt notice of any pending or threatened action by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Assignor authorizes Lender to intervene in Assignor's name in any of the above described actions or claims. Assignor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds will be considered payments and will be applied as provided in this Assignment. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

**10. DUE ON SALE OR ENCUMBRANCE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of all or any part of the Property. This right is subject to the restrictions imposed by federal law, as applicable.

**11. TRANSFER OF AN INTEREST IN THE ASSIGNOR.** If Assignor is an entity other than a natural person (such as a corporation, partnership, limited liability company or other organization), Lender may demand immediate payment if:

**A.** A beneficial interest in Assignor is sold or transferred.

**B.** There is a change in either the identity or number of members of a partnership or similar entity.

**C.** There is a change in ownership of more than 25 percent of the voting stock of a corporation, partnership, limited liability company or similar entity.

However, Lender may not demand payment in the above situations if it is prohibited by law as of the date of this Assignment.

**12. WARRANTIES AND REPRESENTATIONS.** Assignor makes to Lender the following warranties and representations which will continue as long as this Assignment is in effect:

**A. Power.** Assignor is duly organized, and validly existing and in good standing in all jurisdictions in which Assignor operates. Assignor has the power and authority to enter into this transaction and to carry on Assignor's business or activity as it is now being conducted and, as applicable, is qualified to do so in each jurisdiction in which Assignor operates.

**B. Authority.** The execution, delivery and performance of this Assignment and the obligation evidenced by this Assignment are within Assignor's powers, have been duly authorized, have received all necessary governmental approval, will not violate any provision of law, or order of court or governmental agency, and will not violate any agreement to which Assignor is a party or to which Assignor is or any of Assignor's property is subject.

**C. Name and Place of Business.** Other than previously disclosed in writing to Lender, Assignor has not changed Assignor's name or principal place of business within the last 10 years and has not used any other trade or fictitious name. Without Lender's prior written consent, Assignor



2017-018214 05/26/2017 01:37:01 PM
Pages: 6 of 11 ALR
ATTORNEYS TITLE
Timothy A. Snow County Clerk/Register Kalamazoo County, MI

2021-029108 07/20/2021 11:00:17 AM
Pages: 18 of 26 AFF
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

does not and will not use any other name and will preserve Assignor's existing name, trade names and franchises.

**D. Title.** Assignor has good title to the Leases, Rents and Property and the right to assign, grant, bargain, convey, mortgage and warrant to Lender as additional security the Leases and Rents, and no other person has any right in the Leases and Rents.

**E. Recordation.** Assignor has recorded the Leases as required by law or as otherwise prudent for the type and use of the Property.

**F. Default.** No default exists under the Leases, and the parties subject to the Leases have not violated any applicable law on leases, licenses and landlords and tenants. Assignor, at its sole cost and expense, will keep, observe and perform, and require all other parties to the Leases to comply with the Leases and any applicable law. If Assignor or any party to the Lease defaults or fails to observe any applicable law, Assignor will promptly notify Lender.

**G. Lease Modification.** Assignor has not sublet, modified, extended, canceled, or otherwise altered the Leases, or accepted the surrender of the Property covered by the Leases (unless the Leases so require).

**H. Encumbrance.** Assignor has not assigned, compromised, subordinated or encumbered the Leases and Rents.

**13. COVENANTS.** Assignor agrees to the following covenants:

**A. Rent Abatement and Insurance.** When any Lease provides for an abatement of Rents due to fire, flood or other casualty, Assignor will insure against this risk of loss with a policy satisfactory to Lender. Assignor may choose the insurance company, subject to Lender's approval, which will not be unreasonably withheld.

**B. Copies of Leases.** Assignor will promptly provide Lender with copies of the Leases and will certify these Leases are true and correct copies. The existing Leases will be provided on execution of the Assignment, and all future Leases and any other information with respect to these Leases will be provided immediately after they are executed.

**C. Right To Rents.** Immediately after the execution of this Assignment, Assignor will notify all current and future tenants and others obligated under the Leases of Lender's rights to the Leases and Rents, and will request that they immediately pay all future Rents directly to Lender when Assignor or Lender asks them to do so.

**D. Accounting.** When Lender requests, Assignor will provide to Lender an accounting of Rents, prepared in a form acceptable to Lender, subject to generally accepted accounting principles and certified by Assignor or Assignor's accountant to be current, accurate and complete as of the date requested by Lender.

**E. Lease Modification.** Assignor will not sublet, modify, extend, cancel, or otherwise alter the Leases, or accept the surrender of the Property covered by the Leases (unless the Leases so require) without Lender's written consent.

**F. Encumbrance.** Assignor will not assign, compromise, subordinate or encumber the Leases and Rents without Lender's prior written consent.

**G. Future Leases.** Assignor will not enter into any future Leases without prior written consent from Lender. Assignor will execute and deliver such further assurances and assignments as to these future Leases as Lender requires from time to time.

**H. Personal Property.** Assignor will not sell or remove any personal property on the Property, unless Assignor replaces this personal property with like kind for the same or better value.



2017-018214 05/26/2017 01:37:01 PM
Pages: 6 of 11 ALR
ATTORNEYS TITLE
Timothy A. Snow County Clerk/Register Kalamazoo County, MI

2021-029108 07/20/2021 11:00:17 AM
Pages: 19 of 26 AFF
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

**I. Prosecution and Defense of Claims.** Assignor will appear in and prosecute its claims or defend its title to the Leases and Rents against any claims that would impair Assignor's interest under this Assignment and, on Lender's request, Assignor will also appear in any action or proceeding on behalf of Lender. Assignor agrees to assign to Lender, as requested by Lender, any right, claims or defenses which Assignor may have against parties who supply labor or materials to improve or maintain the leaseholds subject to the Leases and/or the Property.

**J. Liability and Indemnification.** Lender does not assume or become liable for the Property's maintenance, depreciation, or other losses or damages when Lender acts to manage, protect or preserve the Property, except for losses or damages due to Lender's gross negligence or intentional torts. Otherwise, Assignor will indemnify Lender and hold Lender harmless for all liability, loss or damage that Lender may incur when Lender opts to exercise any of its remedies against any party obligated under the Leases.

**K. Leasehold Estate.** Assignor will not cause or permit the leasehold estate under the Leases to merge with Assignor's reversionary interest, and agrees that the Leases shall remain in full force and effect regardless of any merger of the Assignor's interests and of any merger of the interests of Assignor and any party obligated under the Leases.

**L. Insolvency.** Lender will be the creditor of each tenant and of anyone else obligated under the Leases who is subject to an assignment for the benefit of creditors, an insolvency, a dissolution or a receivership proceeding, or a bankruptcy.

**14. DEFAULT.** Assignor will be in default if any of the following events (known separately and collectively as an Event of Default) occur:

**A. Payments.** Assignor fails to make a payment in full when due.

**B. Insolvency or Bankruptcy.** The death, dissolution or insolvency of, appointment of a receiver by or on behalf of, application of any debtor relief law, the assignment for the benefit of creditors by or on behalf of, the voluntary or involuntary termination of existence by, or the commencement of any proceeding under any present or future federal or state insolvency, bankruptcy, reorganization, composition or debtor relief law by or against Assignor, Borrower, or any co-signer, endorser, surety or guarantor of this Assignment or any other obligations Borrower has with Lender.

**C. Business Termination.** Assignor merges, dissolves, reorganizes, ends its business or existence, or a partner or majority owner dies or is declared legally incompetent.

**D. Failure to Perform.** Assignor fails to perform any condition or to keep any promise or covenant of this Assignment.

**E. Other Documents.** A default occurs under the terms of any other document relating to the Secured Debts.

**F. Other Agreements.** Assignor is in default on any other debt or agreement Assignor has with Lender.

**G. Misrepresentation.** Assignor makes any verbal or written statement or provides any financial information that is untrue, inaccurate, or conceals a material fact at the time it is made or provided.

**H. Judgment.** Assignor fails to satisfy or appeal any judgment against Assignor.

**I. Forfeiture.** The Property is used in a manner or for a purpose that threatens confiscation by a legal authority.

**J. Name Change.** Assignor changes Assignor's name or assumes an additional name without notifying Lender before making such a change.



2017-018214 05/26/2017 01:37:01 PM
Pages: 7 of 11 ALR
ATTORNEYS TITLE
Timothy A. Snow County Clerk/Register Kalamazoo County, MI

2021-029108 07/20/2021 11:00:17 AM
Pages: 20 of 26 AFF
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

K. **Property Transfer.** Assignor transfers all or a substantial part of Assignor's money or property. This condition of default, as it relates to the transfer of the Property, is subject to the restrictions contained in the DUE ON SALE section.

L. **Property Value.** Lender determines in good faith that the value of the Property has declined or is impaired.

M. **Material Change.** Without first notifying Lender, there is a material change in Assignor's business, including ownership, management, and financial conditions.

N. **Insecurity.** Lender determines in good faith that a material adverse change has occurred in Assignor's financial condition from the conditions set forth in Assignor's most recent financial statement before the date of this Assignment or that the prospect for payment or performance of the Secured Debts is impaired for any reason.

15. **REMEDIES.** After Assignor defaults, Lender may at Lender's option do any one or more of the following.

A. **Acceleration.** Lender may make all or any part of the amount owing by the terms of the Secured Debts immediately due.

B. **Additional Security.** Lender may demand additional security or additional parties to be obligated to pay the Secured Debts.

C. **Sources.** Lender may use any and all remedies Lender has under Michigan or federal law or in any document relating to the Secured Debts.

D. **Insurance Benefits.** Lender may make a claim for any and all insurance benefits or refunds that may be available on Assignor's default.

E. **Payments Made On Assignor's Behalf.** Amounts advanced on Assignor's behalf will be immediately due and may be added to the Secured Debts.

F. **Rents.** Lender may terminate Assignor's right to collect Rents and directly collect and retain Rents in Lender's name without taking possession of the Property and to demand, collect, receive, and sue for the Rents, giving proper receipts and releases. In addition, after deducting all reasonable expenses of collection from any collected and retained Rents, Lender may apply the balance as provided for by the Secured Debts.

G. **Entry.** Lender may enter, take possession, manage and operate all or any part of the Property; make, modify, enforce or cancel or accept the surrender of any Leases; obtain or evict any tenants or licensees; increase or reduce Rents; decorate, clean and make repairs or do any other act or incur any other cost Lender deems proper to protect the Property as fully as Assignor could do. Any funds collected from the operation of the Property may be applied in such order as Lender may deem proper, including, but not limited to, payment of the following: operating expenses, management, brokerage, attorneys' and accountants' fees, the Secured Debts, and toward the maintenance of reserves for repair or replacement. Lender may take such action without regard to the adequacy of the security, with or without any action or proceeding, through any person or agent, or receiver to be appointed by a court, and irrespective of Assignor's possession.

The collection and application of the Rents or the entry upon and taking possession of the Property as set out in this section shall not cure or waive any notice of default under the Secured Debts, this Assignment, or invalidate any act pursuant to such notice. The enforcement of such remedy by Lender, once exercised, shall continue for so long as Lender shall elect, notwithstanding that such collection and application of Rents may have cured the original default.



2017-018214 05/26/2017 01:37:01 PM
Pages: 8 of 11 ALR
ATTORNEYS TITLE
Timothy A. Snow County Clerk/Register Kalamazoo County, MI

2021-029108 07/20/2021 11:00:17 AM
Pages: 21 of 26 AFF
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

H. Waiver. Except as otherwise required by law, by choosing any one or more of these remedies Lender does not give up any other remedy. Lender does not waive a default if Lender chooses not to use a remedy. By electing not to use any remedy, Lender does not waive Lender's right to later consider the event a default and to use any remedies if the default continues or occurs again.

16. TERM. This Assignment will remain in full force and effect until the Secured Debts are paid or otherwise discharged and Lender is no longer obligated to advance funds under any loan or credit agreement which is a part of the Secured Debts. If any or all payments of the Secured Debts are subsequently invalidated, declared void or voidable, or set aside and are required to be repaid to a trustee, custodian, receiver or any other party under any bankruptcy act or other state or federal law, then the Secured Debts will be revived and will continue in full force and effect as if this payment had not been made.

17. WAIVERS. Except to the extent prohibited by law, Assignor waives all appraisement and homestead exemption rights relating to the Property.

18. APPLICABLE LAW. This Assignment is governed by the laws of Michigan, the United States of America, and to the extent required, by the laws of the jurisdiction where the Property is located, except to the extent such state laws are preempted by federal law.

19. JOINT AND INDIVIDUAL LIABILITY AND SUCCESSORS. Each Assignor's obligations under this Assignment are independent of the obligations of any other Assignor. Lender may sue each Assignor individually or together with any other Assignor. Lender may release any part of the Property and Assignor will still be obligated under this Assignment for the remaining Property. Assignor agrees that Lender and any party to this Assignment may extend, modify or make any change in the terms of this Assignment or any evidence of debt without Assignor's consent. Such a change will not release Assignor from the terms of this Assignment. Lender may assign all or part of Lender's rights under this Assignment without Assignor's consent. If Lender assigns this Assignment, all of Assignor's covenants, agreements, representations and warranties contained in this Assignment will benefit Lender's successors and assigns. The duties of this Assignment will bind the successors and assigns of Assignor.

20. AMENDMENT, INTEGRATION AND SEVERABILITY. This Assignment may not be amended or modified by oral agreement. No amendment or modification of this Assignment is effective unless made in writing and executed by Assignor and Lender. This Assignment and any other documents relating to the Secured Debts are the complete and final expression of the agreement. If any provision of this Assignment is unenforceable, then the unenforceable provision will be severed and the remaining provisions will still be enforceable.

21. INTERPRETATION. Whenever used, the singular includes the plural and the plural includes the singular. The section headings are for convenience only and are not to be used to interpret or define the terms of this Assignment.

22. NOTICE, ADDITIONAL DOCUMENTS AND RECORDING FEES. Unless otherwise required by law, any notice will be given by delivering it or mailing it by first class mail to the appropriate party's address listed in the DATE AND PARTIES section, or to any other address designated in writing. Notice to one Assignor will be deemed to be notice to all Assignors. Assignor will inform Lender in writing of any change in Assignor's name, address or other application information. Assignor will provide Lender any other, correct and complete information Lender requests to effectively mortgage or convey the Property. Assignor agrees to pay all expenses, charges and taxes in connection with the preparation and recording of this Assignment. Assignor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and



2017-018214 05/26/2017 01:37:01 PM
Pages: 9 of 11 ALR
ATTORNEYS TITLE
Timothy A. Snow County Clerk/Register Kalamazoo County, MI

2021-029108 07/20/2021 11:00:17 AM
Pages: 22 of 26 AFF
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

preserve Assignor's obligations under this Assignment and to confirm Lender's lien status on any Property, and Assignor agrees to pay all expenses, charges and taxes in connection with the preparation and recording thereof. Time is of the essence.

**23. AGREEMENT TO ARBITRATE.** Lender or Assignor may submit to binding arbitration any dispute, claim or other matter in question between or among Lender and Assignor that arises out of or relates to this Transaction (Dispute), except as otherwise indicated in this section or as Lender and Assignor agree to in writing. For purposes of this section, this Transaction includes this Assignment and any other document relating to the Secured Debts, and proposed loans or extensions of credit that relate to this Assignment. Lender or Assignor will not arbitrate any Dispute within any "core proceedings" under the United States bankruptcy laws.

Lender and Assignor must consent to arbitrate any Dispute concerning the Secured Debt secured by real estate at the time of the proposed arbitration. Lender may foreclose or exercise any powers of sale against real property securing the Secured Debt underlying any Dispute before, during or after any arbitration. Lender may also enforce the Secured Debt secured by this real property and underlying the Dispute before, during or after any arbitration.

Lender or Assignor may, whether or not any arbitration has begun, pursue any self-help or similar remedies, including taking property or exercising other rights under the law; seek attachment, garnishment, receivership or other provisional remedies from a court having jurisdiction to preserve the rights of or to prevent irreparable injury to Lender or Assignor; or foreclose against any property by any method or take legal action to recover any property. Foreclosing or exercising a power of sale, beginning and continuing a judicial action or pursuing self-help remedies will not constitute a waiver of the right to compel arbitration.

The arbitrator will determine whether a Dispute is arbitrable. A single arbitrator will resolve any Dispute, whether individual or joint in nature, or whether based on contract, tort, or any other matter at law or in equity. The arbitrator may consolidate any Dispute with any related disputes, claims or other matters in question not arising out of this Transaction. Any court having jurisdiction may enter a judgment or decree on the arbitrator's award. The judgment or decree will be enforced as any other judgment or decree.

Lender and Assignor acknowledge that the agreements, transactions or the relationships which result from the agreements or transactions between and among Lender and Assignor involve interstate commerce. The United States Arbitration Act will govern the interpretation and enforcement of this section.

The American Arbitration Association's Commercial Arbitration Rules, in effect on the date of this Assignment, will govern the selection of the arbitrator and the arbitration process, unless otherwise agreed to in this Assignment or another writing.

**24. WAIVER OF TRIAL FOR ARBITRATION. Lender and Assignor understand that the parties have the right or opportunity to litigate any Dispute through a trial by judge or jury, but that the parties prefer to resolve Disputes through arbitration instead of litigation. If any Dispute is arbitrated, Lender and Assignor voluntarily and knowingly waive the right to have a trial by jury or judge during the arbitration.**

**25. WAIVER OF JURY TRIAL. If the parties do not opt for arbitration, then all of the parties to this Assignment knowingly and intentionally, irrevocably and unconditionally, waive any and all right to a trial by jury in any litigation arising out of or concerning this Assignment or any other documents relating to the Secured Debts or related obligation. All of these parties acknowledge that this section has either been brought to the attention of each party's legal counsel or that each party had the opportunity to do so.**



2017-018214 05/26/2017 01:37:01 PM
Pages: 10 of 11 ALR
ATTORNEYS TITLE
Timothy A. Snow County Clerk/Register Kalamazoo County, MI

2021-029108 07/20/2021 11:00:17 AM
Pages: 23 of 26 AFF
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

**SIGNATURES.** By signing, Assignor agrees to the terms and covenants contained in this Assignment. Assignor also acknowledges receipt of a copy of this Assignment.

**ASSIGNOR:**

MM Ventures, LLC

By MM Ventures, LLC
David McCord, Sole Member

**ACKNOWLEDGMENT.**
STATE OF MICHIGAN, COUNTY OF ~~Kalamazoo~~ Calhoun ss.
This instrument was acknowledged before me this 17 day of May, 2017 by David McCord - Sole Member of MM Ventures, LLC, a Limited Liability Company on behalf of the Limited Liability Company.

KIM L. REIMINK
NOTARY PUBLIC, KALAMAZOO COUNTY, MI
MY COMMISSION EXPIRES JUNE 10, 2020
ACTING IN THE COUNTY OF ~~Kalamazoo~~ Calhoun

Notary Public, State of Michigan,
County of ____________
My commission expires ____________
Acting in the County of ____________



2017-018214 05/26/2017 01:37:01 PM
Pages: 11 of 11 ALR
ATTORNEYS TITLE
Timothy A. Snow County Clerk/Register Kalamazoo County, MI

2021-029108 07/20/2021 11:00:17 AM
Pages: 24 of 26 AFF
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

Branch :ATD User :TROB

EXHIBIT C

2021-001226 01/11/2021 11:30:10 AM
Pages: 1 of 2 QC
DAVE MCCORD
Meredith Place County Clerk/Register Kalamazoo County, MI

(2) RECEIVED

2021 JAN 11 AM 11: 15

COUNTY OF KALAMAZOO

## QUIT CLAIM DEED IN LIEU OF FORECLOSURE

Grantor, MM Ventures, LLC, a Michigan Limited Liability Company, whose address is 7483 West Q Avenue, Kalamazoo, MI 49009, quit claims to Grantee, Kellogg Community Credit Union, whose address is PO Box 140, Battle Creek, MI 49016, the premises in the Township of Texas, County of Kalamazoo, Michigan, described as

> That part of the Northeast 1/4 of Section 22, T3S, R12W, Texas Township, Kalamazoo County, Michigan, described as: Beginning at the North 1/4 corner of said Section 22; thence North 89°50'24" East along the North line of said Section 160.00 feet; thence South 00°14'07" West parallel with the North and South 1/4 line of said Section 200.00 feet; thence South 89°50'24" West 160.00 feet to said 1/4 line; thence North 00°14'07" East along said 1/4 line 200.00 feet to the point of beginning.
>
> PPN: 09-22-201-001
>
> Commonly known as: 7483 West Q Avenue, Kalamazoo, MI 49009

This Quit claim deed is a deed in lieu of foreclosure on a mortgage dated May 17, 2017, recorded with instrument number 2017-01823 in the Kalamazoo County Register of Deeds, a mortgage dated September 15, 2017, recorded with instrument number 2017-031400 in the Kalamazoo County Register of Deeds, and a mortgage dated November 2, 2018, recorded with instrument number 2018-035033 in the Kalamazoo County Register of Deeds, between the parties on the described property. This quit claim deed extinguishes all rights of Grantor in the mortgages between the parties, including any rights of redemption, and extinguishes all other rights, title, and interests of Grantor in the premises.

Grantor grants to the Grantee the right to make 0 divisions under section 108 of the Land Division Act, Act No 288 of the Public Acts of 1967, as amended.

This conveyance is exempt from the real estate transfer tax under the provisions of MCL 207.505(a) and MCL 207.526(a).

2021-029108 07/20/2021 11:00:17 AM
Pages: 25 of 26 AFF
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

This property may be located within the vicinity of farmland or a farm operation. Generally accepted agricultural and management practices that may generate noise, dust, odors, and other associated conditions may be used and are protected by the Michigan Right to Farm Act.

Dated: 1/4/2021

MM Ventures, LLC

David McCord
Its: Sole Member

STATE OF MICHIGAN )
KALAMAZOO COUNTY )

Acknowledged before me in Kalamazoo County, Michigan on 01 | 04, ~~2020~~ 2021, by David McCord, sole member of MM Ventures, LLC.

Mary K Johnson
Notary public's printed name: Mary K Johnson
Notary public, State of Michigan, County of Kalamazoo.
My commission expires 3/8/2026.
Acting in the County of:

MARY K JOHNSON
NOTARY PUBLIC - STATE OF MICHIGAN

Drafted by and when recorded return to:

Mark D. Hofstee
Bolhouse Hofstee & McLean, PC
3996 Chicago Drive SW
Grandville, MI 49418

Send subsequent tax bills to:

Kellogg Community Credit Union
PO Box 140
Battle Creek, MI 49009

2021-001226 01/11/2021 11:30:10 AM
Pages: 2 of 2 QC
DAVE MCCORD
Meredith Place County Clerk/Register Kalamazoo County, MI

2021-029108 07/20/2021 11:00:17 AM
Pages: 26 of 26 AFF
A T A NATIONAL TITLE GROUP LLC
Meredith Place County Clerk/Register Kalamazoo County, MI

# Exhibit 9

OMB NO: 3245-0132
Expiration Date: 01/31/2018

# U.S. Small Business Administration
## Lender's Transcript of Account

| Name of Borrower | Loan Number | |
|---|---|---|
| MM Ventures LLC | 355421-761 | |
| **Name of Lender** | **Amount of Loan** | **Int. Day Basis** |
| Kellogg Community Credit Union | $438,500.00 | 365/360 |

Repayment Terms as Stated in the Note
Loan Amount: $438,500.00
Interest Rate: "Prime Rate" + 2.25%
The interest rate will be adj. every 5 yrs. (the "change period"), beginning November 5th, 2023 (date of the first-rate adjustment). The interest rate adj. period may only be changed in accordance with SOP 50 10.

Approved Deferment Periods: N/A

Default Date (Next Payment Due Date): 11/30/2019

| Date | Amount Disbursed | Amount Repaid | Deferment | Application of Payment | | Int. Rate | Interest Paid | | Principal Balance |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Principal | Interest | | From | To | |
| 11/02/18 | $ 438,500.00 | | | | | 7.50 | | | $ 438,500.00 |
| 12/03/18 | | $ 4,092.72 | | $ 1,260.87 | $ 2,831.85 | 7.50 | 11/02/18 | 12/02/18 | $ 437,239.13 |
| 01/03/19 | | $ 4,092.72 | | $ 1,268.93 | $ 2,823.79 | 7.50 | 12/03/18 | 01/02/19 | $ 435,970.20 |
| 02/03/19 | | $ 4,092.72 | | $ 1,276.99 | $ 2,815.73 | 7.50 | 01/03/19 | 02/02/19 | $ 434,693.21 |
| 03/03/19 | | $ 4,092.72 | | $ 1,557.04 | $ 2,535.68 | 7.50 | 02/03/19 | 03/03/19 | $ 433,136.17 |
| 03/24/19 | | $ 2,731.80 | | $ 836.76 | $ 1,895.04 | 7.50 | 03/03/19 | 03/23/19 | $ 432,299.41 |
| 03/26/19 | | $ 1,360.92 | | $ 1,180.80 | $ 180.12 | 7.50 | 03/24/19 | 03/26/19 | $ 431,118.61 |
| 05/01/19 | | $ 4,092.72 | | $ 859.20 | $ 3,233.52 | 7.50 | 03/27/19 | 04/30/19 | $ 430,259.41 |
| 05/31/19 | | $ 4,092.72 | | $ 1,403.52 | $ 2,689.20 | 7.50 | 05/01/19 | 05/30/19 | $ 428,855.89 |
| 06/29/19 | | $ 4,092.72 | | $ 1,501.86 | $ 2,590.86 | 7.50 | 05/31/19 | 06/28/19 | $ 427,354.03 |
| 07/26/19 | | $ 4,093.00 | | $ 1,689.19 | $ 2,403.81 | 7.50 | 06/29/19 | 07/25/19 | $ 425,664.84 |
| 08/28/19 | | $ 4,093.00 | | $ 1,166.56 | $ 2,926.44 | 7.50 | 07/26/19 | 08/27/19 | $ 424,498.28 |
| 09/30/19 | | $ 4,093.00 | | $ 1,174.48 | $ 2,918.52 | 7.50 | 08/28/19 | 09/29/19 | $ 423,323.80 |
| 10/31/19 | | $ 4,093.00 | | $ 1,359.11 | $ 2,733.89 | 7.50 | 09/30/19 | 10/30/19 | $ 421,964.69 |
| 07/01/21 | | $ 383,009.85 | | $ 383,009.85 | $ 0.00 | 7.50 | | | $ 38,954.84 |

I Certify This to be a True Copy of Transcript of Account

Signature [signature] Title CLO

Date 09/16/2021

SBA Form 1149 (12-14) REF SOP 50-57 Previous Editions Obsolete **See Reverse Side for Instructions**

(This form is a necessary part of the SBA GUARANTY PURCHASE package.)

# Exhibit 10

DEPARTMENT OF THE TREASURY
BUREAU OF THE FISCAL SERVICE
P.O. BOX 830794
BIRMINGHAM, AL 35283-0794

September 4, 2023

# NOTICE OF INTENT TO INITIATE ADMINISTRATIVE WAGE GARNISHMENT PROCEEDINGS

David McCord
150 Auburn St
BATTLE CREEK MI 49014

Federal Agency: Small Business Administration Small Business Administration
Amount of the Debt: $64,539.79
Treasury Case Number: L43330853

We continue to try to collect the debt you owe to the Small Business Administration, Small Business Administration. You have failed to pay your debt in full or otherwise make arrangements to resolve the debt. The Small Business Administration previously sent you a letter explaining why you owe this debt. If you do not pay your debt or take other action described below, we, on behalf of the Small Business Administration will issue a Wage Garnishment Order to your employer to collect the debt. The Wage Garnishment Order will require your employer to deduct up to 15% from your disposable pay each pay period until your debt, including all interest, penalties and costs, is paid in full. Your employer will be required to send the amounts deducted to us for payment to the Small Business Administration.

If you pay your debt in full or enter into a repayment plan acceptable to Treasury before October 4, 2023, a Garnishment Order will not be issued to your employer.

TO PAY YOUR DEBT IN FULL (Note - we do not accept credit card payments):
You may go online and pay with your debit card using Pay.gov (www.pay.gov/paygov/paymydebt).
You may call a Debt Recovery Analyst toll free at 1-888-826-3127 and provide them your debit card number.

Hearing impaired persons should use the Federal Relay Service by dialing 1-(800) 877-8339 to reach a Communications Assistant, who will dial the toll-free number. You may also pay by check, money order or debit card using the payment coupon below. Checks and money orders should be made payable to the U.S. Department of the Treasury. Please include the Treasury Case Number L43330853 in the memo section of your check or money order and enclose it with the coupon below. When you provide a check as payment, you authorize us to use information from your check to make a one-time electronic funds transfer from your account or to process the payment as a check transaction. Mail your payment and payment coupon to:

U.S. Department of the Treasury
Post Office Box 979101
St. Louis, MO 63197-9000

TO ENTER INTO A WRITTEN PAYMENT AGREEMENT: You may enter into a written payment agreement with us which specifies monthly payments. If you fail to make payments as required under the payment agreement, we may issue a Wage Garnishment Order to your employer without further notice to you. Call us at the toll-free telephone number below to discuss the terms of a payment agreement.

You are also entitled to:
INSPECT AND COPY YOUR RECORDS: You may inspect and copy the Small Business Administration's records related to your debt by writing us or calling us at the address and telephone number listed below.

REQUEST A HEARING: You may request a hearing regarding the validity or amount of the debt. If the proposed garnishment would cause financial hardship, you may also request the garnishment amount be adjusted. These requests must be made in writing by completing, signing, and mailing the enclosed Request for Hearing form to the address listed below. If we receive your written request for a hearing on or before September 26, 2023, we will not issue a Wage Garnishment Order until your hearing is held and a decision is reached. If the reason for your dispute has only been reviewed as part of an administrative review, then you have the right to have your dispute considered by a hearing official. If, however, you have already had a hearing on the issues you raise in your dispute, you will not be provided an additional hearing. If your request is not received by the deadline, Treasury may issue a Wage Garnishment Order before your hearing is held. Hearing procedures are described in the enclosure included with this letter.

If you have filed for bankruptcy and an automatic bankruptcy stay is in effect, please notify us. We will not garnish your pay while the stay is in effect. Your requirement to notify us is complete upon receipt of a phone call or written notice providing details of the bankruptcy. Also, if you have not held your current job for at least 12 months and you were involuntarily separated from your last job you may be ineligible for garnishment. But you must forward to us documentation showing dates of your termination and hiring.

HOW TO CONTACT US. If you have any questions about this letter, call or write to us at:

U.S. Department of the Treasury
Attention: AWG Analyst
Administrative Wage Garnishment Liaison
Post Office Box 830794
Birmingham, AL 35283-0794
1-888-826-3127

Hearing impaired persons may use the Federal Relay Service by dialing (800) 877-8339 to reach a Communications Assistant, who will dial the toll-free number.

U.S. Department of the Treasury
Bureau of the Fiscal Service

SEE ENCLOSURE FOR IMPORTANT
INFORMATION ABOUT ADMINISTRATIVE WAGE
GARNISHMENT

Enclosures:
Request for Hearing
Important Information Concerning Administrative Wage Garnishment
Payment Coupon

# Administrative Wage Garnishment Request for Hearing or Eligibility Determination

Date Notice of Intent Sent: September 4, 2023

**MAIL OR FAX FORM TO:**
FAX: (855) 292-9623
EMAIL: AWGhearingrequest@fiscal.treasury.gov
MAIL: Bureau of the Fiscal Service
Attn: AWG Analyst
Post Office Box 830794
Birmingham, AL 35283-0794

| | |
|---|---|
| Debtor Name | David McCord |
| Treasury Case Number | L43330853 |
| Agency Name | Small Business Administration |
| Agency Account Number | 3103817008 |
| Account Balance | $64,539.79 |

**If you object to garnishment of your wages for the debt mentioned above, you can use this form to request a hearing or to assert ineligibility for garnishment based on the facts of your employment. Please check the appropriate box(es) below. Your request for a hearing or assertion of ineligibility must be in writing, signed, and delivered to the address above. EXPLAIN any additional facts concerning your objection on a separate sheet of paper and, together with all supporting documentation, enclose it with this request. Your objection(s) will be considered based on the information and documents you provide with this form, and any records held by the agency.**

| | |
|---|---|
| I request a hearing based on the existence of the debt - I do not owe the debt. | ☐ |
| I request a hearing based on the amount of the debt - I do not owe the full amount of the debt. | ☐ |
| I request a hearing based on the garnishment amount - Proposed garnishment would cause financial hardship.<br>**NOTE: You must provide a signed financial statement along with copies of earnings and income records and proof of expenses. To obtain a copy of the financial statement form, go to https://www.fiscal.treasury.gov/files/cross-servicing/consumer-finstmt.pdf and fax it to the number listed above.** | ☐ |
| I am ineligible for garnishment because I was involuntarily terminated from my last employment, and I have been employed in my current job less than 12 months.<br>**NOTE: You must attach documentation from your employer showing the date you were hired in your current job and documentation from prior employer showing involuntary termination for this exemption to be considered.** | ☐ |

| | | |
|---|---|---|
| Debtor Address | | |
| Debtor Phone No. / Email | (Phone) | (Email) |
| Employer Name and Address | | |
| Employer Phone Number | | |

**I have read and understand the Important Notice Concerning Administrative Wage Garnishment enclosed with this form.**

I understand that if I make or provide any knowingly false or frivolous claims or statements, representations, or evidence to a Federal Agency, I may be subject to penalties under the False Claims Act, 31 U.S.C. 3729-3731 or criminal penalties under 18 U.S.C. 286,287, 1001, and 1002.

Signature_______________________ Date ___________________

AWGNLD_130_ fdv1 0000000837L43330853 NLD_0008788023 121

# Important Notice Concerning Administrative Wage Garnishment

**What is Administrative Wage Garnishment (AWG)?** Under Federal law, a Federal agency may, without first obtaining a court order, order an employer to withhold up to 15% of your wages for payment to the Federal agency to satisfy a delinquent non-tax debt. See 31 U.S.C. § 3720D; 31 C.F.R. § 285.11. Additional information may be found at Fiscal Service's web site: https://www.fiscal.treasury.gov/dms.

**When can a Federal agency use AWG?** A Federal agency can use an AWG to collect delinquent debt if you are employed and not paying a debt as agreed. An AWG may be used to collect a debt even if state law does not allow wage garnishment. A Federal agency may not garnish your wages if you have not been in your current job for least 12 months and you were involuntarily separated from your previous job.

**How do I know that the Federal agency intends to collect a debt using AWG?** At least 30 days before beginning an AWG, a written notice must be sent to you at your address last known to the Federal agency. This AWG notice must state the nature and amount of the debt, the agency's intention to begin garnishment, and an explanation of your rights.

**What are my rights?** Before AWG begins you must have an opportunity to inspect and copy records related to the debt, enter into a repayment plan approved by Treasury, and have a hearing.

**How do I request a hearing?** You must send a request for a hearing, with written evidence to support your claim, to the address listed in your AWG notice. To have a hearing before AWG begins, you must request a hearing within 15 business days after the AWG notice is mailed to you. The Federal agency may continue the AWG process if you request a hearing after the 15-day period. You may request a hearing concerning the existence or amount of the debt, or the terms of the proposed repayment schedule under the garnishment order. The Federal agency will determine whether your hearing will be oral or written. If the agency decides to hold an oral hearing, the agency will decide when and where the hearing will be held, and you may decide whether the hearing will be held in-person or by telephone. You will have to pay your own travel expenses for an in-person hearing.

**Who will hold the hearing and how will my case be decided?** The Federal agency will choose a hearing official to review and decide your case. The Federal agency will have to prove that you owe the debt. You will have to prove why you disagree with the Federal agency. The hearing official must issue a written opinion as soon as practicable. If the decision is not made within 60 days of the hearing, AWG must stop until the agency makes a decision.

**How much of my pay can be garnished?** A Federal agency can order your employer to deduct up to 15% of your disposable pay. Disposable pay means your compensation (salary, bonuses, commissions, vacation pay, etc.) after deduction of any health insurance premiums, Federal, state, and local taxes, and involuntary retirement or pension payments. You are entitled to keep an amount equal to 30 times the Federal minimum wage which is $217.50 a week. If your pay is being garnished for other debts, the deduction for AWG will be reduced so that your total garnishment does not exceed 25% of your disposable pay.

**What happens if I suffer a disability, divorce, or catastrophic illness during the AWG process?** You may, at any time during the AWG process, ask the Federal agency to review whether the amount being deducted from your pay should be reduced based on a material change in your situation which results in a financial hardship.

**Can my employer fire me if my pay is being garnished?** Under Federal law (31 U.S.C. § 3720D), your employer may not fire you, refuse to employ you, or take any disciplinary action against you because your wages are being garnished.

# AWG PAYMENT COUPON

Responsible Party: David McCord
AWG Number:
Treasury Case Number: L43330853

*Amount Due: $64,539.79

Send your payment to:
U.S. Department of the Treasury
P.O. Box 979101
St. Louis, MO 63197-9000

**METHOD OF PAYMENT**

Pay online at www.pay.gov/paygov/paymydebt or select:

☐ Check ☐ Money Order Amount Enclosed $__________

☐ Debit Card Account Number: ____________________
(We do not accept credit cards)

Expiration Date: ________ Authorized Amount: ____________

Authorized Signature: ______________________________

979101 000L433308539 0006453979 3

# Exhibit 11

5/25/2023

Dear SBA Representative,

We, David and Tamara McCord are writing you to tell you that we dispute this bill (3103817008) and charges. Please provide us in writing with a detail listing of all payments and charges concerning this bill. Our address is: 150 Auburn Battle Creek, MI 49014.

Thank you,

David and Tamara McCord

6/26/2023

Dear SBA Representative,

This is the second letter to inform and request the following. We, David and Tamara McCord are writing you to tell you that we dispute this bill (3103817008) and charges. Please provide us in writing with a detail listing of all payments and charges concerning this bill. Our address is: 150 Auburn Battle Creek, MI 49014.

Thank you,

David and Tamara McCord

8/9/2023

Dear Department of the Treasury Representative,

We David and Tamara McCord are disputing the bill on account 3103817008. Please provide to us in writing a detailed list of ALL payments and charges concerning this account. We received an SBA communication that didn't provide the information requested. Requesting a full account of loan records from the start to current amount including ALL payments and charges. Please provide descriptive details on charges not internal codes. This is our third time requesting this information.

Thank you,

David and Tamara McCord

1/17/2024

Dear Treasury,

This letter is response to waiting for a hearing on case number L43330853. We have been very patient with this process and still unable to receive any relevant information from parties involved.

How can we or the company owe money on this account? Property associated with loan was sold for $23000 over what was owed. Kellogg Community Credit Union took all money with leaving mortgage on personal property of full amount originally loaned.

Over a year after the sale of the property, with no explanation or letter from Kellogg Community Credit Union we sent a letter to KCCU. We hired a lawyer due to no response of any kind. Our lawyer contracted KCCU attorney several times with finally getting a response reporting a deficiency from the property sale. Our lawyer again asked several times how KCCU came up with their numbers with no response. That is when we received a letter from SBA. Request two times from the SBA how the organization came up with the amount owed. Days before we received a letter from the treasury, we received a paper from SBA with *a couple of numbers on it. What was that paper of numbers representing*? Now we have asked again from the treasury for the same information.

Kellogg Community Credit Union hasn't been able to provide evidence of a deficiency to us or any other party involved after two and a half year after the sale of property. SBA or Treasury doesn't know why KCCU states a deficiency or we would have this information. We have made several attempts to close this matter with organization stated above but unable to answer simple request. This should have been taken care with lawyers at first level but KCCU doesn't want to work with anyone. Lawyers cut into more profits for KCCU.

KCCU greed has gotten in the way of closing this out. It doesn't hurt Kellogg Community Credit Union to claim a deficiency. They either make more money on this situation or not.

David and Tammy McCord

March 24, 2024

Dear SBA,

I am contacting you again about account #3103817008. SBA decided to send this matter to Treasury and now the Treasury decided to send it back to you. We have complied with all correspondent with no evidence that proves a claim against us.

Kellogg Community Credit Union hasn't sent us any information on this account. We contacted the credit union by a letter after years had passed since sale of the property. From the sale, Kellogg received over amount owed on the loan. Our lawyers contacted them several times with no response. Finally, thorough our second lawyer we found out Kellogg is claimed a deficiency. Lawyers asked several times for details on what wasn't paid with no response. Then we recieved a letter from the SBA stating to pay an amount. We request twice, asking for details on how they came up with claimed amount. A next day UPS letter came with some numbers on it with no explanation and no letter head or account number. Not sure what it was or who sent it. Three days after we received this mystery paper a letter from the Treasury came.

We request a hearing from Treasury and then we get a form letter from SBA stating again to pay. As it stands now, the property sold for over amount owed on loan, we have lien on our personal property for the full amount of the original loan, we are still paying on the business loan that should have been paid with the sale the property, and you want us to pay money also. For what? Kellogg isn't recouping a loss; they are trying to make more money on this situation. If we owed them money, wouldn't they send a letter requesting it? Which never happened. Wouldn't they response to letters and lawyers asking to drop the lien on our personal property? Which never happened. Why did they contact you?

Please provide detailed information how Kellogg came up with the amount they claim. Do not add internal codes that can't be interrupted.

If no proof of claim can be sent within 30 calendar days of this letter, the claim has no warrant and will be dismissed.

Enclosed is the bankruptcy paperwork for the companies involved with this matter.

Dave and Tammy McCord

May 5/5/2024

Dear SBA,

I am contacting you again about account #3103817008. We have contacted SBA, Kellogg Community Credit Union, and Treasury several times with no response with information about proof of claim. We and other businesses associated with above account must be refunded for the amount collected which is over amount owed the loan on this account. The property sold for over amount owed on loan.

Sending the same form letter over and over doesn't prove we owe on this account. Kellogg Community Credit Union was unable to come up with why we owe money. Kellogg hasn't sent one statement or letter claiming we are deficient on the account. SBA has sent the same form letter several times with no explanation, did change the date of the letter. Treasury determine we don't owe on the account and sent case back to SBA.

Due to over payment and no proof of claim, send a letter stating account is closed with paid in full. Notify Kellogg Community Credit Union to refund amount paid over amount owed on this loan on this account to: David McCord, 150 Auburn Street, Battle Creek, MI 49014.

Thank you for getting this completed by June 6th 2024.

David and Tammy McCord

June ~~1~~ 10, 2024

Dear SBA,

We are contacting you again about account #3103817008. We have written SBA several times with you (SBA). The only response from you has been sending the same form letter on different dates. Either our communications haven't been read or SBA isn't interested in resolving the situation.

We (Dave and Tammy McCord) or any business involved with this account **do not** owe Kellogg Community Credit Union, SBA, or Treasury any money with any accounts. In fact, Kellogg Community Credit Union owes Dave and Tammy McCord an overpayment on this account. Bankruptcy was filed on this account, with the property associated with loan sold for over the amount owed. Kellogg Community Credit Union received all proceeds for the sale of this property.

We have request repeatedly asking for detailed information why this account isn't closed. All we get from the SBA is the same form letter. I have requested a hearing with no response. I have had 2 lawyers ask Kellogg Community Credit Union multiple times how they came up with a deficiency on the loan with no response. Kellogg's didn't inform us with an email or letter about any deficiency. They didn't tell us how they came up with a deficiency number either. No collection agency reported a deficiency on this loan or tried collecting for any amount. Kellogg's didn't unitize any form of collection. So, we are confused why we are receiving letters from the SBA for a very old loan that has been overpaid.

SBA has created damages to us (David and Tammy McCord) due to being unwilling to resolve this account. We are giving you an opportunity to correct this by closing this account with it paid in full and demand Kellogg Community Credit Union to return all over payment with interest.

Thank you,

David and Tammy McCord

Tamara McCord
150 Auburn St
Battle Creek, MI 49014
6/15/2026

Department of the Treasury
Bureau of the Fiscal Service
P.O. Box 830794
Birmingham, AL 35283-0794

Dear Department of the Treasury:

This is in regards to Treasury Account number 16850733\Agency Debt number 3013817008. I dispute this debt because it was paid in full at the time of the sale of the property/asset.

Sincerely,

Tamara McCord

June 15, 2026

Dear Suchat Suwannakam,

I'm writing with response to received Acknowledgement of Hearing Request on 6/12/26. Below will explain why we dispute any claim on SBA No. 3103817008 and the need for a hearing.

Property associated to SBA No. 3103817008 was sold for $445,000 with debt of $421,964.69 with a surplus of $23035.31. Surplus was kept by Kellogg Community Credit Union (KCCU). KCCU never sent anything stating the note wasn't paid in full or answer lawyer request on the loans. I know if they had more expenses than the surplus collected it was mis-management of the property after I handed over keys to the business real estate. I would be glad to share reasons why the property was mis-managed if you would like.

By looking at the documents you sent me, I am surprised SBA accepted this paperwork and guarantee a loan for my businesses. Unless the rules have changed, no signature no agreement. There are some other items that make me wonder if this was a legal transaction.

Please allow me in the next 30 days to attain counsel or an accountant to make more sense of this transaction. May need to look at financial hardship if this continues the path you are presenting. My wife and I care for a special needs child and our expenses are larger than most with this family size.

It looks like to me, if KCCU did what they were supposed to do, you wouldn't be in the situation of looking at this case. My wife and I tried to resolve this matter several times and KCCU refused to discuss or communicate with us. KCCU sent a letter to SBA instead of making efforts to collect what they think we owe them. Mis- management to the property after getting the keys has add cost to the loan.

SBA closed this loan in Aug 11 2023. We asked for this hearing before the loan closed.

We will be sending supporting documents on or before July 6th as required on your Acknowledgement of Hearing Request letter.

Thank you for reading this corresponds. I am sure all of our other responses to the same repeating SBA form letter weren't read.

David and Tammy McCord

# Exhibit 12

DEPARTMENT OF THE TREASURY
BUREAU OF THE FISCAL SERVICE
P.O. BOX 830794
BIRMINGHAM, AL 35283-0794

April 16, 2026

Tamara McCord
150 Auburn St
Battle Creek MI 49014-5405

00000[redacted]
Q102[redacted]

$74,566.62
16850733
3103817008

0-0 58854339.1 00001349 CDOTLTR2 1266 1283 TRSL 07 20260415 PG 1 OF 1

Dear Tamara McCord,

The Small Business Administration, Loan Obligors referred your unpaid debt to the U.S. Department of the Treasury, Bureau of the Fiscal Service, for collection. You may take advantage of several new services that are accessible 24/7 in order to make payments, check your balance, or request a payment agreement.

## CONVENIENT SERVICE OPTIONS

### *Pay Electronically*

Visit
[redacted]
or scan the QR code below to pay via a debit card, from your bank account, or from your PayPal account.

### *Phone Contact*

Call
[redacted]
for our Interactive Voice Response system and follow the prompts to obtain information about your account. Hearing impaired persons may call the Telecommunications Relay Service at 711 for help.

## FLEXIBLE PAYMENT OPTIONS

If you cannot afford to pay your debt in full at this time, please call (888) 826-3127 Monday through Friday between 8:30am - 6:30pm EST to speak with one of our debt recovery analysts. You may be eligible for different payment options based on a review of your finances.

U.S. Department of the Treasury
Bureau of the Fiscal Service

# Exhibit 13

**U.S. SMALL BUSINESS ADMINISTRATION**
**Covid EIDL Servicing Center**
**P.O. Box 156059, Fort Worth, TX 76155-2243**

**(833) 853-5638**
**For Relay**
**Service Dial**
**7-1-1**

**VIA USPS, CERTIFIED MAIL RETURN RECEIPT**

David McCord
150 Auburn St
Battle Creek, MI 49014

Re: Small Business Administration Loan No. 3103817008
Treasury Case No. L43330853

June 4, 2026

# Acknowledgment of Hearing Request

Dear David McCord:

Your request for a hearing concerning a potential Administrative Wage Garnishment (AWG) action as to the above U.S. Small Business Administration (SBA) loan has been received by the SBA and has been assigned to me for resolution.

For your appeal, a written records hearing will be conducted by way of a review of written materials and other records submitted for consideration.

Pursuant to your hearing request, you are disputing the proposed garnishment based on why you believe you do not owe the debt or why you believe the amount of the debt is incorrect. To evaluate the merits of your claim, please provide a complete explanation of your claim. In addition, all documentation supporting your claim should also be included.

I have attached a copy of the hearing file, including a copy of (i) a **$438,500.00 Note** that you executed in favor of the SBA dated **November 2, 2018**.

You may be entitled to an oral hearing if, and only if, I cannot determine the matters under dispute on written documentation alone. If you believe that an oral hearing is necessary, then you must notify me by the end of business on **Friday, June 19, 2026**, explaining why written evidence and argument are insufficient. If I determine that an oral hearing is necessary, I will issue the parties a separate order setting out the rules of that hearing.

If I conduct an oral hearing, you may select whether the hearing will be in person or over the telephone. If you elect an in-person hearing, I will conduct it in Fort Worth, Texas, and each

party will be responsible for its own expenses, including travel expenses. If you elect to have a telephonic hearing, SBA will pay the expenses of the telephone connection.

On my own, I may order an oral hearing at any time, regardless of whether you have asked for one. *See*, generally, 13 C.F.R. § 140.11(f)(3).

I will also review your income and expenses and compare them against averages spent for those expenses by families of the same size and income as your family. If you claim more for an expense than the average spent by families like yours, you must provide a persuasive explanation as to why the amount you claim is necessary. The IRS determined these average amounts from different government studies. These Collection Financial Standards may be found at https://www.irs.gov/businesses/small-businesses-self-employed/collection-financial-standards. A Financial Disclosure Statement has been enclosed for your use. Any additional documentation supporting your hardship claim should also be included.

I respectfully draw the attention of both parties to 13 C.F.R. § 140.11(f)(8), which provides:

> *Burden of Proof* (i) The SBA will have the burden of going forward to prove the existence or amount of the debt.
>
> (ii) Thereafter, if you dispute the existence or amount of the debt, you must establish by a preponderance of the evidence that no debt exists or that the amount of the debt is incorrect. **In addition, you may present evidence that the terms of the repayment schedule are unlawful, would cause you a financial hardship**, or that collection of the debt may not be pursued due to operation of law.

Please submit all evidence and argument which would help to establish:

1. Why you believe you do not owe the debt.
2. Why you believe the amount of the debt is incorrect.

While I will scrutinize the record to reach a just and accurate conclusion on the issues, consistent with the applicable law and regulations, I rely on the parties to develop the record. Accordingly, *you will be deemed to have waived any argument that you fail to raise before me by the close of evidence,* absent good cause shown.

Please submit any documents you wish to include in the record by the end of business on **Monday, July 6, 2026**, as well as any argument, to:

**U.S. Small Business Administration**
**Attn: Suchat Suwannakam, AWG Hearing Official**
**P.O. Box 156059**
**Fort Worth, Texas 76155-2243**

Or you may email them to me at suchat.suwannakam@sba.gov.

Except for compelling reasons, or unless both parties submit evidence, argument, or both, I will conduct the hearing based on the written record before me, *on or before*, **Monday, August 3, 2026**, *unless I need more time.*

In lieu of an appeal hearing, you may elect to enter into a **written payment agreement directly with the U.S. Department of Treasury, Bureau of Fiscal Service**, which will specify the repayment agreements. U.S. Department of Treasury can be reached by dialing a toll-free number (888) 826-3127. If you elect to do so, please provide me with proof of the written agreement.

Finally, **if you would consent to be contacted by email**, and **give us your email address**, that would be helpful, although not required. If you have any questions, please call me at 817-516-6541.

Sincerely,

SUCHAT SUWANNAKAM

Digitally signed by SUCHAT SUWANNAKAM
Date: 2026.06.04 11:20:36 -04'00'

Hearing Official

Enclosures: 1. Records forwarded by the Bureau of the Fiscal Service 2. Assignment 3. Note 4. Unconditional Guarantee and 5. Loan Authorization and Agreement 6. blank form Financial Disclosure Statement

SBA Document sent to us explaining amount.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | **Payment Data** | | | | | |
| **LoanNmb** 3103817008 | | **Borrower** McCord Alf LLC | | | | | |
| Process Date | Effective Date | Tran Code | Paid Amount | Fee / Refund | Principal Amount | Interest Amount | Principal Balance |
| 05/24/2023 | 05/22/2023 | 360 | 13.39 | 0 | 0 | 0 | $ - |
| 05/06/2023 | 05/04/2023 | 210 | 0 | 0 | 0 | 0 | $ - |
| 05/01/2023 | 05/01/2023 | 360 | 52.83 | 0 | 0 | 0 | $ - |
| 05/01/2023 | 04/28/2023 | Purchased guaranty | 13.65 | 0 | 0 | 0 | $ 47,755.50 |

# ASSIGNMENT

U.S. Small Business Administration

FOR VALUE RECEIVED, in accordance with SBA Form 750 executed by
Name of Lender: Comerica Bank

("Lender" or "Assignor"), and in accordance with Loan Program Requirements, as that term is defined in 13 C.F.R. Part 120, Lender assigns, grants, conveys and transfers to the Assignee, the U.S. Small Business Administration ("SBA"), all right, title and interest in and to SBA 7(a) Loan Number: 7653445004 made to Name of Borrower: Carlos H Montenegro MD Inc on Date: 06/19/2015 including all Loan Documents, Loan Instruments, and any associated security instruments, mortgages or deeds of trust (the "Loan"). *See attached addendum.

Assignor authorizes the United States of America on behalf of the SBA to ask, demand, receive, collect, sue and take all lawful actions for recovery of the moneys due or to become due on this Loan, and further that the United States of America on behalf of the SBA may avail itself of its remedies under 31 U.S.C. § 3701, *et seq.*, and/or any other remedies available at law or equity for collection of the Loan and the claim or debt evidenced by the Loan.

Assignor has not done and will not do anything to hinder or prevent the United States of America on behalf of the SBA from enforcing recovery on this Loan. Assignor agrees to timely execute such other documents as are requested by SBA to effectuate recordation or as otherwise requested by SBA to assist it in collection of the Loan. In the event that after the date hereof, Assignor receives any payment or any value of any kind with respect to the Loan or obligations secured or evidenced thereby, Assignor shall hold the same in trust for Assignee and shall immediately deliver the guaranteed share to Assignee. The Assignor agrees that SBA reserves all rights and authority under 13 C.F.R. Part 120, including without limitation under 13 C.F.R. § 120.524. This Assignment shall be interpreted and construed under federal law.

The Assignor's address is:

Lender Name: Comerica Bank
Address: 6260 Mockingbird Lane 2nd Floor
City: Dallas
State: Texas
Zip: 75214

The Assignee address is: United States of America, Small Business Administration,
(Please mark the applicable address)

- [ ] National Guaranty Purchase Center (NGPC)
1145 Herndon Parkway Suite 900
Herndon, VA 20170

- [x] Commercial Loan Service Center (CLSC) - AR
2120 Riverfront Drive Suite 100
Little Rock, AR 72202

- [ ] Commercial Loan Service Center (CLSC) - CA
801 R Street Suite 101
Fresno, CA 93721

In witness whereof, Lender, through its authorized representative and officer listed below, has executed this instrument on Date: 10/25/2024

Name of Lender: Comerica Bank

BY: [signature]
[Signature of Authorized Representative]

Print Name/Title: Mario Martinez, Jr., Vice President
Address: 6260 Mockingbird Lane 2nd Floor
City: Dallas
State: Texas
Zip Code: 75214

Certificate of Acknowledgement

City/County of Dallas )
)
State of Texas ) to wit:

On the ____ day of October, 20__, before me in the aforesaid jurisdiction, a Notary Public in and for the said jurisdiction, personally appeared ______________, the Vice President for Comerica Bank, who is known to me personally (or satisfactorily proven to me) to be the person whose name is subscribed to within instrument and acknowledged that he/she executed the same for the purposes and in the capacity therein contained.

ELIZABETH SALDUA
Notary Public
STATE OF TEXAS
My Comm. Exp. 09-14-25
Notary ID # 12655322-8

[signature]
Notary Public

Elizabeth Saldua
Printed Name

Notary No.:____________________

My Commission Expires: 09-14-25

Stamp/Seal:

**Addendum**

☑ Lender Comerica Bank also assigns the following judgment(s) obtained on the underlying Loan ("Judgment"):

Against: Carlos H Montenegro MD Inc

Court: Los Angeles County, California

Index No./Case No. 20STCV03094

Date: 11/09/2020

Amount: $ 64,317.68

☐ A portion of the underlying obligation that resulted in the Judgment was a loan that was not guaranteed by the SBA. Therefore, Lender retains the sum of $ ______________ that was awarded in the Judgment.

Lender understands that certain jurisdictions may require additional actions to assign judgments, and Lender agrees to take further actions as appropriate, if requested by Assignee.

SBA
U.S. Small Business Administration

U.S. Small Business Administration

# NOTE

| | |
|---|---|
| SBA Loan # | 31038170-08 |
| SBA Loan Name | Sunrise Haven |
| Date | November 2, 2018 |
| Loan Amount | $438,500.00 |
| Interest Rate | "Prime Rate" + 2.25% |
| Borrower | MM Ventures, LLC, a Michigan limited liability company and McCord ALF, LLC, a Michigan limited liability company |
| Operating Company | McCord ALF, LLC, a Michigan limited liability company |
| Lender | Kellogg Community Credit Union |

1. PROMISE TO PAY:

In return for the Loan, Borrower promises to pay to the order of Lender the amount of Four Hundred Thirty-Eight Thousand Five Hundred and No/100 Dollars, interest on the unpaid principal balance, and all other amounts required by this Note.

2. DEFINITIONS:

"Collateral" means any property taken as security for payment of this Note or any guarantee of this Note.

"Guarantor" means each person or entity that signs a guarantee of payment of this Note.

"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.

3. PAYMENT TERMS:

Borrower must make all payments at the place Lender designates. The payment terms for this Note are:

The interest rate on this Note will fluctuate. The initial interest rate is 7.50% per year. This initial rate is the Prime Rate in effect on the first business day of the month in which SBA received the loan application, plus 2.25%. The initial interest rate must remain in effect until the first change period begins unless reduced in accordance with SOP 50 10.

Borrower must pay principal and interest payments of $4,091.86 every month, beginning one month from the month this Note is dated; payments must be made on the 5th calendar day in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

The interest rate will be adjusted every 5 years (the "change period"), beginning November 5, 2023 (date of first rate adjustment).

The "Prime Rate" is the prime rate in effect on the first business day of the month (as published in the Wall Street Journal newspaper) in which SBA received the application, or the first day of the month in which any interest rate change occurs. Base Rates will be rounded to two decimal places with .004 being rounded down and .005 being rounded up.

The adjusted interest rate will be 2.25% above the Prime Rate. Lender will adjust the interest rate on the first calendar day of each change period. The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change.

The interest rate identified in the Note may not be changed during the life of the Loan unless changed in accordance with SOP 50 10.

The interest rate adjustment period may only be changed in accordance with SOP 50 10.

Lender must adjust the payment amount at least annually as needed to amortize principal over the remaining term of the note.

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default. If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.

Loan Prepayment:

Notwithstanding any provision in this Note to the contrary:

Borrower may prepay this Note. Borrower may prepay 20% or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20% and the Loan has been sold on the secondary market, Borrower must:

a. Give Lender written notice;

b. Pay all accrued interest; and

c. If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

Subsidy Recoupment Fee. When in any one of the first three years from the date of initial disbursement Borrower voluntarily prepays more than 25% of the outstanding principal balance of the loan, Borrower must pay to Lender on behalf of SBA a prepayment fee for that year as follows:

a. During the first year after the date on which the loan is first disbursed, 5% of the total prepayment amount;

b. During the second year after the date on which the loan is first disbursed, 3% of the total prepayment amount; and

c. During the third year after the date on which the loan is first disbursed, 1% of the total prepayment amount.

All remaining principal and accrued interest is due and payable 15 years from date of Note.

Late Charge: If a payment on this Note is more than 10 days late, Lender may charge Borrower a late fee of up to 5.00% of the unpaid portion of the regularly scheduled payment.

4. DEFAULT:

Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower or Operating Company:

A. Fails to do anything required by this Note and other Loan Documents;
B. Defaults on any other loan with Lender;
C. Does not preserve, or account to Lender's satisfaction for, any of the Collateral or its proceeds;
D. Does not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;
E. Makes, or anyone acting on their behalf makes, a materially false or misleading representation to Lender or SBA;
F. Defaults on any loan or agreement with another creditor, if Lender believes the default may materially affect Borrower's ability to pay this Note;
G. Fails to pay any taxes when due;
H. Becomes the subject of a proceeding under any bankruptcy or insolvency law;
I. Has a receiver or liquidator appointed for any part of their business or property;
J. Makes an assignment for the benefit of creditors;
K. Has any adverse change in financial condition or business operation that Lender believes may materially affect Borrower's ability to pay this Note;
L. Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without Lender's prior written consent; or
M. Becomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay this Note.

5. LENDER'S RIGHTS IF THERE IS A DEFAULT:

Without notice or demand and without giving up any of its rights, Lender may:

A. Require immediate payment of all amounts owing under this Note;
B. Collect all amounts owing from any Borrower or Guarantor;
C. File suit and obtain judgment;
D. Take possession of any Collateral; or
E. Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

6. LENDER'S GENERAL POWERS:

Without notice and without Borrower's consent, Lender may:

A. Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses;
B. Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance;
C. Release anyone obligated to pay this Note;
D. Compromise, release, renew, extend or substitute any of the Collateral; and
E. Take any action necessary to protect the Collateral or collect amounts owing on this Note.

7. WHEN FEDERAL LAW APPLIES:

When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

8. SUCCESSORS AND ASSIGNS:

Under this Note, Borrower and Operating Company include the successors of each, and Lender includes its successors and assigns.

9. GENERAL PROVISIONS:

A. All individuals and entities signing this Note are jointly and severally liable.
B. Borrower waives all suretyship defenses.
C. Borrower must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.
D. Lender may exercise any of its rights separately or together, as many times and in any order it chooses. Lender may delay or forgo enforcing any of its rights without giving up any of them.
E. Borrower may not use an oral statement of Lender or SBA to contradict or alter the written terms of this Note.
F. If any part of this Note is unenforceable, all other parts remain in effect.
G. To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that Lender did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale.

10. STATE-SPECIFIC PROVISIONS:

NONE

U.S. Small Business Administration

# UNCONDITIONAL GUARANTEE

| | |
|---|---|
| SBA Loan # | 31038170-08 |
| SBA Loan Name | Sunrise Haven |
| Guarantor | David M. McCord |
| Borrower | MM Ventures, LLC, a Michigan limited liability company and McCord ALF, LLC, a Michigan limited liability company |
| Lender | Kellogg Community Credit Union |
| Date | November 2, 2018 |
| Note Amount | $438,500.00 |

1. GUARANTEE:

Guarantor unconditionally guarantees payment to Lender of all amounts owing under the Note. This Guarantee remains in effect until the Note is paid in full. Guarantor must pay all amounts due under the Note when Lender makes written demand upon Guarantor. Lender is not required to seek payment from any other source before demanding payment from Guarantor.

2. NOTE:

The "Note" is the promissory note dated November 2, 2018 in the principal amount of Four Hundred Thirty-Eight Thousand Five Hundred and No/100 Dollars, from Borrower to Lender. It includes any assumption, renewal, substitution, or replacement of the Note, and multiple notes under a line of credit.

3. DEFINITIONS:

"Collateral" means any property taken as security for payment of the Note or any guarantee of the Note.

"Loan" means the loan evidenced by the Note.

"Loan Documents" means the documents related to the Loan signed by Borrower, Guarantor or any other guarantor, or anyone who pledges Collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.

4. LENDER'S GENERAL POWERS:

Lender may take any of the following actions at any time, without notice, without Guarantor's consent, and without making demand upon Guarantor:

A. Modify the terms of the Note or any other Loan Document except to increase the amounts due under the Note;

B. Refrain from taking any action on the Note, the Collateral, or any guarantee;

C. Release any Borrower or any guarantor of the Note;

D. Compromise or settle with the Borrower or any guarantor of the Note;

E. Substitute or release any of the Collateral, whether or not Lender receives anything in return;

F. Foreclose upon or otherwise obtain, and dispose of, any Collateral at public or private sale, with or without advertisement;

G. Bid or buy at any sale of Collateral by Lender or any other lienholder, at any price Lender chooses; and

H. Exercise any rights it has, including those in the Note and other Loan Documents.

These actions will not release or reduce the obligations of Guarantor or create any rights or claims against Lender.

5. FEDERAL LAW:

When SBA is the holder, the Note and this Guarantee will be construed and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Guarantee, Guarantor may not claim or assert any local or state law against SBA to deny any obligation, defeat any claim of SBA, or preempt federal law.

6. RIGHTS, NOTICES, AND DEFENSES THAT GUARANTOR WAIVES:

To the extent permitted by law,

A. Guarantor waives all rights to:

1) Require presentment, protest, or demand upon Borrower;
2) Redeem any Collateral before or after Lender disposes of it;
3) Have any disposition of Collateral advertised; and
4) Require a valuation of Collateral before or after Lender disposes of it.

B. Guarantor waives any notice of:

1) Any default under the Note;
2) Presentment, dishonor, protest, or demand;
3) Execution of the Note;
4) Any action or inaction on the Note or Collateral, such as disbursements, payment, nonpayment, acceleration, intent to accelerate, assignment, collection activity, and incurring enforcement expenses;
5) Any change in the financial condition or business operations of Borrower or any guarantor;
6) Any changes in the terms of the Note or other Loan Documents, except increases in the amounts due under the Note; and
7) The time or place of any sale or other disposition of Collateral.

C. Guarantor waives defenses based upon any claim that:

1) Lender failed to obtain any guarantee;
2) Lender failed to obtain, perfect, or maintain a security interest in any property offered or taken as Collateral;
3) Lender or others improperly valued or inspected the Collateral;
4) The Collateral changed in value, or was neglected, lost, destroyed, or underinsured;

5) Lender impaired the Collateral;
6) Lender did not dispose of any of the Collateral;
7) Lender did not conduct a commercially reasonable sale;
8) Lender did not obtain the fair market value of the Collateral;
9) Lender did not make or perfect a claim upon the death or disability of Borrower or any guarantor of the Note;
10) The financial condition of Borrower or any guarantor was overstated or has adversely changed;
11) Lender made errors or omissions in Loan Documents or administration of the Loan;
12) Lender did not seek payment from the Borrower, any other guarantors, or any Collateral before demanding payment from Guarantor:
13) Lender impaired Guarantor's suretyship rights;
14) Lender modified the Note terms, other than to increase amounts due under the Note. If Lender modifies the Note to increase the amounts due under the Note without Guarantor's consent, Guarantor will not be liable for the increased amounts and related interest and expenses, but remains liable for all other amounts;
15) Borrower has avoided liability on the Note; or
16) Lender has taken an action allowed under the Note, this Guarantee, or other Loan Documents.

7. DUTIES AS TO COLLATERAL:

Guarantor will preserve the Collateral pledged by Guarantor to secure this Guarantee. Lender has no duty to preserve or dispose of any Collateral.

8. SUCCESSORS AND ASSIGNS:

Under this Guarantee, Guarantor includes heirs and successors, and Lender includes its successors and assigns.

9. GENERAL PROVISIONS:

A. ENFORCEMENT EXPENSES. Guarantor promises to pay all expenses Lender incurs to enforce this Guarantee, including, but not limited to, attorney's fees and costs.

B. SBA NOT A CO-GUARANTOR. Guarantor's liability will continue even if SBA pays Lender. SBA is not a co-guarantor with Guarantor. Guarantor has no right of contribution from SBA.

C. SUBROGATION RIGHTS. Guarantor has no subrogation rights as to the Note or the Collateral until the Note is paid in full.

D. JOINT AND SEVERAL LIABILITY. All individuals and entities signing as Guarantor are jointly and severally liable.

E. DOCUMENT SIGNING. Guarantor must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

F. FINANCIAL STATEMENTS. Guarantor must give Lender financial statements as Lender requires.

G. LENDER'S RIGHTS CUMULATIVE, NOT WAIVED. Lender may exercise any of its rights separately or together, as many times as it chooses. Lender may delay or forgo enforcing any of its rights without losing or impairing any of them.

H. ORAL STATEMENTS NOT BINDING. Guarantor may not use an oral statement to contradict or alter the written terms of the Note or this Guarantee, or to raise a defense to this Guarantee.

I. SEVERABILITY. If any part of this Guarantee is found to be unenforceable, all other parts will remain in effect.

J. CONSIDERATION. The consideration for this Guarantee is the Loan or any accommodation by Lender as to the Loan.

SBA

U.S. Small Business Administration

U.S. Small Business Administration

# AUTHORIZATION
# (SBA 7(A) GUARANTEED LOAN)

| | |
|---|---|
| SBA Loan # | 31038170-08 |
| SBA Loan Name | Sunrise Haven |
| Approval Date | October 25, 2018 |

Lender:

Kellogg Community CU
41 Second St
Battle Creek, MI 49014

U. S. Small Business Administration (SBA):

Standard 7a Loan Guaranty Processing Center
6501 Sylvan Road, Suite 100
Citrus Heights, CA 95610-5017

SBA approves, under Section 7(a) of the Small Business Act as amended, Lender's application, received October 10, 2018, for SBA to guaranty 75% of a loan ("Loan") in the amount of $438,500.00 to assist:

Borrower: (EPC)

1. MM Ventures, LLC
   7483 West Q Ave
   Kalamazoo, MI 49009

Operating Company:

1. McCord ALF, LLC dba
   Sunrise Haven (Co-Borrower)
   7483 West Q Ave
   Kalamazoo, MI 49009

All requirements in the Authorization which refer to Borrower also apply to any Co-Borrower.

A. **THE GUARANTY FEE IS $9,866.25.**

Lender must pay the guaranty fee within 90 days of the approval date of this Authorization. Failure to timely pay the guaranty fee will result in cancellation of the SBA guarantee. The 90-day deadline may not be extended. Lenders are required to make their payments electronically. Payment can be made at www.pay.gov or by ACH if they have previously enrolled with the SBA. No part of the guaranty fee is refundable if Lender has made any disbursement. Lender may collect this fee from Borrower after initial disbursement of Loan, except when an escrow closing is used, Lender may not collect the fee until all Loan funds have been disbursed to the Borrower from the escrow account. Borrower may use Loan proceeds to reimburse Lender for the guaranty fee.

For loans of $150,000 or less, Lender may retain 25% of any required guaranty fee but must remit the remainder to SBA.

B. **ON-GOING GUARANTY FEE** (Lender's Annual Service Fee):

1. Lender agrees to pay SBA an on-going guaranty fee equal to 0.550 of one percent per year of the guaranteed portion of the outstanding balance.
2. Lender may not charge or otherwise pass through this fee to Borrower.

C. **IT IS LENDER'S SOLE RESPONSIBILITY TO:**

1. Close the Loan in accordance with the terms and conditions of this Authorization.
2. Obtain valid and enforceable Loan documents, including obtaining the signature or written consent of any obligor's spouse if such consent or signature is necessary to bind the marital community or create a valid lien on marital property.
3. Retain all Loan closing documents. Lender must submit these documents, along with other required documents, to SBA for review if Lender requests SBA to honor its guarantee on the Loan, or at any time SBA requests the documents for review.

D. **REQUIRED FORMS**

NOTE: LENDER MAY USE ITS OWN NOTE AND GUARANTEE AGREEMENTS IN LIEU OF THE SBA NOTE AND GUARANTEE AGREEMENTS. IF LENDER USES ITS OWN NOTE AND/OR GUARANTEE FORMS, LENDER MUST ENSURE THE DOCUMENTS COMPLY WITH THE REQUIREMENTS SET FORTH IN SOP 50 10.

1. Lender may use its own forms except as otherwise instructed in this Authorization. Lender must use the following SBA forms for the Loan:
   SBA Form 147, Note or Lender's own Note that complies with SOP 50 10
   SBA Form 1050, Settlement Sheet
   SBA Form 159, Compensation Agreement, for each required agent
   SBA Form 722, Equal Opportunity Poster
   Guarantee: SBA Form 148 or Lender equivalent
2. Lender may use computer-generated versions of mandatory SBA Forms, as long as the text is identical.
3. Lender must submit a copy of each completed SBA Form 159 by email to the SBA fiscal and transfer agent after initial disbursement and in conjunction with Lender's 1502 Report for the month. Lender must maintain each original SBA Form 159 in its file.

E. **CONTINGENCIES**—SBA issues this Authorization in reliance on representations in the Loan application, including supporting documents. The guarantee is contingent upon Lender:

1. Having and complying with a valid SBA Loan Guarantee Agreement (SBA Form 750, SBA Form 750B for short-term loans, or 750CA for Community Advantage (CA) loans, if applicable) and any required supplemental guarantee agreements, between Lender and SBA;
2. Having paid the full guaranty fee in the time and manner required by this Authorization and SBA Loan Program Requirements;
3. Complying with the current SOP 50 10 and all applicable appendices;
4. Completing disbursement no later than 48 months from the approval date of this Authorization. (The loan must be fully disbursed within 48 months from the date of this Authorization. Any undisbursed balance remaining after 48 months will be automatically cancelled by SBA.);
5. Having no evidence since the date of the Loan application, or since any preceding disbursement, of any unremedied adverse change in the financial condition, organization, management, operation, or assets of Borrower or Operating Company which would warrant withholding or not making any further disbursement; and,
6. Satisfying all of the conditions in this Authorization.

F. **NOTE TERMS**:

1. **Maturity**: This Note will mature in 15 years from date of Note.
2. **Repayment Terms:**

If Lender uses its own Note, Lender must comply with the repayment terms set forth below and must ensure the Note is legally enforceable and assignable, has a stated maturity and is not payable on demand. The Note must include the following language:

> *"When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law."*

If Lender uses SBA Note, Form 147, Lender must insert into Note, to be executed by Borrower, the following terms, without modification. Lender must complete all blank terms on the Note at time of closing.

The interest rate on this Note will fluctuate. The initial interest rate is 7.50% per year. This initial rate is the Prime Rate in effect on the first business day of the month in which SBA received the loan application, plus 2.25%. The initial interest rate must remain in effect until the first change period begins unless changed in accordance with SOP 50 10.

Borrower must pay principal and interest payments of $4,064.95 every month, beginning one month from the month this Note is dated; payments must be made on the __________ calendar day in the months they are due.

Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

The interest rate will be adjusted every 5 years (the "change period") beginning __________ (date of first rate adjustment).

The "Prime Rate" is the Prime Rate in effect on the first business day of the month (as published in the Wall Street Journal newspaper) in which SBA received the application, or the first day of the month in which any interest rate change occurs. Base Rates will be rounded to two decimal places with .004 being rounded down and .005 being rounded up.

The adjusted interest rate will be 2.25% above the Prime Rate. Lender will adjust the interest rate on the first calendar day of each change period. The change in interest rate is effective on that day whether or not Lender gives Borrower notice of the change.

The interest rate identified in the Note may not be changed during the life of the Loan unless changed in accordance with SOP 50 10.

The interest rate adjustment period may only be changed in accordance with SOP 50 10.

Lender must adjust the payment amount at least annually as needed to amortize principal over the remaining term of the note.

If SBA purchases the guaranteed portion of the unpaid principal balance, the interest rate becomes fixed at the rate in effect at the time of the earliest uncured payment default. If there is no uncured payment default, the rate becomes fixed at the rate in effect at the time of purchase.

**Loan Prepayment:**

Notwithstanding any provision in this Note to the contrary:

**Borrower may prepay this Note.** Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:

a. Give Lender written notice;

b. Pay all accrued interest; and

c. If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

**Subsidy Recoupment Fee.** When in any one of the first three years following the date of first disbursement Borrower voluntarily prepays more than 25% of the outstanding principal balance of the loan, Borrower must pay to Lender on behalf of SBA a prepayment fee for that year as follows:

a. During the first year after the date of first disbursement, 5% of the total prepayment amount;

b. During the second year after the date of first disbursement, 3% of the total prepayment amount; and

c. During the third year after the date of first disbursement, 1% of the total prepayment amount.

All remaining principal and accrued interest is due and payable 15 years from date of Note.

**Late Charge:** If a payment on this Note is more than 10 days late, Lender may charge Borrower a late fee of up to 5.00% of the unpaid portion of the regularly scheduled payment.

G. **USE OF PROCEEDS**

1. $259,356.00 to pay outstanding debt to Kellogg Community CU #355421-830.
2. $115,144.00 to pay outstanding debt to Kellogg Community #355421-760.
3. $39,000.00 to pay outstanding debt to Kellogg Community CU line-of-credit.
4. $10,134.00 for working capital.
5. $9,866.00 to pay the guaranty fee. (Lender may not disburse Loan proceeds solely to pay the guaranty fee).
6. $5,000.00 professional fees, closing costs and other fees..

All amounts listed above are approximate. Lender may not disburse Loan proceeds solely to pay the guaranty fee. Lender may disburse to Borrower, as working capital only, funds not spent for the listed purposes as long as those funds do not exceed 20% of the specific purpose authorized or $50,000.00, whichever is less. An Eligible Passive Company may not receive working capital funds or funds to be used for the purchase of other assets, including intangible assets, for the Operating Company's use.

The loan must be made for a sound business purpose and must benefit the small business, and one 7(a) loan may not be split into two 7(a) loans merely to benefit the Lender. 13 CFR 120.120 and 120.130(f).

Lender must document that Borrower used the loan proceeds for the purposes stated in this Authorization. Except under SBA Express, Export Express, and 7(a) Small Loans, Lender and Borrower must complete and sign SBA Form 1050 at the time of first disbursement. Lender must document the first and all subsequent disbursements by attaching required documentation to the original SBA Form 1050 and must maintain the documentation in the Loan file, following the procedures described in SOP 50 10.

## H. COLLATERAL CONDITIONS

Lender must obtain a lien on 100% of the interests in the following collateral and properly perfect all lien positions.

The following language must appear in Lender's Guarantee when Lender uses its own Guarantee.

*"When SBA is the holder, the Note and this Guarantee will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Guarantee, Guarantor may not claim or assert any local or state law against SBA to deny any obligation, defeat any claims of SBA, or preempt federal law."*

1. **First Mortgage** (including due on sale clause, water rights, if any and assignment of rents) on land and improvements located at 7483 West Q Ave, Kalamazoo MI 49009. This property is commercial.
   a. Subject to no other liens.
   b. Evidence of title and priority of lien must be based upon:
      (1) ALTA Loan Policy, insuring lender and assigns, policy to be without standard exceptions ("extended ALTA") and without arbitration clause.
2. **First Perfected Security Interest, subject to no other liens,** in the following personal property (including any proceeds and products), whether now owned or later acquired, wherever located:
   Equipment; Fixtures; Inventory; Accounts; Instruments; Chattel Paper; General Intangibles;
   a. Lender must obtain a written agreement from all Lessors (including sublessors) agreeing to: (1) Subordinate to Lender Lessor's interest, if any, in this property; (2) Provide Lender written notice of default and reasonable opportunity to cure the default; and (3) Allow Lender the right to take possession and dispose of or remove the collateral.

b. Lender must obtain a list of all equipment and fixtures that are collateral for the Loan. For items with a unit value of $5,000 or more, the list must include a description and serial number, if applicable.

c. Lender must obtain an appropriate Uniform Commercial Code lien search evidencing all required lien positions. If UCC search is not available, another type of lien search may be substituted.

3. **Guarantee on SBA Form 148** or equivalent lender's form, by David & Tamara McCord, resident in Michigan.

Secured by:

a. **Shared Second Mortgage** (including water rights, if any and assignment of rents) on land and improvements located at 150 Auburn St., Battle Creek, MI 49014. This property is residential. The collateral property is the Borrower's primary residence.

(1) Subject only to prior lien(s) as follows:

(a) First: Bank of America in the present amount of $28,898.00, with a revolving provision limited to a total principal outstanding of $64,000.00

(2) The lien securing the Loan is a shared lien pari passu with Lender's non-SBA loan in the amount of $39,000.00. Lender must follow the requirements in the pari-passu provision below.

(3) Any prior open ended lien(s) that is (are) open ended as to future advances must be closed in writing according to applicable state law. The revolving line(s) of credit set out above, if any, must be limited in writing to the amount stated.

(4) Lender must obtain a written agreement from prior lienholders to provide Lender with 30 days written notice before commencing foreclosure of prior lien.

(5) Evidence of title and priority of lien must be based upon:

(a) Title and/or Lien Search or other evidence of proper ownership and lien position.

4. **Assignment of Rents from Eligible Passive Company**. Lender must obtain a perfected assignment of all rents paid under the lease between the Eligible Passive Company and the Operating Company. The term of lease, with options to renew exercisable solely by the Operating Company, must be for at least the term of the Loan. The lease must be in writing and subordinate to Lender's Security Interest, Deed of Trust or Mortgage. Lease payments must be no more than is necessary to amortize debt plus pay expenses related to holding the property.

If in acquiring the property the Eligible Passive Company becomes the beneficiary or owner of the right to an existing mineral lease on the property, the Eligible Passive Company must assign its interest in the lease (together with its rights to all rental, mineral, royalty, bonus, or similar lease payments that might accrue by virtue of the existing mineral (oil and gas) lease to the Operating Company; and any such assignment must be subordinated to all Deeds of Trust or Mortgages. In addition, the Lender must take the additional actions described in SOP 50 10 as applicable.

The following language must appear in all security instruments including Mortgages, Deeds of Trust, and Security Agreements:

> *"The Loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations:*
>
> *a) When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.*
>
> *b) Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax, or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.*
>
> *c) Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument."*

## I. ADDITIONAL CONDITIONS

### 1. Insurance Requirements

Prior to disbursement, Lender must require Borrower to obtain the following insurance coverage and maintain this coverage for the life of Loan:

a. **Flood Insurance.** Based on the Standard Flood Hazard Determination (FEMA Form 086-0-32):

(1) If any portion of a building that is collateral for the Loan is located in a special flood hazard area, Lender must require Borrower to obtain flood insurance for the building under the NFIP.

(2) If any equipment, fixtures, or inventory that is collateral for the loan ("Personal Property Collateral") is in a building any portion of which is located in a special flood hazard area and that building is collateral for the Loan, Lender must require Borrower to also obtain flood insurance for the Personal Property Collateral under the NFIP.

(3) If any Personal Property Collateral is in a building any portion of which is located in a special flood hazard area and that building is not collateral for the Loan, Lender must require Borrower to obtain available flood insurance for the Personal Property Collateral. Lender may waive this requirement when the building is not collateral for the Loan if it uses prudent lending standards and includes in the Loan file a written justification that fully explains why flood insurance is not economically feasible or, if flood insurance is not available, the steps taken to determine that it is not available.

Insurance coverage must be at least equal to the outstanding principal balance of the loan or the maximum limit of coverage made available under the National Flood Insurance Act of 1968, as amended (42 U.S.C. 4001 et seq.), whichever is less. ("Maximum limit of coverage available" is the lesser of the maximum limit available under the NFIP for the type of structure or the insurable value of the structure.) Insurance coverage must contain a MORTGAGEE CLAUSE/LENDER'S LOSS PAYABLE CLAUSE (or substantial equivalent) in favor of Lender. This clause must provide that any action or failure to act by the debtor or owner of the insured property will not invalidate the interest of Lender and SBA. (Borrower will be ineligible for any future SBA disaster assistance or business loan assistance if Borrower does not maintain any required flood insurance for the entire term of the Loan.)

b. **Real Estate Hazard Insurance** coverage (including any required additional coverage, such as wind, hail, earthquake, etc., if the business is located in a state that requires additional coverage) on all real estate that is collateral for the Loan in the amount of the full replacement cost. If full replacement cost insurance is not available, coverage must be for maximum insurable value. Insurance coverage must contain a MORTGAGEE CLAUSE (or substantial equivalent) in favor of Lender. This clause must provide that any action or failure to act by the mortgagor or owner of the insured property will not invalidate the interest of Lender. The policy or endorsements must provide for at least 10 days prior written notice to Lender of policy cancellation.

c. **Personal Property Hazard Insurance** coverage (including required additional coverage, such as wind, hail, earthquake, etc., if the business is located in a state that requires additional coverage) on all equipment, fixtures or inventory that is collateral for the Loan, in the amount of full replacement costs. If full replacement cost insurance is not available, coverage must be for maximum insurable value. Insurance coverage must contain a LENDER'S LOSS PAYABLE CLAUSE in favor of Lender. This clause must provide that any action or failure to act by the debtor or owner of the insured property will not invalidate the interest of Lender. The policy or endorsements must provide for at least 10 days prior written notice to Lender of policy cancellation.

d. **Life Insurance**, satisfactory to Lender:

(1) on the life of David McCord in the amount of $438,500.00.

Lender must obtain a collateral assignment of each policy with Lender as assignee and Lender must also obtain acknowledgment of the assignment by the Home Office of the Insurer. Lender must ensure that Borrower pays the premium on the policy.

e. **Liability Insurance** in an amount and with an insurance company satisfactory to Lender.

2. **Environmental Requirements**

a. Lender may not disburse the Loan until it has:

(1) completed the review for potential environmental contamination required in SOP 50 10 on each commercial real property site taken as collateral; and

(2) sufficiently minimized the risk from any adverse environmental findings discovered in the Environmental Investigation, or otherwise, as required by SOP 50 10 and applicable appendices.

b. Lender should consult with the local SBA office where the real property is located to ascertain any state or local environmental requirements.

3. **Borrower, Guarantor and Operating Company Documents**

a. Prior to closing, Lender must obtain from Borrower, Guarantor and Operating Company a current copy of each of the following as appropriate:

(1) **Corporate Documents**—Articles or Certificate of Incorporation (with amendments), any By-laws, Certificate of Good Standing (or equivalent), Corporate Borrowing Resolution, and, if a foreign corporation, current authority to do business within this state.

(2) **Limited Liability Company (LLC) Documents**—Articles of Organization (with amendments), Fact Statement or Certificate of Existence, Operating Agreement, Borrowing Resolution, and evidence of registration with the appropriate authority.

(3) **General Partnership Documents**—Partnership Agreement, Certificate as to Partners, and Certificate of Partnership or Good Standing (or equivalent), as applicable.

(4) **Limited Partnership Documents**—Partnership Agreement, Certificate as to Partners, and Certificate of Partnership or Good Standing (or equivalent), as applicable, Certificate of Limited Partnership, and evidence of registration with the appropriate authority.

(5) **Limited Liability Partnership (LLP) Documents**—Partnership Agreement, Certificate as to Partners, Certificate of Partnership or Good Standing (or equivalent) as applicable, and evidence of registration with the appropriate authority.

(6) **Trustee Certification**—A Certificate from the trustee warranting that:

(a) The trust will not be revoked or substantially amended for the term of the Loan without the consent of Lender/SBA;

(b) The trustee has authority to act;

(c) The trust has the authority to borrow funds, guarantee loans, and pledge trust assets;

(d) If the trust is an Eligible Passive Company, the trustee has authority to lease the property to the Operating Company;

(e) There is nothing in the trust agreement that would prevent Lender from realizing on any security interest in trust assets;

(f) The trust agreement has specific language confirming the above; and

(g) The trustee has provided and will continue to provide Lender/SBA with a true and complete list of all trustors and donors.

(7) **Trade Name**—Documentation that Borrower has complied with state requirements for registration of Borrower's or Operating Company's trade name (or fictitious name), if one is used.

b. Prior to closing, Lender must obtain from Borrower and Operating Company:

(1) **Ownership**—Evidence that ownership and management have not changed without Lender's approval since the application was submitted.

4. **Operating Information**

Prior to any disbursement of Loan proceeds, Lender must obtain:

a. **Verification of Financial Information**—Lender must submit IRS Form 4506-T to the Internal Revenue Service to obtain federal income tax information on Borrower, or the Operating Company if the Borrower is an EPC, for the last 3 years (unless Borrower or Operating Company is a start-up business). If the business has been operating for less than 3 years, Lender must obtain the information for all years in operation. This requirement does not include tax information for the most recent fiscal year if the fiscal year-end is within 6 months of the date SBA received the application. If the applicant has filed an extension for the most recent fiscal year, Lender must obtain a copy of the extension along with evidence of payment of estimated taxes. Lender must compare the tax data received from the IRS with the financial data or tax returns submitted with the Loan application, and relied upon in approving the Loan. Borrower must resolve any significant differences to the satisfaction of Lender and SBA. Failure to resolve differences may result in cancellation of the Loan.

   If the Loan involves a change of ownership, Lender must verify financial information provided by the seller of the business in the same manner as above.

   If the IRS responds and the transcript reflects "Record not Found" for any tax year, Lender must follow the procedures detailed in SOP 50 10 to determine what steps must be taken to satisfy the SBA tax verification requirement.

   If Lender is processing a loan under its delegated authority and does not receive a response from the IRS or copy of the tax transcript within 10 business days of submitting the IRS Form 4506-T, then Lender may close and disburse the loan provided that Lender sends a second request following precisely the procedures detailed in SOP 50 10 and Lender performs the verification and resolves any significant differences discovered, even if the Loan is fully disbursed.

b. **Authority to Conduct Business**—Evidence that Borrower and Operating Company have an Employer Identification Number and all insurance, licenses, permits and other approvals necessary to lawfully operate the business, including, but not limited to, the ability to operate at the business location.

c. **Flood Hazard Determination**—A completed Standard Flood Hazard Determination (FEMA Form 086-0-32).

d. **Lease**—Current lease(s) on all business premises where collateral is located with term, including options, at least as long as the term of the Loan.

5. **Appraisal**

Prior to disbursement, and in accordance with SOP 50 10, Lender must obtain:

a. **Real Estate Appraisal** on the real property located at 7483 West Q Ave, Kalamazoo MI 49009, showing a fair market value of at least $400,000.00.

6. **Certifications and Agreements**

a. **Additional Financing provided by** Kellogg Community CU **("Pari Passu Lender")**

   (1) Pari Passu Lender will provide additional financing to the Borrower at or about the same time for the same or a similar purpose financed by this Loan in the amount of $39,000.00 that will not be guaranteed by SBA (hereafter called the "Pari Passu Loan"). Both loans must be secured with the same collateral. Both loans must have a shared lien ("Pari Passu") on all collateral securing either loan and a shared position

with respect to any recovery from any other source, such as insurance or set-off. The outstanding principal balance of each loan at the time of default (as defined in this paragraph) on either loan will determine how to calculate the pro-rata sharing of each dollar collected after default. Default is defined as any condition or event which would constitute a default under the terms and conditions of either loan, even when such a condition or event has not yet been declared a default.

(2) Pari Passu Loan must include a cross default provision between the Pari Passu Loan and this Loan. The Pari Passu Lender must give the Lender written notice of default within 30 days of default on the Pari Passu Loan.

(3) Pari Passu Loan must not include the following in its note or loan documents:
   (a) A provision to allow future advances except advances made for the reasonable costs of collection, maintenance, and protection of Pari Passu Lender's shared lien.
   (b) A provision that permits the Pari Passu loan be cross-collateralized with other non-SBA financing provided by the Pari Passu Lender to Borrower (and/or Operating Company, if the Borrower on this Loan is an Eligible Passive Company).
   (c) A provision that permits the Pari Passu Lender to make demand on the Pari Passu Loan for reasons other than default.

(4) If the Pari Passu Lender transfers or assigns all or part of the Pari Passu Loan, the Pari Passu Lender must:
   (a) Notify all transferees and assigns of these requirements applicable to the Pari Passu Loan, which also must bind any transferee or assignee.
   (b) Notify the Lender of the transfer or assignment within 30 days of the transfer or assignment of the Pari Passu Loan.

(5) If the Pari Passu Loan is not made by the Lender then, prior to disbursement of this Loan, Lender must execute an Inter-Creditor Agreement with the Pari Passu Lender that includes the requirements identified in paragraphs (1), (2), (3), and (4) above and contains no provisions that conflict with or modify these requirements.

b. Prior to disbursement, Lender must require Borrower and Operating Company to certify that:

   (1) **Receipt of Authorization**—Borrower and Operating Company have received a copy of this Authorization from Lender, and acknowledge that:
      (a) The Authorization is not a commitment by Lender to make a loan to Borrower;
      (b) The Authorization is between Lender and SBA and creates no third party rights or benefits to Borrower;
      (c) The Note will require Borrower to give Lender prior notice of intent to prepay.
      (d) If Borrower defaults on Loan, SBA may be required to pay Lender under the SBA guaranty. SBA may then seek recovery of these funds from Borrower. Under SBA regulations, 13 CFR Part 101, Borrower may not claim or assert against SBA any immunities or defenses available under local law to defeat, modify or otherwise limit Borrower's obligation to repay to SBA any funds advanced by Lender to Borrower.
      (e) Payments by SBA to Lender under SBA's guarantee will not apply to the Loan account of Borrower, or diminish the indebtedness of Borrower under the Note or the obligations of any personal guarantor of the Note.
      (f) If the small business defaults on the SBA-guaranteed loan and SBA suffers a loss, the names of the small business and the guarantors of the SBA-guaranteed loan will be referred for listing in the Credit Alert Verification Reporting System

(CAIVRS) database, which may affect their eligibility for further financial assistance.

(2) There has been no adverse change in Borrower's (and Operating Company's) financial condition, organization, operations, or fixed assets since the date the Loan application was signed.

(3) **Child Support**—No principal who owns at least 50% of the ownership or voting interest of the company is delinquent more than 60 days under the terms of any (a) administrative order, (b) court order, or (c) repayment agreement requiring payment of child support.

(4) **Current Taxes**—Borrower and Operating Company are current (or will be current with any loan proceeds specified for eligible tax payments) on all federal, state, and local taxes, including but not limited to income taxes, payroll taxes, real estate taxes, and sales taxes.

(5) **Environmental**—For any real estate pledged as collateral for the Loan or where the Borrower or Operating Company (if applicable) is conducting business operations (collectively "the Property"):

(a) At the time Borrower and Operating Company submitted the Loan application, Borrower was in compliance with all local, state, and federal environmental laws and regulations pertaining to reporting or clean-up of any hazardous substance, hazardous waste, petroleum product, or any other pollutant regulated by state or federal law as hazardous to the environment (Contaminant), and regarding any permits needed for the creation, storage, transportation or disposal of any Contaminant;

(b) Borrower and Operating Company will continue to comply with these laws and regulations;

(c) Borrower and Operating Company, and all of its principals, have no knowledge of the actual or potential existence of any Contaminant that exists on, at, or under the Property, including groundwater under such Property, other than what was disclosed in connection with the Environmental Investigation of the Property;

(d) Until full repayment of the Loan, Borrower and Operating Company will promptly notify Lender and SBA if it knows or suspects that there has been, or may have been, a release of a Contaminant in, at, or under the Property, including groundwater, or if Borrower or Operating Company or such Property are subject to any investigation or enforcement action by any federal, state, or local environmental agency (Agency) pertaining to any Contaminant on, at, or under such Property, including groundwater;

(e) As to any Property owned by Borrower or Operating Company, Borrower and Operating Company indemnifies, and agrees to defend and hold harmless, Lender and SBA, and any assigns or successors in interest which take title to the Property, from and against all liabilities, damages, fees, penalties or losses arising out of any demand, claim or suit by any Agency or any other party relating to any Contaminant found on, at, or under the Property, including groundwater, regardless of whether such Contaminant resulted from Borrower's or Operating Company's operations. (Lender or SBA may require Borrower and Operating Company to execute a separate indemnification agreement).

c. Prior to disbursement, Lender must require Borrower and Operating Company to certify that they will:

(1) **Reimbursable Expenses**—Reimburse Lender for expenses incurred in the making and administration of the Loan.

(2) **Books, Records, and Reports**—
 (a) Keep proper books of account in a manner satisfactory to Lender;
 (b) Furnish year-end statements to Lender within 120 days of fiscal year end;
 (c) Furnish additional financial statements or reports whenever Lender requests them;
 (d) Allow Lender or SBA, at Borrower's or Operating Company's expense, to:
  [1] Inspect and audit books, records and papers relating to Borrower's and Operating Company's financial or business condition; and
  [2] Inspect and appraise any of Borrower's and Operating Company's assets; and
  [3] Allow all government authorities to furnish reports of examinations, or any records pertaining to Borrower and Operating Company, upon request by Lender or SBA.

(3) **Equal Opportunity**—Post SBA Form 722, Equal Opportunity Poster, where it is clearly visible to employees, applicants for employment and the general public.

(4) **American-made Products**—To the extent practicable, purchase only American-made equipment and products with the proceeds of the Loan.

(5) **Taxes**—Pay all federal, state, and local taxes, including income, payroll, real estate and sales taxes of the business when they come due.

(6) **Occupancy**—Comply with the following provisions: (a) Borrower must lease 100% of the Rentable Property to Operating Company; (b) Operating Company may sublease up to 49% of the Rentable Property for business or residential use; and (c) Operating Company will not use Loan proceeds to improve or renovate any of the Rentable Property that is to be sub-leased. Operating Company may provide up to 49% of the Rentable Property occupied by Operating Company for use by a resident owner or manager only if the nature of the business demands it.

(7) **Leasing** – During the life of the loan, the real estate pledged as Collateral for the Loan or where the Borrower or Operating Company conducts its business operations will not be leased to or occupied by any business that Borrower or Operating Company knows is engaged in any activity that is illegal under federal, state or local law or any activity that can reasonably be determined to support or facilitate any activity that is illegal under federal, state, or local law.

d. Lender must require Borrower and Operating Company to certify that they will not, without Lender's prior written consent:

(1) **Distributions**—Make any distribution of company assets that will adversely affect the financial condition of Borrower and/or Operating Company.

(2) **Ownership Changes**—Change the ownership structure or interests in the business during the term of the Loan.

(3) **Transfer of Assets**—Sell, lease, pledge, encumber (except by purchase money liens on property acquired after the date of the Note), or otherwise dispose of any of Borrower's property or assets, except in the ordinary course of business.

ADMINISTRATOR
SMALL BUSINESS ADMINISTRATION

By: Joanne King

For: Susan Ely, Loan Specialist

October 25, 2018
Date

In consideration of SBA's guarantee of the Loan to be made by Lender to Borrower, Lender accepts the above conditions.

KELLOGG COMMUNITY CU

By: Kirk Schwarz, Sr. Business Service Manager

Date

# Financial Disclosure Statement

To evaluate a hardship claim, the Small Business Administration (SBA) compares the expenses you claim against averages spent for those same expenses by families of the same size and income as yours. SBA considers proven expenses as reasonable up to the amount of these averages. If you claim more for an expense than the average spent by families like yours, you must provide persuasive explanation why the amount you claim is necessary. These average amounts were determined by the IRS from different government studies. You can find the average expense amount that SBA uses at the "Collection Financial Standards" page of the IRS website: http://www.irs.gov/Individuals/Collection-Financial-Standards

**Provide complete information about your family, income, and expenses.**

- **Complete all items.** Do not leave any item blank. If the answer is zero, write zero. If not applicable, write NA.
- **Disclose and provide documentation for all sources of income.** For wages, you must submit copies of two (2) of the most recent pay stubs for yourself and your spouse. Also provide documentation for other sources of income in your household. You may submit last year's W-2's and 1040 Income Tax Filing as proof of household income. Failure to provide this information may result in a denial of your claim of financial hardship.
- **Provide documentation of expenses.** Expenses may not be considered if you do not provide documents supporting the amounts claimed. Provide monthly or other statements for mortgage, car, insurance, and utility payments.

Based on the enclosed financial disclosure statement, I think I can afford to pay $____________per month to SBA.

I declare under penalties provided by 18 U.S.C. Section 1001 that the answers and statements contained herein are to the best of my knowledge and belief true, correct, and complete.

Signature ____________________________________________ Date ____________

**Warning:** 18 U.S.C. § 1001 provides that "whoever…knowingly and willfully falsifies, conceals, or covers up by any trick, scheme, or device a material fact, or makes any materially false, fictitious, or fraudulent statement or representation…shall be fined up to $10,000.00 or imprisoned up to five years, or both."

**Privacy Act Notice**

This request is authorized under 31 U.S.C. 3711 and 31 U.S.C. 3720D. You are not required to provide this information. If you do not, we cannot determine your financial ability to repay your SBA loan debt. The information you provide will be used to evaluate your ability to pay. It may be disclosed to government agencies and their contractors, to employees, lenders, and others to enforce this debt; to third parties in audit, research, or dispute about the management of this debt; and to parties with a right to this information under the Freedom of Information Act or other federal law, or with your consent. These uses are explained in the Code of Federal Regulations at Title 13, Part 102, et seq. We will send a copy at your request.

This is an attempt to collect a debt and any information obtained will be used for that purpose.

## A. PERSONAL INFORMATION

| | Respondent | Spouse (if any) |
|---|---|---|
| Full Name (First MI Last) | | |
| Street Address | | |
| City/State/Zip Code | | |
| County of Residence | | |
| Phone # | | |
| Date of Birth (MM/DD/YR) | | |
| Social Security # | | |
| Current Employer | | |
| Employer's Phone # | | |
| Present Position | | |
| How Long Employed | | |

| | |
|---|---|
| Number of Dependents (including self) | |
| Number of Cars Owned or Leased by Family | |

## B. INCOME

| | Respondent | F* | Spouse | F* | Other Contributors | F* |
|---|---|---|---|---|---|---|
| Gross Wages each Pay Period** | | | | | | |
| Less Deductions: | | | | | | |
| Federal & State Taxes | | | | | | |
| Social Security & Medicare | | | | | | |
| Health Insurance | | | | | | |
| Retirement/401K | | | | | | |
| Other | | | | | | |
| Net Wages each Pay Period | | | | | | |
| Commissions | | | | | | |
| Interest | | | | | | |
| Dividends/Capital Gains | | | | | | |
| Royalties | | | | | | |
| Pensions/Retirement/Annuities | | | | | | |
| Social Security | | | | | | |
| Rental Income | | | | | | |
| Alimony/Child Support | | | | | | |
| Business Profits/Losses | | | | | | |
| Other Income | | | | | | |

* Frequency: Weekly (W), Bi-Weekly (BW – once every two weeks), Bi-Monthly (BM – twice a month), or Monthly (M)
** Provide copy of two most recent pay stubs

## C. MONTHLY EXPENSES

| Housing and Utilities | |
|---|---|
| **Category** | **Amount** |
| Mortgage Payment or Rent | |
| Home or Renter's Insurance | |
| Home Maintenance | |
| Gas/Fuel | |
| Water/Sewer | |
| Power/Electricity | |
| Internet | |
| Garbage Collection | |
| Cellular Service | |

| Food, Clothing, and Other | |
|---|---|
| **Category** | **Amount** |
| Groceries | |
| Eating Out | |
| Housekeeping Supplies | |
| Clothing | |
| Dry Cleaning/Laundry | |
| Personal Care Products & Services | |
| Cellphone(s) | |
| Child Care | |
| Entertainment | |
| Memberships/Dues | |
| Other:________________ | |

| Transportation | |
|---|---|
| **Category** | **Amount** |
| Car Payment(s) | |
| Car Insurance | |
| Car Maintenance | |
| Gas | |
| Public Transportation | |
| Other:________________ | |

| Out-of-Pocket Health Care | |
|---|---|
| **Category** | **Amount** |
| Medical Services | |
| Prescription Drugs | |
| Medical Supplies | |
| Other:________________ | |

# Exhibit 14

**U.S. SMALL BUSINESS ADMINISTRATION**
**Covid EIDL Servicing Center**
**P.O. Box 156059, Fort Worth, TX 76155-2243**

**(833) 853-5638**
**For Relay**
**Service Dial**
**7-1-1**

**VIA USPS FIRST CLASS MAIL**

David McCord
150 Auburn St
Battle Creek, MI 49014

Re: Small Business Administration Loan No. 3103817008
Treasury Case No. L43330853

August 3, 2026

# Garnishment Hearing Decision

Dear David McCord:

This letter is in response to your request for a hearing concerning a potential Administrative Wage Garnishment ("AWG") action for the above-referenced loan.

I am the hearing official for your client's Administrative Wage Garnishment ("AWG") hearing request. I have reviewed your objections to the garnishment and rendered the following decision. As permitted under 13 C.F.R. § 140.11, I conducted a hearing based on review of the written record, after careful review of the arguments and the available records submitted by you or held by the U.S. Small Business Administration ("SBA").

This decision addresses all significant issues raised in *Hearing Request: Administrative Wage Garnishment* dated September 4, 2023, and the other documents that you have submitted to me subsequently. I will describe the procedures used, evidence considered, and the conclusions reached all in the context of the arguments you have raised. I will also describe the consequences of my decision and explain your rights after the decision

Summary of Proceedings to Date

On or about November 2, 2018, you executed a Note in the principal amount of $438,500.00 ("Note") for a loan, which was extended by SBA. The Loan was assigned SBA Loan No. 3103817008 (the "Loan").

After a default on the Loan, your obligation on the Loan was referred to the U.S. Department of Treasury ("Treasury") for collection pursuant to the Debt Collection Improvement Act of 1996 and its implementing regulations.

To that end, on or about September 4, 2023, the Treasury sent you a *Notice of Intent to Initiate Administrative Wage Garnishment Proceedings* ("Notice of Intent"). The Notice of Intent reflected a delinquent debt due in the amount of $64,539.79 and advised that a wage garnishment order would be issued to your employer to deduct up to 15 percent (15%) of your disposable pay each pay period until the debt (including interest, penalties, and costs) was paid in full, unless the debt were repaid, or a payment plan were entered into by October 4, 2023. The Notice of Intent further advised you of your right to request a hearing regarding the wage garnishment and indicated that if a written request for a hearing was received on or before September 26, 2023, a wage garnishment order would not be issued until after the hearing was held and a decision reached.

On or about September 4, 2023, you submitted to the Treasury, a Hearing Request objecting to administrative wage garnishment on the bases that you did not owe the full amount of the debt, and that garnishment would cause financial hardship.

The Hearing Request was assigned to the undersigned and an Acknowledgment of Request for Hearing Letter was sent to you on June 4, 2026 ("Acknowledgement Letter"). The Acknowledgment Letter advised that a written records hearing would be conducted and set a deadline of July 6, 2026, for you to submit all documentation in further support of your objection to garnishment.

SBA also provided documents for review and this written records hearing followed.

Evidence and Documentation Entered into the Record

1. Loan Authorization and Agreement ("LA&A") dated and signed on October 25, 2018.
2. Note dated and signed on November 2, 2018.
3. Unconditional Guarantee dated and signed on November 2, 2018.
4. Assignment to SBA dated and signed on October 25, 2024.
5. *Department of the Treasury Notice of Intent to Initiate Administrative Wage Garnishment Proceedings* dated September 4, 2023.
6. *Department of the Treasury Hearing Request*, Administrative Wage Garnishment and attached documentation:
    a. January 17, 2024, Letter from David and Tammy McCord to U.S. Department of the Treasury

b. August 9, 2023, Letter from David and Tammy McCord to U.S. Department of the Treasury

c. June 15, 2026, Letter from David and Tammy McCord to U.S. Small Business Administration

7. SBA Denver Finance Center Transcript of Account as of June 10, 2026.

8. Suchat Suwannakam, SBA Hearing Official, *Acknowledgement of Hearing Request* letter to David McCord dated June 4, 2026, with enclosed AWG Transfer File, Note and blank Financial Disclosure Statement sent via USPS Certified Mail, Return Receipt Tracking No. 7018 2290 0000 6575 4651.

Analysis and Determinations Regarding Objections to Garnishment

Pursuant to 13 C.F.R. § 140.11(e), written notice must be provided to a debtor's last known address at least thirty days before initiating garnishment and advise regarding the type and amount of the debt; the intent to collect the debt; and the debtor's rights—including the rights to request a hearing before a hearing official. The Notice of Intent sent to Petitioner conforms to these requirements.

In that regard, after the Notice of Intent was sent, Petitioner submitted a Hearing Request thereby prompting the instant written records hearing. See 13 C.F.R. § 140.11(f)(3) (permitting written records or "paper" hearings in place of oral argument). Petitioner submitted additional supporting with the Hearing Request.

**A. The Debt Is Valid.**

SBA bears the burden of proving the amount of the debt. 13 C.F.R. § 140.11(f)(8)(i). The record for this matter reflects that SBA has submitted evidence of the existence, amount, and past due status of the debt, as required by the applicable regulation. SBA has met this burden by providing a copy of the SBA Loan Authorization & Agreement, Note and Unconditional Guaranty signed by you and the SBA Transcript of Account, Certificate of Indebtedness and Certified Statement of Account. Therefore, I conclude that, based on the totality of the evidence in the hearing record, SBA has carried its burden to prove the existence and past due status of the debt and the valid amount of debt.

Treasury is permitted to charge additional fees, and SBA is authorized to add those fees to the debt owed. 31 U.S.C. § 3711(g)(6) states that Treasury is authorized to charge fees to creditor agencies to cover the costs of collecting transferred debts. Unless prohibited or otherwise provided by law, SBA must charge those costs to the debtor. See 31 U.S.C. § 3711; 31 C.F.R. § 285.12(j); 31 C.F.R. § 901.1(f). As noted above, SBA must include any fees the SBA is charged by the Treasury in the balance owed to SBA.
You owe the debt and owe the statutory collection costs of the Fiscal Service. (This is a liquidated amount, not contract damages.)

In that regard, after the Notice of Intent was sent, Petitioner submitted a Hearing Request thereby prompting the instant written records hearing. See 13 C.F.R. § 140.11(f)(3) (permitting written records or "paper" hearings in place of oral argument).

**B. Financial Hardship.**

You **did not** provide a *U.S. Department of the Treasury Financial Disclosure Statement.* The introduction to this Treasury form says:

> To evaluate a hardship claim, the U.S. Department of the Treasury (the Department) compares the expenses you claim and support against averages spent for those similar expenses by families of the same size and income as yours.

You object to garnishment on the basis that withholding an amount equal to 15% of your disposable pay would cause financial hardship. Both SBA and the Treasury account for hardship by evaluating family or household income.

Under the proposed garnishment order, 15% of your disposable pay per month will be withheld. Accordingly, after careful examination of the supporting documents submitted by you and the written record, I conclude that the proposed wage garnishment order would NOT cause you unreasonable financial hardship at this time.

You have not established that the proposed garnishment would cause an unreasonable financial hardship for you at this time. *See, e.g.*, Harrill v. United States Dep't of Educ., 2009 U.S. Dist. LEXIS 7045 (S.D. Ohio Jan. 29, 2009); *Norasteh v. U.S. Dept. of Education*, 2011 U.S. Dist. LEXIS 68128 (S.D.N.Y. March 18, 2011) (Government's decision to reject financial hardship claims was not arbitrary or capricious because borrower failed to provide supporting documents to substantiate his purported income and expenses).

**Conclusion**

Therefore, I have reached the following conclusions:

- SBA has met its burden of proving the existence and amount of a debt that you owe to the SBA **in the amount of $69,170.17 as of June 10, 2026.**
- Hardship has **NOT** been proven, **at this time.**
- Garnishment of your wages **is warranted at this time** for this debt.
- This AWG action may proceed, pursuant to 13 C.F.R. § 140.11.

This decision affects only the debt described in the Notice of garnishment and is totally separate from any notice of proposed Federal payment offset or garnishment you may have received from any other agency

**Consequences of Decision**

Your employer may not discharge you from employment, nor take disciplinary action against you because of an AWG order; nor can a prospective employer refuse to employ you as a result of this action. If any such actions for such reason are taken against you, you may wish to consider seeking legal counsel as to your rights against your employer.

Consistent with 13 C.F.R. § 140.11(f)(12), this is the final agency decision on this hearing for purposes of judicial review under the Administrative Procedure Act. *See* 5 U.S.C. §§ 701-706. To appeal this decision an action for judicial review in the United States District Court, 5 U.S.C. § 706.

Executed on August 3, 2026.

SUCHAT SUWANNAKAM Digitally signed by SUCHAT SUWANNAKAM Date: 2026.08.03 13:11:47 -04'00'

Hearing Official

Enclosures: SBA Transcript of Account

- SBA SERVICED, SINGLE INTEREST RATE LOAN

| | | | | | |
|---|---|---|---|---|---|
| NAME | McCord Alf LLC | | | TRANSCRIPT | **SBA** U. S. Small Business Administration Denver, CO 80259 |
| | | | | 47,755.50 | |
| LOAN NUMBER | 3103817008 | START DATE: | 01/01/93 | 21,414.67 | |
| LOAN APPROVAL DT | 10/25/2018 | LOAN TYPE: | 27 | 7A- Guaranty | |

ELIPS TRANSACTIONAL DATA

| EFFECTIVE DATE | INT DAYS | INT RATE | DISBURSEMENT | REMITTANCE | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/28/2023 | - | 7.500% | $ 47,755.50 | $ - | $ - | $ - | $ - | $ 47,755.50 | $ 10,237.92 | $ - | 2 |
| 5/11/2023 | 13 | 7.500% | $ - | $ - | $ - | $ - | $ - | $ 47,755.50 | $ 10,365.49 | $ 127.57 | 2 |
| 6/9/2026 | 1,125 | 7.500% | $ - | $ - | $ - | $ - | $ - | $ 47,755.50 | $ 21,404.86 | $ 11,039.37 | 2 |
| 6/10/2026 | 1 | 7.500% | $ - | $ - | $ - | $ - | $ - | $ 47,755.50 | $ 21,414.67 | $ 9.81 | 2 |
| Total | | | $ 47,755.50 | $ - | $ - | $ - | $ - | $ 47,755.50 | 21414.67 | $ 11,176.75 | |

F THE DATES INDICATED. TAKEN FROM THE RECORDS OF THIS AGENCY.

AUTHORIZED SIGNATURE

DATE

# Exhibit 15

**Tom DeLano**

**From:** Tara Steele <tsteele@kccu4u.org>
**Sent:** Thursday, September 17, 2026 1:03 PM
**To:** Tom DeLano
**Subject:** RE: Loan Files for Dave McCord

**Caution!** This message is potentially suspicious.
(From: tsteele@kccu4u.org, External)

**First-Time Sender**
This is the first message you've received from this sender. Be careful when replying or interacting with any attachments or links.

Report This Email FAQ Protection by INKY

Thanks for this – after reviewing a little more – I am showing an SBA payment that was sent to us in the amount of $36,537.03 that was the difference that was still owed from the sale of the property. That payment came on April 29th 2023.

Are you able to send me the documentation from the SBA that you have? I will work on gathering our stuff and send a big secure file to you. See below for the SBA payment that shows was posted to the loan.

Thanks

Tara

Name MM VENTURES LLC Current balance

Account # 355421-761 COMMERCIAL REAL EST Available

Search by: Date 00000000 Transaction amount 0.00

Desc ID

Debits Only | Credits Only

Options...

| Business Date | Activity Date | Activity Time | Amount | Interest | Balance |
|---|---|---|---|---|---|
| Apr 29, 2023 | Apr 29, 2023 | 08:51:29 | 36,537.03- | 720.40 | 3,198.21 |
| Apr 29, 2023 | Apr 29, 2023 | 08:57:01 | 5,413.10- | 5,413.10 | 3,198.21 |

If you have files to send to me, please use this secure link to my KCCU File Drop: https://sftp.kelloggccu.org/filedrop/tsteele

**Tara Steele**
*Assistant Vice President of Business Development*
Second Street Branch
41 2nd Street, P.O. Box 140
Battle Creek, MI 49016-0140
www.kccu4u.org
e: tsteele@kccu4u.org
o: 269-968-9251 ext. 2515

*Keep the Earth clean by going green! Consider the Environment before printing.*

***STATEMENT OF CONFIDENTIALITY:*** This e-mail, and any attachments, is intended only for use by the addressee and may contain legally privileged or confidential information. The opinions expressed here are my own and do not necessarily represent those of Kellogg Community Credit Union. If you are not the intended recipient of this e-mail, any dissemination, distribution or copying of this e-mail, and any attachments, is prohibited. If you have received this e-mail in error, please immediately notify me by telephone, permanently delete the original and any copy of the e-mail.

**NOTICE:** KCCU has transitioned our emails from @kelloggccu.org to @kccu4u.org. We will continue to support our original email addresses, but we ask that you please add the new @kccu4u.org email address to your contacts and whitelist this email, to ensure our emails continue to reach you. Thank you.

**From:** Tom DeLano <tdelano@xuereblawgroup.com>
**Sent:** Thursday, September 17, 2026 12:35 PM
**To:** Tara Steele <tsteele@kccu4u.org>
**Subject:** Loan Files for Dave McCord

**WARNING:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good Afternoon,

It was nice speaking with you today. I represent Dave McCord, who previously financed a business loan through your institution. As we discussed, the Small Business Administration has begun garnishing my client's wages weekly. The SBA alleges that there was an unpaid balance of about $65,000 on the loans financed by KCCU and guaranteed by the SBA. I believe that this balance is drawn from a document that got shuffled into my client's file but belonged in another individual's SBA loan file and then went unnoticed. I am reaching out to obtain copies of Dave's entire file regarding his business loans so that I can explain to a court that his obligations with KCCU were satisfied (and if they were not, what the status of those obligations were) and that the SBA made an error by concluding that he owed the SBA any money.

These accounts may be associated with account number 355421, but I am not certain that all of them would be.

If you need any more clarifying information from me, please reach out, and I will be happy to help.

Best,
Tom

XUEREB Law Group
*a professional corporation*
ATTORNEYS AT LAW

Thomas W. DeLano
Associate Attorney
Xuereb Law Group PC
39209 Six Mile Rd., Suite 165
Livonia, Michigan 48152
734-455-2000 Ext. 104
734-455-2013 fax

**CONFIDENTIALITY NOTICE: The documents accompanying this email transmission contain confidential information belonging to the sender, which is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance upon the contents of this email is strictly prohibited. If you have received this telecopy in error, please immediately notify us by telephone to arrange for return of the original documents to us.**

**CIRCULAR 230 DISCLOSURE: Any U.S. tax advice contained in this e-mail or any included attachments was not intended or written to be used, and cannot be used, for the purpose of: (i) avoiding penalties that may be imposed under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another person any tax-related matter.**

Name MM VENTURES LLC
Current balance 3,198.21

Account # 355421-761 COMMERCIAL REAL EST
Available 0.00

Search by: Date 00000000 Transaction amount 0.00

Desc ID

Debits Only | Credits Only | All | Toggle Description | Teller/Cash Activity

Options...

| Business Date | Activity Date | Activity Time | Amount | Interest | Balance | Description | Transfer Acct | ID |
|---|---|---|---|---|---|---|---|---|
| Apr 29, 2023 | Apr 29, 2023 | 08:51:29 | 36,537.03- | 720.40 | 3,198.21 | SBA PAYMENT | | Z2 |
| Apr 29, 2023 | Apr 29, 2023 | 08:57:01 | 5,413.10- | 5,413.10 | 3,198.21 | INTEREST ADJ | | Z2 |

# Exhibit 16

**Tom DeLano**

**From:** Tom DeLano
**Sent:** Wednesday, October 7, 2026 12:17 PM
**To:** Tara Steele
**Cc:** Lindsey Law
**Subject:** RE: Loan Files for Dave McCord

Good Afternoon,

I have received and had a chance to review the records that you provided to me. Unfortunately, I am still not understanding the mechanics of how KCCU determined that a deficiency remained on my client's loans. Specifically, how did KCCU determine the value of the July 1, 2021 payment of $383,009.85 against the principal amount remaining of $421,964.69? First, I would have expected that the deed in lieu of foreclosure that was executed on January 4, 2021, would have been executed in full satisfaction of any outstanding debts. But, the best I can tell from the documents you have provided so far is that the $383K+ that was applied against my client's loan came from proceeds from the June 30, 2021 sale of the property to Dinah Owiti and Jasper Mukwada for $445,000.00. If that is the case, I am uncertain of the mechanism that was used, but the entire purchase price, less some administrative costs, should have been applied against the loan balance, leaving no remaining deficiency.

I believe that KCCU is in possession of documents that would explain these discrepancies and the underlying procedures taken to arrive at the relevant numbers. My client is exceedingly frustrated with how difficult it has been to get information and documentation regarding his accounts at KCCU, and he is considering legal action to compel the production of his accounts. Please provide full accountings regarding all of my client's accounts before further legal action is necessary.

Thank you.
Tom DeLano
Counsel for David McCord

XUEREB Law Group
a professional corporation
ATTORNEYS AT LAW

Thomas W. DeLano
Associate Attorney
Xuereb Law Group PC
39209 Six Mile Rd., Suite 165
Livonia, Michigan 48152
734-455-2000 Ext. 104
734-455-2013 fax

**CONFIDENTIALITY NOTICE: The documents accompanying this email transmission contain confidential information belonging to the sender, which is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance upon the contents of this email is strictly prohibited. If you have received this telecopy in error, please immediately notify us by telephone to arrange for return of the original documents to us.**

**CIRCULAR 230 DISCLOSURE: Any U.S. tax advice contained in this e-mail or any included attachments was not intended or written to be used, and cannot be used, for the purpose of: (i) avoiding penalties that may be imposed under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another person any tax-related matter.**

---

**From:** Tara Steele <tsteele@kccu4u.org>
**Sent:** Thursday, October 1, 2026 12:32 PM
**To:** Tom DeLano <tdelano@xuereblawgroup.com>
**Cc:** Lindsey Law <LLaw@kccu4u.org>
**Subject:** RE: Loan Files for Dave McCord

**Caution!** This message is potentially suspicious.
(From: tsteele@kccu4u.org, External)

**Sensitive Content**
The message appears to discuss sensitive information (e.g., passwords, account information, etc). If possible, instead of clicking a link, go directly to the sender's web site to carry out the requested action, or confirm the request outside of email before replying.

XUEREB Law Group ATTORNEYS AT LAW

Report This Email FAQ Protection by INKY

I uploaded a copy of David's loan closing documents along with a 1 page document that shows the breakdown of what the property sold for and what the balance was that was left over to you via our secure portal – you should see that shortly. The SBA did provide us their guarantee – so it is possible that they could be trying to re coop that.

Now that paperwork you provided that lists another borrower – that does appear to potentially be an error on the SBA's part, but that did not come from KCCU.

Hopefully the documents I provided help you.

Please let us know if there is anything further that you need from us.

Tara

---

**From:** Tom DeLano <tdelano@xuereblawgroup.com>
**Sent:** Wednesday, September 30, 2026 12:56 PM
**To:** Tara Steele <tsteele@kccu4u.org>
**Cc:** Lindsey Law <LLaw@kccu4u.org>
**Subject:** RE: Loan Files for Dave McCord

**WARNING:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good Afternoon,

Are you able to provide an update regarding when I will be able to receive a copy of my client's records?

Thank you,

Tom

XUEREB Law Group
a professional corporation
ATTORNEYS AT LAW

Thomas W. DeLano
Associate Attorney
Xuereb Law Group PC
39209 Six Mile Rd., Suite 165
Livonia, Michigan 48152
734-455-2000 Ext. 104
734-455-2013 fax

**CONFIDENTIALITY NOTICE: The documents accompanying this email transmission contain confidential information belonging to the sender, which is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance upon the contents of this email is strictly prohibited. If you have received this telecopy in error, please immediately notify us by telephone to arrange for return of the original documents to us.**

**CIRCULAR 230 DISCLOSURE: Any U.S. tax advice contained in this e-mail or any included attachments was not intended or written to be used, and cannot be used, for the purpose of: (i) avoiding penalties that may be imposed under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another person any tax-related matter.**

---

**From:** Tara Steele <tsteele@kccu4u.org>
**Sent:** Thursday, September 24, 2026 4:03 PM
**To:** Tom DeLano <tdelano@xuereblawgroup.com>
**Cc:** Lindsey Law <LLaw@kccu4u.org>
**Subject:** RE: Loan Files for Dave McCord

Tom,
Thanks for your patience while my boss was on vacation. We are still working through things internally to gather the necessary information. We will be in touch when we have more information for you.

Thank you

Tara

---

**From:** Tom DeLano <tdelano@xuereblawgroup.com>
**Sent:** Friday, September 18, 2026 12:21 PM
**To:** Tara Steele <tsteele@kccu4u.org>
**Subject:** RE: Loan Files for Dave McCord

**WARNING:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good Morning, Tara,

Thank you for the message. While I do understand, if there is even a subset of my client's file that you are able to send either him or me sooner than next week, I would appreciate it. With weekly garnishments, my client is understandably interested in keeping things moving as much as possible.

Best,
Tom

XUEREB Law Group
a professional corporation
ATTORNEYS AT LAW

Thomas W. DeLano
Associate Attorney
Xuereb Law Group PC
39209 Six Mile Rd., Suite 165
Livonia, Michigan 48152
734-455-2000 Ext. 104
734-455-2013 fax

**CONFIDENTIALITY NOTICE: The documents accompanying this email transmission contain confidential information belonging to the sender, which is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance upon the contents of this email is strictly prohibited. If you have received this telecopy in error, please immediately notify us by telephone to arrange for return of the original documents to us.**

**CIRCULAR 230 DISCLOSURE: Any U.S. tax advice contained in this e-mail or any included attachments was not intended or written to be used, and cannot be used, for the purpose of: (i) avoiding penalties that may be imposed under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another person any tax-related matter.**

---

**From:** Tara Steele <tsteele@kccu4u.org>
**Sent:** Friday, September 18, 2026 11:24 AM
**To:** Tom DeLano <tdelano@xuereblawgroup.com>
**Subject:** RE: Loan Files for Dave McCord

Tom – my boss wants us to review everything together when she gets back next week and we will also be double checking with our attorney who helped in the process – so I will be in touch more end of next week.

Thanks

Tara

If you have files to send to me, please use this secure link to my KCCU File Drop: https://sftp.kelloggccu.org/filedrop/tsteele

**Tara Steele**
*Assistant Vice President of Business Development*
Second Street Branch
41 2nd Street, P.O. Box 140

Battle Creek, MI 49016-0140
www.kccu4u.org
e: tsteele@kccu4u.org
o: 269-968-9251 ext. 2515

*Keep the Earth clean by going green! Consider the Environment before printing.*

***STATEMENT OF CONFIDENTIALITY:*** This e-mail, and any attachments, is intended only for use by the addressee and may contain legally privileged or confidential information. The opinions expressed here are my own and do not necessarily represent those of Kellogg Community Credit Union. If you are not the intended recipient of this e-mail, any dissemination, distribution or copying of this e-mail, and any attachments, is prohibited. If you have received this e-mail in error, please immediately notify me by telephone, permanently delete the original and any copy of the e-mail.

**NOTICE:** KCCU has transitioned our emails from @kelloggccu.org to @kccu4u.org. We will continue to support our original email addresses, but we ask that you please add the new @kccu4u.org email address to your contacts and whitelist this email, to ensure our emails continue to reach you. Thank you.

**From:** Tom DeLano <tdelano@xuereblawgroup.com>
**Sent:** Thursday, September 17, 2026 12:35 PM
**To:** Tara Steele <tsteele@kccu4u.org>
**Subject:** Loan Files for Dave McCord

**WARNING:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good Afternoon,

It was nice speaking with you today. I represent Dave McCord, who previously financed a business loan through your institution. As we discussed, the Small Business Administration has begun garnishing my client's wages weekly. The SBA alleges that there was an unpaid balance of about $65,000 on the loans financed by KCCU and guaranteed by the SBA. I believe that this balance is drawn from a document that got shuffled into my client's file but belonged in another individual's SBA loan file and then went unnoticed. I am reaching out to obtain copies of Dave's entire file regarding his business loans so that I can explain to a court that his obligations with KCCU were satisfied (and if they were not, what the status of those obligations were) and that the SBA made an error by concluding that he owed the SBA any money.

These accounts may be associated with account number 355421, but I am not certain that all of them would be.

If you need any more clarifying information from me, please reach out, and I will be happy to help.

Best,
Tom

XUEREB Law Group
a professional corporation
ATTORNEYS AT LAW

Thomas W. DeLano
Associate Attorney
Xuereb Law Group PC
39209 Six Mile Rd., Suite 165
Livonia, Michigan 48152
734-455-2000 Ext. 104
734-455-2013 fax

**CONFIDENTIALITY NOTICE: The documents accompanying this email transmission contain confidential information belonging to the sender, which is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance upon the contents of this email is strictly prohibited. If you have received this telecopy in error, please immediately notify us by telephone to arrange for return of the original documents to us.**

**CIRCULAR 230 DISCLOSURE: Any U.S. tax advice contained in this e-mail or any included attachments was not intended or written to be used, and cannot be used, for the purpose of: (i) avoiding penalties that may be imposed under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another person any tax-related matter.**